GILBERT, KELLY, CROWLEY & JENNETT LLP
OWEN T. ROONEY / Bar No. 127830
44 Montgomery Street, Suite 2080
San Francisco, California 94104-6702
(415) 627-9000; FAX: (213) 615-7100

Mailing Address:
550 South Hope Street, 22nd Floor
Los Angeles, California 90071-2627

Attorneys for Defendants
BAY AREA RAPID TRANSIT DISTRICT and JON
TOUGAS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH JAMES GREER, | ) Case No. 3:15-cv-02307-WHO |
| Plaintiff, | ) DEFENDANT BAY AREA RAPID |
| v. | ) TRANSIT DISTRICT'S NOTICE OF |
| | ) MOTION FOR SUMMARY JUDGMENT |
| | ) OR PARTIAL SUMMARY JUDGMENT |
| CITY OF HAYWARD, BAY AREA RAPID | ) AND MEMORANDUM OF POINTS AND |
| TRANSIT DISTRICT, and DOES 1-50, | ) AUTHORITIES IN SUPPORT THEREOF |
| Defendant. | ) Date: January 4, 2017 |
| | ) Time: 2:00 p.m. |
| | ) Court Room: 2 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on January 4, 2017 at 2:00 p.m. in Courtroom 2 of the above-entitled court, defendant Bay Area Rapid Transit District (BART) and Tougas will move the Court for an order granting summary judgment or partial summary judgment pursuant to Federal Rule of Civil Procedure 56 on the grounds that there is no genuine issue of material fact as to the following issues:

1. The use of force by Sgt. Tougas with the BART Police Department was reasonable;

2. That Sgt. Tougas is entitled to qualified immunity;

DEFENDANT BAY AREA RAPID TRANSIT DISTRICT'S MOTION FOR SUMMARY JUDGMENT

3. There was no loss of a familial relationship;

4. That Sgt. Tougas was not deliberately indifferent to decedent Greer's medical condition;

5. Sgt. Tougas was not an integral participant;

6. There is no proximate cause between Mr. Greer's death and the actions of Sgt. Tougas;

7. BART is immune under Government Code §845.6

8. That there is no viable Monell claim against BART; and

9. Sgt. Tougas did not have a reasonable opportunity to intercede.

Accordingly, defendants BART and TOUGAS are entitled to summary judgment as a matter of law. Moving parties seek an order granting this Motion for Summary Judgment dismissing this action in its entirety with prejudice. This Motion is based on this Notice of Motion and Memorandum of Points and Authorities, the Declaration of Owen T. Rooney, the Declaration of Jon Tougas, Declaration of Jared Zwickey and Declaration of Lance Haight.

Dated: November 29, 2016  GILBERT, KELLY, CROWLEY & JENNETT, LLP


        /s/ Owen T. Rooney
        OWEN T. ROONEY, Attorney for Defendants

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Gilbert, Kelly
Crowley & Jennett LLP
Attorneys at Law

4157172.1  08433-00004

# **TABLE OF CONTENTS**

I.     Introduction.................................................................................................. 1

II.    Allegations in Second Amended Complaint................................................ 1

III.   Statement of Facts........................................................................................ 2

     A.   The Traffic Stop................................................................................ 2

     B.   The Field Sobriety Test .................................................................... 3

     C.   Mr. Greer Tried to Leave the Scene ................................................ 4

     D.   The Struggle...................................................................................... 4

     E.   Sgt. Tougas Did Not Tase, Strike or Straddle Mr. Greer ................ 7

     F.   Independents Witnesses Support the Police Officers' Testimony...... 7

     G.   Only Hayward Officers Apply the WRAP ...................................... 8

     H.   Medical Care Was Promptly Administered ...................................... 8

     I.   BART Police Training ....................................................................... 9

     J.   Summary of Autopsy and Medical Treatment.................................. 9

III.   LEGAL ANALYSIS ..................................................................................... 9

     A.   Sgt. Tougas' Use of Force Was Reasonable..................................... 9

     B.   Sgt. Tougas is Entitled to Qualified Immunity .............................. 12

     C.   No Loss of Familial Relationship ................................................... 14

     D.   Sgt. Tougas Was Not Deliberately Indifferent To Decedent's Medical Needs ................................................................................. 15

     E.   Sgt. Tougas Was Not an "Integral Participant" ............................. 18

     F.   No Proximate Cause Between Mr. Greers' Death and the Actions of Sgt. Tougas........................................................................................ 19

     G.   BART is Immune under Government Code §845.6 ........................ 20

     H.   There Is No Viable Monell Claim .................................................. 21

     I.   Sgt. Tougas Did Not Have an Opportunity to Intercede ................ 23

IV.   CONCLUSION ........................................................................................... 23

DEFENDANT BAY AREA RAPID TRANSIT DISTRICT'S MOTION FOR SUMMARY JUDGMENT

Gilbert, Kelly
Crowley & Jennett LLP
Attorneys at Law

4157172.1  08433-00004  GKC

# TABLE OF AUTHORITIES

**CASES**

Blankenhorn v. City of Orange, 485 F. 3d 463, 477 (9th Cir., 2007)...........................................10, 18

Brosseau v. Haugen 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed. 2d 583 (2004)........................... 13

Brown v. City and County of San Francisco, 2014 WL 1364931 (N.D. CA April 7, 2014) ........... 19

Bryan v. MacPherson 630 F.3d 805, 826 (9th Cir., 2010) ..................................................... 13

Castaneda v. Dept. of Corrections and Rehabilitation (2013) 212 Cal. App. 4th 1051, 1070-1071 . 20

Chuman v. Wright 76 F. 3d 292, 295 (9th Cir., 1996) ...................................................... 11

City & County of San Francisco v. Sheehan 135 S.Ct. 1765, 1775, 191 L.Ed. 2d 856, 867-868

    (2015) ............................................................................................ 10

City of Canton v. Harris 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed. 2d 412 (1989)....................15, 16

City of Oklahoma City v. Tuttle, 471 U.S. 808, 824, 105 S. Ct. 2423, 85 L.Ed. 2d 791 (1985) ..... 22

Cunningham v. Gates 229 F.3d 1271, 1289-1290 (9th Cir., 2000) ........................................ 23

Forrester v. County of San Diego 25 F.3d 804, 807 (9th Cir., 1984.)..................................... 11

George v. Morris 736 F.3[rd] 829, 838 (9th Cir., 2013.) ......................................................... 11

Gonzales v. City of Anaheim 747 F.3[rd] 789, 797 (9th Cir., 2014..................................................... 15

Graham v. Conner 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed 2nd 443 (1989............................ 10

Guy v. County of San Diego, 2008 WL 506218, at p. 6 (S.D. CA, Feb. 25, 2008) ...................... 16

Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed 2d 396 (1982) ....................... 12

Heien v. North Carolina, 135 S.Ct. 530, 536, 190 L.Ed 2nd 475, 482 (2014) ................................. 13

Hobkins v. Bonvicino 573 F. 3d 752, 770 (9th Cir., 2009)....................................................... 18

Kraft v. Laney 2005 WL 2042310 (E.D. CA, Aug. 24, 2005.) .................................................. 16

Lolli v. County of Orange 351 F.3d. 410 (9th Cir., 2003)..............................................16, 17

Manetta v. City of Seattle, 409 F. 3d 1113, 1147 (9th Cir., 2005) ............................................ 22

Mattos v. Agarano 590 F. 3d 1082, 1089 (9th Cir., 2010) ...................................................... 13

McSherry v. City of Long Beach, 584 F. 3d 1129, 1147(9th Cir., 2009.).................................... 22

Mendez v. Montour, 2014 WL 1218665 ND CA March 21, 2014…………………………………..19

DEFENDANT BAY AREA RAPID TRANSIT DISTRICT'S MOTION FOR SUMMARY JUDGMENT

Gilbert, Kelly
Crowley & Jennett LLP
Attorneys at Law

4157172.1  08433-00004  GKC

Monell v. Department of Social Services, 436 U.S. 658, 690-691, 98 S.Ct. 2018, 56 L. Ed. 2d 611 (1978) ............................................................................................................... ii, 16, 21, 22

Mullenix v. Luna 136 S.Ct 305, 193 L.Ed 2d 255 (2015) ................................................. 13

Palacios v. City of Oakland 970 F. Supp. 732 740 (ND CA 1987) ................................... 11

Porter v. Osborn 546 F. 3d 1131 (9th Cir., 2008 ............................................................... 14

Prasad v. County of Sutter, 958 F. Supp. 2d 1101, 1117 (E.D. CA, 2013) ............................ 20, 21

Ryburn v. Huff, 132 S.Ct. 987, 991-992, 181 L.Ed 2d 966, 972 (2012) ......................... 10

Thompson v. City of Los Angeles, 885 F. 2d 1139, 1143 (9th Cir., 1988) ......................... 22

Toguchi v. Chung 391 F.3d. 1051 (9th Cir., 2004) ........................................................... 17

Trevino v. Gates, 99 F3d 911, 918 (9th Cir., 1996.) ......................................................... 22

**STATUTES**

Government Code § 815 ..................................................................................................... 20

Government Code §845.6 ............................................................................................. iii, 20, 21

Penal Code §835 ................................................................................................................ 14

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Gilbert, Kelly
Crowley & Jennett LLP
Attorneys at Law

4157172.1  08433-00004

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.     Introduction

On the evening of May 23, 2014 Sgt. Tougas with the BART Police Department provided unsolicited backup for Lt. Lutzinger with the Hayward Police Department who had pulled over James Greer for suspected driving under the influence.   During the course of administering the field sobriety test, Mr. Greer became agitated and combative and then attempted to walk away from Lt. Lutzinger.   A struggle ensued between numerous Hayward police officers and Sgt. Tougas and Mr. Greer who exhibited extraordinary strength, due to his having consumed a lethal dose of acute phencyclidine (PCP).  Six police officers were required to subdue Mr. Greer.  As a result of the struggle, Mr. Greer went into cardiac arrest.  Even though the paramedics were on scene, they were unable to revive Mr. Greer.   Notwithstanding the general allegations in the Second Amended Complaint to the use of a taser and the WRAP[1] and asphyxia, Sgt. Tougas did not use his taser, he was not involved in application of the WRAP or any conduct that lead to asphyxia.  On that basis, Sgt. Tougas and BART are entitled to summary judgment.

## II.     Allegations in Second Amended Complaint

Filed by Mr. Greer's 22 year old son, the Second Amended Complaint contains causes of action for: 1) wrongful death, 2) a violation of decedent's Fourth Amendment rights, and 3) a violation of decedent's Fourteenth Amendment rights.

The first cause of action alleges that officers from the Hayward Police Department and Tougas with BART "were negligent and careless in their actions on the evening of March (sic) 23, 2014 by: deliberately and intentionally Tasering decedent at least three times in rapid succession; placing decedent in a WRAP and applying pressure to decedent's back even though he was unconscious, resulting in asphyxia; and failing to administer, or otherwise depriving decedent of, reasonable medical treatment once it was apparent that decedent was in medical distress." (Doc. 38, p. 3:3-5 and p. 5:26-6:3).

_____

[1] A three part device used by police to subdue a combative subject.

DEFENDANT BAY AREA RAPID TRANSIT DISTRICT'S MOTION FOR SUMMARY JUDGMENT

Gilbert, Kelly
Crowley & Jennett LLP
Attorneys at Law

4157172.1  08433-00004 GKC

1    After repeating the foregoing allegation, the second cause of action alleges BART failed "to

2    prevent, provide supervision of, and/or proper training to officers … so that violations of federal

3    civil rights would not occur, resulting in the use of excessive force – as alleged above – against

4    persons such as decedent. Defendants HAYWARD and BART acted with deliberate indifference

5    to the obvious consequences of the failure to prevent, supervise, or train their officers not to engage

6    in the above conduct, which was a moving force in decedent's death." (Doc. 38, p. 7:13-18.)

7    The allegations in the third cause of action mirror those in the first and second causes of

8    action. (Doc. 38, p. 8:8-17.)

9

10                       **III.    Statement of Facts**

11       **A. The Traffic Stop**

12       Between 10:00- 11:00 p.m., decedent James Greer was observed driving erratically and he

13   twice proceeded straight from a left turn lane which almost caused a collision and then he came to a

14   stop in the no. 1 lane of travel. Accordingly, Hayward Police Department Lt. Lutzinger attempted

15   to initiate a traffic stop. Mr. Greer initially complied but as soon as Lt. Lutzinger exited his patrol

16   car, Mr. Greer drove away. Lt. Lutzinger followed and Mr. Greer ultimately turned into a K-Mart

17   parking lot and came to a stop. (Declaration of Owen T. Rooney, Exhibit A, Lutzinger deposition,

18   p. 13:10-13 and p. 38:12-41:24.) Lt. Lutzinger suspected Mr. Greer was under the influence.

19   (Declaration of Owen T. Rooney, Exhibit A, Lutzinger deposition, p. 42:17-19.)

20       Lt. Lutzinger exited his vehicle and directed Mr. Greer to turn off the engine and drop the

21   keys from the window. Mr. Greer did not do so, fearing that he would break the key. Lt. Lutzinger

22   again told Mr. Greer to drop the key or place them on the roof of the vehicle. Mr. Greer was

23   "verbally challenging" from the outset after stopping. (Declaration of Owen T. Rooney, Exhibit A,

24   Lutzinger deposition, p. 44:9-21 and 46:18-47:20.)

25       Realizing that Lt. Lutzinger was alone, Sgt. Tougas with BART asked Lt. Lutzinger if he

26   needed assistance, to which he responded affirmatively. (Declaration of Owen T. Rooney, Exhibit

27   A, Lutzinger deposition, p 51:25-52:24 and Exhibit B, Tougas deposition, p. 32:1-14 and p.37:19-

28   38:15.) Two Hayward officers, Officer Clark and Officer Lewandowski, then arrived, which was

Gilbert, Kelly
Crowley & Jennett LLP
Attorneys at Law

4157172.1  08433-00004

1  routine for the Hayward Police Dept. (Declaration of Owen T. Rooney, Exhibit A, Lutzinger

2  deposition, p. 54:15-18 and p. 37:23-38:2 and Exhibit C, Lewandowski deposition, p. 15:15-20, p.

3  26:11-18 and p. 27:14-22.)

4        Lt. Lutzinger and Sgt. Tougas did not know each other before this evening. (Declaration of

5  Owen T. Rooney, Exhibit A, Lutzinger deposition, p. 51:21-22 and Exhibit B, Tougas deposition,

6  p. 34:1-5.)

7  **B. The Field Sobriety Test**

8        Initially, Mr. Greer "was fumbling" to retrieve his driver license, his face was flushed, his

9  eyes were glassy and was incoherent, furthering the lieutenant's suspicions. (Declaration of Owen

10  T. Rooney, Exhibit A, Lutzinger deposition, p. 48:16-49:10 and p. 50:5-12.)  Mr. Greer had been

11  argumentative and partially uncooperative up to this point.  Based on the totality of the

12  circumstances, Lt. Lutzinger thought Mr. Greer might become physically combative. (Declaration

13  of Owen T. Rooney, Exhibit A, Lutzinger deposition, p. 52: 25-54:7.)

14        After back-up arrived, Lt. Lutzinger directed Mr. Greer to exit his truck for purposes of

15  conducting a field sobriety test.  Initially, Mr. Greer was patted down (a pocket knife was found)

16  and then a Nystagmus test was administered on the driver's side of the vehicle.  (Declaration of

17  Owen T. Rooney, Exhibit A, Lutzinger deposition, p. 58:14-60:5 and p. 62:12-15, Exhibit B,

18  Tougas deposition, p. 43:17-44:7 and Exhibit C, Lewandowski deposition, p. 37:12-24.)

19        After exiting his vehicle, Mr. Greer continued to be verbally challenging. (Declaration of

20  Owen T. Rooney, Exhibit A, Lutzinger deposition, p. 59:3-7.)

21        Mr. Greer was unable to track Lt. Lutzinger's fingers during the Nystagmus test.  Believing

22  that additional field sobriety tests were needed, Mr. Greer was directed to the passenger's side of

23  the pickup truck where the ground was more level and the balance test could be administered.

24  (Declaration of Owen T. Rooney, Exhibit A, Lutzinger deposition, p. 64:18-69:22 and p. 67:22-

25  68:5, Exhibit B, Tougas deposition, p. 45:13-18 and Exhibit C, Lewandowski deposition, p. 38:17-

26  38:13 and p. 42:6-12.)  Lt. Lutzinger continued to believe that Mr. Greer was under the influence of

27  an undetermined substance. (Declaration of Owen T. Rooney, Exhibit A, Lutzinger deposition, p.

28  67:9-13.)

1    After relocating to the passenger's side, Mr. Greer continued to ask- as he had throughout

2    the encounter - questions such as "what's going on? "why are you bothering me?" and "why

3    messing with me?" (Declaration of Owen T. Rooney, Exhibit A, Lutzinger deposition, p. 68:9-13

4    and Exhibit B, Tougas deposition, p. 42:21-25.)    Repeated questioning demonstrates an altered

5    level of cognition. (Declaration of Owen T. Rooney, Exhibit A, Lutzinger deposition, p. 68:20-25.)

6        During the course of the balance test, Mr. Greer was unable to follow the basic commands

7    of putting his feet together and his hands by his side. (Declaration of Owen T. Rooney, Exhibit A,

8    Lutzinger deposition, p. 71:17-72:16 and p. 73:12-19, Exhibit B, Tougas deposition, p. 50:20-51:11

9    and Exhibit C, Lewandowski deposition, p. 53:12-54:15 and p. 42:6-12.) During the course of the

10   balance test, Mr. Greer's agitation increased. (Declaration of Owen T. Rooney, Exhibit A,

11   Lutzinger deposition, p. 71:17-72:16 and p. 73:1-8, Exhibit B, Tougas deposition, p. 51:22-52:17

12   and Exhibit C, Lewandowski deposition, p. 49:15-50:1 and 51:2-12.) Mr. Greer's inflection and

13   demeanor changed and he started to spread his feet and moving around and hike up his shorts,

14   which is pre-assaultive behavior. (Declaration of Owen T. Rooney, Exhibit A, Lutzinger

15   deposition, p. 75:23-76:19, Exhibit B, Tougas deposition, p. 52:18-53:6 and Exhibit C,

16   Lewandowski deposition, p. 49:15-50:1, 51:2-12.)

17   **C. Mr. Greer Tried to Leave the Scene**

18       Mr. Greer then began to walk away from Lt. Lutzinger who attempted to apply a twist wrist

19   lock for pain compliance. (Declaration of Owen T. Rooney, Exhibit A, Lutzinger deposition, p.

20   76:20-77:3 and p. 80:14-18, Exhibit B, Tougas deposition, p. 55:16-56:2 and Exhibit C,

21   Lewandowski deposition, p. 59:21-61:8.)

22   **D. The Struggle**

23       The other officers began struggling with Mr. Greer and inexplicably, all of the officers and

24   Mr. Greer wound up on the ground. Mr. Greer was told to put his arms behind his back which he

25   did not do; the officers wanted Mr. Greer handcuffed. (Declaration of Owen T. Rooney, Exhibit A,

26   Lutzinger deposition, p. 80:19-81:18, Exhibit B, Tougas deposition, p. 62:3-63:3 and Exhibit C,

27   Lewandowski deposition, p. 66:25-67:6 and p. 69:12-23.)    None of the officers executed a

28   takedown maneuver. Although Sgt. Tougas wanted Mr. Greer on the ground he did not execute any

Gilbert, Kelly
Crowley & Jennett LLP
Attorneys at Law

4157172.1  08433-00004

1  take down maneuver and possibly their feet became tangled. (Declaration of Owen T. Rooney,

2  Exhibit A, Lutzinger deposition, p. 82:14-83:22, Exhibit B, Tougas deposition, p. 57:14-24, p.

3  60:11-62:2 and p. 63:16-21 and Exhibit C, Lewandowski deposition, p. 68:22-69:3, Exhibit H,

4  Hendricks deposition, p. 62:9-63:3.)  Sgt. Tougas grabbed the back of Mr. Greer's T-shirt.

5  (Declaration of Owen T. Rooney, Exhibit B, Tougas deposition, p. 56:22-23.)

6  Several times at the outset of the struggle, Mr. Greer was warned by the police officers and

7  Sgt. Tougas in particular, to relax, calm down and to stop resisting, all to no avail. (Declaration of

8  Owen T. Rooney, Exhibit A, Lutzinger deposition, p. 80:19-81:4 and Exhibit B, Tougas deposition,

9  p. 58:24-59:4.)    The police told at least five times to relax and seven times to put his hands

10  behind his back before Mr. Greer and the officers fell to the ground.  All total, the officers

11  including Sgt. Tougas, told Mr. Greer approximately thirteen times to put his hands behind his back

12  and approximately thirty times to calm down and to stop resisting before he was ultimately

13  handcuffed. (Declaration of Jared Zwickey, ¶14.)

14  Initially, Mr. Greer was on his right side or back and ultimately, he was rolled over on to

15  his stomach.  He grabbed hold of the trailer hitch at the rear of his pickup truck.  He then had his

16  hands beneath his torso and the officers struggled for several minutes to gain control of Mr. Greer's

17  hands.  Particularly, Sgt. Tougas and Officer Clark were on Mr. Greer's right side and Lt.

18  Lutzinger and Officer Lewandowski were on the left.  (Declaration of Owen T. Rooney, Exhibit A,

19  Lutzinger deposition, p. 85:17-86:18 and p. 87:3-17, Exhibit B, Tougas deposition, p. 67:7-68:22

20  and Exhibit C, Lewandowski deposition, p. 71:14-18, p. 73:19-25 and p. 74:7-75:7.)  There was a

21  "continual struggle" to control Mr. Greer's hands.  (Declaration of Owen T. Rooney, Exhibit A,

22  Lutzinger deposition, p. 85:18.)

23  During the course of the struggle, Mr. Greer repeatedly asked "What are you guys doing?"

24  and "You know who you're f*****g messing with!" and other similar comments. (Declaration of

25  Owen T. Rooney, Exhibit B, Tougas deposition, p. 81:23-82:8)

26  Several minutes into the struggle, Lt. Lutzinger expressly warned Mr. Greer that he would

27  be tased if he did not stop resisting.  Lt. Lutzinger then discharged his taser in dart mode on two

28  occasions which did not have any effect. (Declaration of Owen T. Rooney, Exhibit A, Lutzinger

Gilbert, Kelly
Crowley & Jennett LLP
Attorneys at Law

4157172.1  08433-00004

deposition, p. 89:22-90:3.)

During the course of the struggle, Hayward Officer Lewandowski placed his knee on the back of Mr. Greer's left shoulder to prevent him from getting up or rolling over. This was unsuccessful. (Declaration of Owen T. Rooney, Exhibit C, Lewandowski deposition, p. 75:10-14, p. 75:22-76:10 and p. 78:15-23.) Officer Lewandowski then discharged his taser in drive mode, which did not have any effect. (Declaration of Owen T. Rooney, Exhibit C, Lewandowski deposition, p. 100:19-101:14.) Notwithstanding the efforts of the various police officers, Mr. Greer continued to resist and started doing "push-ups" in an effort to break free of the officers. As a result of Mr. Greer doing the push-ups, Sgt. Tougas struck his head on the rear bumper or trailer hitch. (Declaration of Owen T. Rooney, Exhibit B, Tougas deposition, p. 73:18-74:8.) Officer Lewandowski used his baton in an effort to pry Mr. Greer's arm from under his torso. (Declaration of Owen T. Rooney, Exhibit C, Lewandowski deposition, p. 83:5-8.)

At one point, the officers secured a handcuff to each of Mr. Greer's wrists although the handcuffs were not linked together. Mr. Greer then succeeded in tucking his arms back under his torso. (Declaration of Owen T. Rooney, Exhibit C, Lewandowski deposition, p. 79:18-80:1 and p. 81:9-14.) Eventually, Sgt. Tougas was successful in pulling out Mr. Greer's right arm. (Declaration of Owen T. Rooney, Exhibit B, Tougas deposition, p. 73:13-17.) However, Sgt. Tougas did not apply a handcuff to Mr. Greer's right wrist and rather, this was done by an unknown Hayward officer. (Declaration of Owen T. Rooney, Exhibit B, Tougas deposition, p. 75:16-21.) Sgt. Tougas then observed Mr. Greer's left arm, which had been only partially handcuffed, flailing about. Recognizing this as an officer safety issue, Sgt. Tougas then grabbed hold of the chain link portion of the handcuff which was above Mr. Greer's left shoulder. (Declaration of Owen T. Rooney, Exhibit B, Tougas deposition, p. 76:1-17 and p. 77:18-78:2.)

Ultimately, and after a struggle which lasted approximately 5-7 minutes, Mr. Greer was handcuffed. Sgt. Tougas was not involved in handcuffing Mr. Greer, a process that took 2-3 pairs of handcuffs due to Mr. Greer's enormous girth. (Declaration of Owen T. Rooney, Exhibit A, Lutzinger deposition, p. 89:2-9, Exhibit B, Tougas deposition, p. 75:16-18 and Exhibit C, Lewandowski deposition, p. 80:22-23, p. 82: 14-20 and p. 109:7-13.)

-6-

Gilbert, Kelly
Crowley & Jennett LLP
Attorneys at Law

4157172.1 08433-00004

1    During the struggle, additional Hayward officers arrived, including Officer McAdams and
2  Reserve Officer Covarrubias, both of whom attempted to control Mr. Greer's legs. These officers
3  struggled to control Mr. Greer's legs. (Declaration of Owen T. Rooney, Exhibit D, McAdams
4  deposition, p. 12: 9-11, p. 22:2-8, p. 25:8-19 and p. 37: 17-22 and Exhibit A, Lutzinger deposition,
5  p, 98:20-99:8.)

6    Hayward Officer Tong also arrived and applied two different types of nerve stimulation
7  pain techniques to Mr. Greer's jawline. (Declaration of Owen T. Rooney, Exhibit E, Tong
8  deposition, p. 12:6-8, p. 38:14-39:7, p. 40:5-41:1, p. 43:4-44:11 and p. 46:15-47:1.)

9    Mr. Greer exhibited extraordinary and "super human strength." (Declaration of Owen T.
10  Rooney, Exhibit A, Lutzinger deposition, p. 89:12, Exhibit B, Tougas deposition, p. 72:22-73:1,
11  Exhibit C, Lewandowski deposition, p. 78:15-19 and Exhibit E, Tong deposition, p. 61:13-14.)

12    **E. Sgt. Tougas Did Not Tase, Strike or Straddle Mr. Greer**

13    Sgt. Tougas did not tase, use a baton or ASP, punch, kick, handcuff or straddle Mr. Greer or
14  engage in excessive force. (Declaration of Owen T. Rooney, Exhibit A, Lutzinger deposition, p.
15  118:20-119:11, p. 120:3-121:189:12, Exhibit C, Lewandowski deposition, p. 108:9-109:6 and
16  Exhibit E, Tong deposition, p. 80:16-81:7; and Declaration of Jared Zwickey, ¶19.)

17    **F. Independents Witnesses Support the Police Officers' Testimony**

18    Independent witness Todd Hendricks, a pastor at a Livermore church, was approximately
19  thirty (30) yards away from the scene and saw the decedent resist. Mr. Greer was extremely strong
20  and substantially larger than any of the officers on scene. Mr. Hendricks denied that any police
21  officer punched, kicked, sat or kneeled on or used the baton on Mr. Greer. Mr. Hendricks also saw
22  the decedent kicking in an effort to resist application of the WRAP. In his view, Mr. Greer resisted
23  "the entire time." (Declaration of Owen T. Rooney, Exhibit H, Hendricks deposition, p. 9:3-11, p.
24  31:13-32:2, p. 37:19-25, p. 36:19-37:18, p. 26:9-13, p. 53:1-8 and p. 32:3-4).   Mr. Hendricks also
25  opined that the officers did not engage in excessive force because "it seemed like they wanted to
26  arrest him and he resisted arrest. They did everything in their power to arrest him without trying to
27  physically hurt him. By my account they did the best that they could." (Declaration of Owen T.
28  Rooney, Exhibit H, Hendricks deposition, p. 39:20-40:7.)

Gilbert, Kelly
Crowley & Jennett LLP
Attorneys at Law

4157172.1  08433-00004

1   A second independent witness, Cuitahus Frias, also denied that any officer sat on, kneeled,

2   punched, kicked or stood on Mr. Greer. Mr. Frias saw Mr. Greer repeatedly twisting his upper

3   body laterally and heard the officers instructing the decedent to stop resisting. (Declaration of

4   Owen T. Rooney, Exhibit I, Frias deposition, p. 29:24-30:11, p. 31:21-32:32:3 and p. 20:12-

5   22:16.)

### G.  Only Hayward Officers Apply the WRAP

7       The WRAP is a three part device used to control an extremely combative and resistive

8   subject. The first is an ankle strap and the second is a leg restraint which includes mesh and metal

9   bars. The first two steps are applied while the subject is prone. The final step is a chest harness,

10  which is draped over the shoulders. In essence, there is a front and rear bib which have buckles

11  that go underneath the armpits. A tether is then applied from the front bib to the leg restraint while

12  the subject is in a seated position. The WRAP was applied by Hayward Officer Cosgriff, with the

13  help of another unidentified officer.

14      (Declaration of Owen T. Rooney, Exhibit A, Lutzinger deposition, p. 98:3-9 and p. 100:12-

15  23, Exhibit F, Cosgriff deposition, p. 9:19-10:4 and p. 22:17-23:16, Exhibit G, Krimm deposition,

16  78:1-80:11.)

17      Sgt. Tougas was not involved in application of the WRAP and, in fact, the BART Police

18  Department did not even use the WRAP back in May of 2014. (Declaration of Owen T. Rooney,

19  Exhibit B, Tougas deposition, p. 30:17-22 and Declaration of Jared Zwickey, ¶19.)

### H.  Medical Care Was Promptly Administered

21      Sgt. Tougas noted that Mr. Greer appeared to be unconscious after he was rolled over. A

22  Hayward officer moments thereafter was able to locate a pulse. (Declaration of Owen T. Rooney,

23  Exhibit A, Lutzinger deposition, p. 102:12-17 and Exhibit B, Tougas deposition, p. 84:5-8 and p.

24  86:24-87:10.)

25      The Hayward Fire Department and paramedics had already been summoned. The

26  firefighter-paramedic staged a short distance away for 1-2 minutes until the scene was cleared for

27  their safety. (Declaration of Owen T. Rooney, Exhibit J, Brassfield deposition, p. 5:11-13, 14:3-11,

28  p. 15:13-16: 4 and 17:25-18:3.)   The WRAP was removed within 30-60 seconds of the

Gilbert, Kelly
Crowley & Jennett LLP
Attorneys at Law

4157172.1 08433-00004

1   paramedic's arrival and there was no delay in administering CPR. (Declaration of Owen T.

2   Rooney, Exhibit J, Brassfield deposition, p. 30:8-16 and p. 48: 6:16.)  Mr. Greer went into cardiac

3   arrest after the paramedic arrived.   (Declaration of Owen T. Rooney, Exhibit J, Brassfield

4   deposition, p. 40:3-41:6.)

5           The police officers also testified the paramedic, who is more highly trained than the police,

6   was there immediately. (Declaration of Owen T. Rooney, Exhibit A, Lutzinger deposition, p.

7   113:4-12 and p. 115: 6-13, Exhibit B, Tougas deposition, p. 87:23-25 and p. 92:14-18, Exhibit C,

8   Lewandowski, 96:21-97:5 and p. 98:22-99:4, Exhibit D, McAdams deposition, p.12:22-25, p.

9   45:19-22 and Exhibit E, Tong deposition, p. 72:4-12 and p.73:22-74:1 and Declaration of Jared

10  Zwickey, ¶20.)    Witness Hendricks concurred that "the ambulance was there on the spot so

11  quickly that that (i.e. CPR) wasn't even needed… it was as soon as they rolled him over they

12  observed he was unconscious the ambulance was right there" and the police summoned the

13  paramedic. (Declaration of Owen T. Rooney, Exhibit H, Hendricks deposition, p. 32:8-21.)

14          **I.   BART Police Training**

15          The  BART Police Dept. has a training program that surpasses the requirements of Peace

16  Officers Standards and Training (POST) and other police departments in the Bay Area.  POST

17  requires 24 hours every two years and the BART Police Dept. requires a minimum forty hours of

18  POST training per year.   BART's annual training requirement exceeds that of most, if not all, other

19  Bay Area police departments. (Declaration of Lance Haight, ¶9.)

20          **J.   Summary of Autopsy and Medical Treatment**

21          The coroner determined Mr. Greer's cause of death to be acute phencyclidine (PCP)

22  intoxication associated with physical assertion. (Declaration of Owen T. Rooney, Exhibit K,

23  Rogers deposition, p. 41:16-43:20.)  His PCP level was 0.596mgL which toxicologist Mr. Posey

24  testified was a <u>lethal dosage</u>.  In addition, Mr. Greer had a history of cardiomyopathy. The

25  decedent, age 46, was 5'11" and weighed 380 pounds.  (Declaration of Owen T. Rooney, Exhibit

26  L, Posey deposition, p. 26:12-28:2 and 30:16-31:6.)

27                      **III.      LEGAL ANALYSIS**

28      **A.     Sgt. Tougas' Use of Force Was Reasonable**

Gilbert, Kelly
Crowley & Jennett LLP
Attorneys at Law

4157172.1  08433-00004

1   Under the Fourth Amendment, police may use only objectively reasonable force based on

2   the circumstances. (*Graham v. Conner* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed 2nd 443

3   (1989). Quoting from *Graham, supra*, *Saucier v. Katz* 533 U.S. 194, 205, 121 S.Ct. 2151, 150

4   L.Ed. 2nd 272 (2001) held that claims of excessive force must be analyzed under an objective

5   reasonableness standard. Because "police officers are often forced to make split-second judgments

6   – in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is

7   necessary in a particular situation, the reasonableness of the officer's belief as to the appropriate

8   level of force should be judged from that on-scene perspective" and that the Court "cautioned

9   against the 20/20 vision of hindsight."

10   One of the factors to be considered in evaluating whether or not an officer is entitled to

11   qualified immunity is whether the suspect is "actively resisting arrest." *Id.*

12   "Neither tackling nor punching a suspect to make an arrest necessarily constitutes excessive

13   force. Not every push or shove, even if it may seem unnecessary in the peace of a judge's

14   chambers…violates the Fourth Amendment." (*Blankenhorn v. City of Orange*, 485 F. 3d 463, 477

15   (9th Cir., 2007).)

16   "The Fourth Amendment standard is reasonableness, and it is reasonable for police to move

17   quickly if delay would gravely endanger their lives or the lives of others. This is true even when,

18   judged with the benefit of hindsight, the officers may have made some mistakes. The Constitution

19   is not blind to the fact that police officers are often forced to make split-second judgments." (*City*

20   *& County of San Francisco v. Sheehan* 135 S.Ct. 1765, 1775, 191 L.Ed. 2d 856, 867-868 (2015)

21   (citations omitted).)

22   "Judges should be cautious about second-guessing a police officer's assessment, made on

23   the scene, of the danger presented in a particular situation." (*Ryburn v. Huff*, 132 S.Ct. 987, 991-

24   992, 181 L.Ed 2d 966, 972 (2012).) There, the Supreme Court criticized the Ninth Circuit for

25   reversing the District Court's "wise admonition" after two officers entered plaintiff's home after

26   the plaintiff ran into the home after refusing to answer questions about the presence of guns inside

27   the home. The officers reacted for officer safety reasons.

28   "If a person is armed…(then) a furtive movement, harrowing gesture or a serious verbal

Gilbert, Kelly
Crowley & Jennett LLP
Attorneys at Law

4157172.1  08433-00004

1    threat might create an immediate threat." (*George v. Morris* 736 F.3rd 829, 838 (9th Cir., 2013.))

2        "Police officers are not required to use the least intrusive degree of force if possible; they

3    are required only to act within a reasonable range of conduct." (*Palacios v. City of Oakland* 970 F.

4    Supp. 732 740 (ND CA 1987); *Forrester v. County of San Diego* 25 F.3d 804, 807 (9th Cir., 1984.))

5    In evaluating whether force is excessive, the issue is whether the officer "acted within a reasonable

6    range of conduct, not whether in hindsight he might have used a less intrusive degree of force.

7    *Palacios, supra.*

8        Police officers "need not retreat or desist from his efforts by reason of the resistance or

9    threatened resistance of the person being arrested, nor shall such officer be deemed an aggressor or

10   lose his right to self-defense by the use of reasonable force to effect the arrest or to prevent escape

11   or to overcome resistance." (Penal Code §835a)

12       Under *Palacios, supra*, the test is whether the use of force was reasonable and not whether a

13   lesser degree of force could have been used.  Plaintiff is inappropriately applying a hindsight test.

14       Sgt. Tougas was one of several officers confronted with an extremely large and combative

15   individual, who was intoxicated or a lethal dose of PCP, such that he had "Hulk-like strength."

16   Several officers were required to subdue the decedent during a struggle that lasted several minutes.

17   There was no indication that Sgt. Tougas used excessive force.  In fact, independent witness

18   Hendricks testified that in his opinion, the officers restrained themselves and did not attempt to hurt

19   Mr. Greer.  This is confirmed by the video in which Mr. Greer was repeatedly told to stop resisting,

20   put his hands behind his back and to relax.  (Declaration of Jared Zwickey, ¶14.)

21       Sgt. Tougas' use of force was reasonable under these circumstances with which he was

22   confronted.  Sgt. Tougas' use of force was "within a reasonable range of conduct" under the

23   circumstances.  Palacios, supra. (Declaration of Jared Zwickey, ¶¶16-19.)

24       Even plaintiff's police practices expert <u>does not</u> directly criticize Sgt. Tougas.  Rather,

25   plaintiff's expert criticized the officers collectively.  Of course, there is no group liability under 42

26   U.S.C. §1983.  For example, in *Chuman v. Wright* 76 F. 3d 292, 295 (9th Cir., 1996) the Court held

27   "the underlying problem with a "team effort" theory is that it is an improper alternative grounds for

28   liability. It removes individual liability as the issue and allows a jury to find a defendant liable on

Gilbert, Kelly
Crowley & Jennett LLP
Attorneys at Law

4157172.1  08433-00004

the ground that even if the defendant had no role in the unlawful conduct, he would nonetheless be guilty if the conduct was the result of a "team effort." … In essence, the "team effort" standard allows the jury to lump all the defendants together, rather than require it to base each individual's liability on his own conduct."

### B. Sgt. Tougas is Entitled to Qualified Immunity

Qualified immunity protects government officials from civil liability if their conduct does not violate clearly established rights of which a reasonable public official would have been aware of. (*Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed 2d 396 (1982) Qualified immunity gives governmental officials "breathing room to make a reasonable but mistaken judgments by protecting all but the plainly incompetent for those who knowingly violate the law." *Sheehan, supra*, at p.1774.

The Sheehan Court held that even an officer acting contrary to training does not, in and of itself, negate qualified immunity. Plaintiff cannot avoid summary judgment by simply producing an expert's report that criticizes the officer's conduct as "imprudent, inappropriate, or even reckless." *Id.* at p. 1777.

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known…the protection of qualified immunity applies regardless of whether the government officials error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and the fact." (*Pearson v. Callahan*, 555 U.S. 233, 129 S.Ct. 808, 815, 172 L.Ed. 2nd 565 (2009)

The calculus of a reasonableness must embody allowance for the fact that "because police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in a particular situation, the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." *Graham, supra*, at p. 396-397. Courts are cautioned against employing a 20/20 hindsight test "in favor of deference to the judgment of reasonable officers on the scene. *Saucier, supra*, at p. 205.

Gilbert, Kelly
Crowley & Jennett LLP
Attorneys at Law

4157172.1 08433-00004

1    An officer will therefore be entitled to qualified immunity even if he was mistaken in his

2    belief that his conduct was lawful, so long as that belief was reasonable. *Mattos v. Agarano* 590 F.

3    3d 1082, 1089 (9th Cir., 2010) "The ultimate touchstone of the Fourth Amendment is

4    reasonableness. To be reasonable is not to be perfect, and so the Fourth Amendment allows for

5    some mistakes on the part of government officials, giving them fair leeway for enforcing the law in

6    the community's protection." (*Heien v. North Carolina*, 135 S.Ct. 530, 536, 190 L.Ed 2nd 475, 482

7    (2014)

8        As the Ninth Circuit held:

9        "Rather, we examine the totality of these circumstances and consider whatever
         specific factors may be appropriate in a particular case whether or not listed in
10       Graham. This analysis allows for us to determine objectively the amount of force
         that is necessary in a particular situation...the most important factor under Graham
11       is whether the suspect posed an immediate threat to the safety of the officers or
         others. This simple statement by an officer that he fears for his safety or the
12       safety of others is not enough; there must be objective factors to justify such a
         concern. (*Bryan v. MacPherson* 630 F.3d 805, 826 (9th Cir., 2010) (Citations
13       omitted.))

14

15       "Qualified immunity shields an officer from suit when she makes a decision that, even if

16   constitutionally deficient, reasonably misapprehends the law governing the circumstances she

17   confronted. (Qualified immunity operates to protect officers from the sometimes hazy border

18   between excessive and acceptable force"). *Brosseau v. Haugen* 543 U.S. 194, 198, 125 S.Ct. 596,

19   160 L.Ed. 2d 583 (2004). Reasonableness under the Fourth Amendment "is not capable of precise

20   definition or mechanical application." *Id.* at p. 199.

21       The U.S. Supreme Court in *Mullenix v. Luna* 136 S.Ct 305, 193 L.Ed 2d 255 (2015),

22   repeated that the rule regarding qualified immunity:

23       "The dispositive question is whether the violative nature of particular conduct is
         clearly established. This inquiry must be undertaken in light of the specific
24       context of the case, not as a broad general proposition." *Id.* at p. 308. (Original
         emphasis).
25
         Based on the totality of the circumstances, Sgt. Tougas acted in an objectively reasonable
26
     manner. (Declaration of Jared Zwickey, ¶¶16-19.) A police officer defending himself does not
27
     violate a clearly established right. Rather, a police officer is entitled to "breathing room" regarding
28

-13-

Gilbert, Kelly
Crowley & Jennett LLP
Attorneys at Law

4157172.1  08433-00004

1  their use of force and qualified immunity allows for reasonable mistakes of law and/or fact. San

2  Francisco and Pearson, supra. Penal Code §835a specifically provides that a police officer "need

3  not retreat or desist" in his effort to restrain a subject. Thus, Sgt. Tougas lawfully was entitled to

4  stand his ground.

5  So too in the present case. Sgt. Tougas was not required as a matter of law to "wait and see"

6  what Mr. Greer would do when faced with a combative, resistive and extremely strong individual,

7  an individual who was so powerful that six officers were needed to restrain him. Mr. Greer was

8  obviously stronger than any officer on scene and weighed more than twice that of Sgt. Tougas.

9  Further, an officer does not lose his "right to self-defense" by the use of reasonable force

10  under Penal Code Section 835a. That is precisely what Sgt. Tougas did and accordingly, he is

11  entitled to qualified immunity.

12  **C. No Loss of Familial Relationship**

13  In *Porter v. Osborn* 546 F. 3d 1131 (9th Cir., 2008) two officers responded to a call about an

14  apparently abandoned vehicle parked in the pull-out area along a highway. The first officer

15  discovered the car was occupied by Casey, who apparently had been asleep in the driver's seat. In

16  a rapidly escalating confrontation, the officer shouted at a startled and confused Casey to exit his

17  vehicle. When he failed to comply, both troopers quickly exited their cars and drew their guns with

18  Officer Osborn taking the lead in approaching Casey's car. When Casey rolled down his window,

19  but did not move to get out, Officer Osborn pepper sprayed him through the open window. Casey

20  reacted in pain and began to drive slowly forward towards Officer Whittom's patrol car, at which

21  point Officer Osborn fired five shots, killing Casey.

22  While a parent has a constitutionally protected right in their child's companionship, "only

23  official conduct that shocks the conscious is cognizable as a due process violation…we hold,

24  following Supreme Court precedent and our cases that the purpose to harm standard must govern

25  Osborn's conduct. Thus, viewing the facts in light most favorable to the Porters, they must

26  demonstrate that Osborne acted with a purpose to harm Casey that was unrelated legitimate law

27  enforcement objectives." *Id.* at p. 1137.

28  The basis of this standard is that the officers reacted to a rapidly evolving situation. *Id.* at p.

-14-

Gilbert, Kelly
Crowley & Jennett LLP
Attorneys at Law

4157172.1  08433-00004

1137. As such, "the Supreme Court recognized that law enforcement officers confront of a variety of circumstances that may lead to the use of force, and drew a distinction between situations that evolve in a timeframe that permits the officer to deliberate before acting and those that escalate so quickly that the officer must make a snap judgment. Thus, as the very term deliberate indifference implies, the standard is sensibly employed only when actual deliberation is practical." *Id.* at p. 1137. In accord: *Gonzales v. City of Anaheim* 747 F.3rd 789, 797 (9th Cir., 2014).

There is no evidence that Sgt. Tougas "deliberated" before responding to the immediate threat posed by a combative and PCP-laced Greer. In fact, the evidence is directly to the contrary. Nor is there any evidence that Sgt. Tougas acted with an "unrelated legitimate law enforcement objective." For this reason, plaintiff's claims fail.

### D. Sgt. Tougas Was Not Deliberately Indifferent To Decedent's Medical Needs

The U. S. Supreme Court in *City of Canton v. Harris* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed. 2d 412 (1989) dealt with the issue of lack of medical care. Ms. Harris was found sitting on the floor of the police patrol wagon. She responded incoherently when asked if she needed medical attention. When she was brought into the station for processing, she slumped to the floor on two separate occasions. The police laid her on the ground, but did not provide any medical attention. Plaintiff was then released from custody and taken to a nearby hospital where she was diagnosed as suffering from emotional problems.

The Supreme Court held "the inadequacy of police training may serve as the basis for §1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.... Only where a failure to train reflects a deliberate or conscious choice by a municipality – a policy as outlined by our prior cases- can a city be held liable for such a failure under §1983." *Id.* at p. 389. Further, the Court noted that plaintiff "must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs." *Id.* at p. 391.

Any lesser of a standard on:

> "fault and causation would open municipalities to unprecedented liability under §1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a §1983 plaintiff will be able

-15-

Gilbert, Kelly
Crowley & Jennett LLP
Attorneys at Law

4157172.1 08433-00004

to point to something the city could have done to prevent the unfortunate incident. Thus, permitting cases against cities for their failure to train employees to go forward under §1983 on a lesser standard of fault would result in de facto respondeat superior liability on municipalities, a result we rejected in *Monell*." *Id.* at p. 391-392.

In a case remarkably similar to the present case, in *Kraft v. Laney* 2005 WL 2042310 (E.D. CA, Aug. 24, 2005.) plaintiffs were the widow and children of the decedent who was arrested for driving under the influence. He was transported to the hospital for a blood test where he stopped breathing and underwent cardiac arrest. The plaintiffs claimed excessive force and a lack of medical attention.

The Court noted that rights of pretrial detainees under the Fourteenth Amendment are comparable to a prisoner's rights under the Eighth Amendment, and therefore, the same standard is applied. Thus, "in order to state a §1983 claim for violation of the Eighth Amendment based on inadequate medical care, plaintiff must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. To prevail, plaintiff must show both that his medical needs were objectively serious, and that defendants possessed a sufficiently culpable state of mind. The requisite state of mind for a medical claim is deliberate indifference." *Id.* at p. 7.

"Mere differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth Amendment violation." *Id.* at p. 8. Similarly, "actions, inadvertent failures to provide medical care, malpractice, and even gross negligence will not suffice to demonstrate deliberate indifference. Even negligent errors or omissions such as failing to take a medical history and failing to diagnose an injury cannot, as a matter of law, support the inference that a defendant medical practitioner acted purposefully with deliberate indifference." *Guy v. County of San Diego*, 2008 WL 506218, at p. 6 (S.D. CA, Feb. 25, 2008).

In *Lolli v. County of Orange* 351 F.3d. 410 (9th Cir., 2003) the plaintiff was stopped for a bicycle infraction and then arrested for an outstanding warrant stemming from an unpaid traffic ticket. Plaintiff claimed that he told the arresting officer that he was diabetic and felt ill and that the same information was relayed to the screening nurse at the jail. The nurse allegedly promised him a snack, but it was never provided. After four hours in a holding cell, he told another deputy that he was diabetic and not feeling well and asked what happened to the snack he been promised

Gilbert, Kelly
Crowley & Jenett LLP
Attorneys at Law

4157172.1  08433-00004

earlier. Plaintiff claims that he was then attacked by several deputies including being struck by a baton and pepper sprayed.

The deputies denied knowing that he was diabetic. The defendants' Motion for Summary Judgment was granted and plaintiff filed a Motion for Reconsideration which was denied.

The Ninth Circuit held:

> In order to defeat summary judgment, under traditional Eighth Amendment standards used in Fourteenth Amendment claims such as this one, Lolli must show he was (1) confined under conditions posing a risk of objectively sufficiently serious harm and (2) that the officials had a sufficiently culpable state of mind in denying the proper medical care. A defendant is liable for denying needed medical care only if he knows of and disregards an excessive risk to inmate health and safety. In order to know of the risk, it is not enough that the person merely be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, he must also draw that inference.... But if a person is aware of a substantial risk of serious harm, a person may be liable for neglecting a prisoner's serious medical needs on the basis of either his action or his inaction. Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment. *Id.* at p. 419.

While the Court acknowledged that a constitutional violation may occur when governmental officials do not respond to the legitimate medical needs of a detainee whom they know is diabetic, the issue then became whether plaintiff presented sufficient evidence from which a reasonable jury could conclude that the individual officers knew of and were deliberately indifferent to plaintiff's medical condition. In short, the Court concluded that some, but not all, officers, had the requisite notice of his diabetic condition and reversed summary judgment as to those officers only. *Id.* at p. 420.

The import of Lolli is that some officers had specific actual knowledge that plaintiff not only was diabetic, but was suffering from a lack of food intake after having previously taken insulin. Here, Sgt. Tougas did not have such direct actual notice and knowledge.

Thereafter, in *Toguchi v. Chung* 391 F.3d. 1051 (9th Cir., 2004) plaintiff was incarcerated and had a long history of mental illness and illicit drug use. The inmate then began to act in a bizarre fashion and Dr. Chung ordered that he be placed in restraints. He died shortly thereafter and the medical examiner determined the cause of death to be the combined toxic effects of sertraline and diphenhydramine. When notified that the decedent had stopped breathing, Dr.

Gilbert, Kelly
Crowley & Jennett LLP
Attorneys at Law

4157172.1  08433-00004

1  Chung ran to the scene and CPR was already being performed. Dr. Chung's response to the
2  emergency was not deliberately indifferent.

3      The fact remains that the paramedics were present immediately once Mr. Greer was
4  controlled. Hayward officer Tong testified the paramedics were by Mr. Greer's side
5  "immediately." In fact, the paramedics were present in approximately one minute. Sgt. Tougas
6  reasonably deferred to the paramedic who was more experienced in rendering medical care.
7  (Declaration of Jared Zwickey, ¶20.)

8      **E. Sgt. Tougas Was Not an "Integral Participant"**

9      A police officer's liability under 42 U.S.C. §1983 is predicated upon his "integral
10 participation" in an alleged constitutional violation. (*Blankenhorn v. County of Orange* 485 F.3d
11 481 (fn. 12) (9th Cir., 2007).) This doctrine "extends liability to those actors who were integral
12 participants in the constitutional violation, even if they did not directly engage in the
13 unconstitutional conduct themselves." (*Hobkins v. Bonvicino* 573 F. 3d 752, 770 (9th Cir., 2009).)

14     The integral participant must have "some fundamental involvement in the conduct that
15 allegedly caused the violation." Blankenhorn, (fn. 12).

16     Sgt. Tougas' involvement is analogous to the situation in *Mendez vs. Montour*, 2014 WL
17 1218665 (N.D. CA, March 21, 2014) There, two officers were involved in arresting Mendez, one
18 of which engaged in an alleged unconstitutional action and the other was unaware that the conduct
19 was about to occur. Specifically, the officers approached Mendez's vehicle which was stopped on
20 the side of the highway. *Id.* at p. 1. After officers conducted a field sobriety test, the first officer
21 attempted to handcuff Mendez who was instructed to place both hands on his head. Mendez
22 unexpectedly removed one hand from his head, which prompted the second officer to conduct a leg
23 sweep, taking Mendez to the ground. *Id.* The second officer then allegedly slammed Mendez's
24 head on the patrol car. The Court granted the first officer's Motion for Summary Judgment,
25 finding no evidence that he "authorized, knew in advance, encouraged, or otherwise helped" the
26 second officer take down Mendez or slam him into the patrol car. *Id.* at p. 4.

27     There was no coordination between Sgt. Tougas and the Hayward officers – nor did they
28 have time to do so – in trying to restrain Mr. Greer. As such, Sgt. Tougas was not "fundamentally

-18-

Gilbert, Kelly
Crowley & Jennett LLP
Attorneys at Law

4157172.1  08433-00004

1 involved" in restraining Mr. Greer.

2     In *Brown v. City and County of San Francisco*, 2014 WL 1364931 (N.D. CA April 7, 2014)
3 multiple officers were involved in arresting a suspect who "violently resisted" efforts to place him
4 in handcuffs, refused to provide a DNA sample and resisted efforts to be placed in a safety cell.
5 One officer responded to the struggle in the hallway, assisted with putting a shackle on Brown's
6 leg, walked with the deputies while Brown was escorted to the safety cell, looked into the door of
7 the safety cell once Brown was placed inside, but had no direct contact with Brown. The Court
8 found, on summary judgment, that the officer's conduct did not constitute excessive force and he
9 did not direct the conduct of any other deputy or have "awareness of a decision to use excessive
10 force." *Id.* at p. 8. Therefore, he was not an integral participant in the allegedly unconstitutional
11 conduct.

12     Sgt. Tougas had less involvement with Mr. Greer than the officers in Brown or Mendez.
13 Particularly, the officers in Mendez were from the same agency, were partners and intended to
14 detain Mendez. Here, Sgt. Tougas is with a separate police department from the Hayward officers,
15 he did not respond to a radio call for assistance; rather, he simply observed Lt. Lutzinger alone with
16 Mr. Greer in the parking lot and voluntarily stopped to render backup. Lt. Lutzinger was
17 attempting to administer a field sobriety test when Mr. Greer resisted and attempted to walk away.
18 At that moment, there was no opportunity to coordinate or create a "plan" to detain Mr. Greer.

19     **F. No Proximate Cause Between Mr. Greers' Death and the Actions of Sgt. Tougas**

20     The medical evidence is that Mr. Greer's cause of death to be acute phencyclidine (PCP)
21 intoxication associated with physical assertion. (Declaration of Owen T. Rooney, Exhibit K,
22 Rogers deposition, p. 41:16-43:20.) His PCP level was 0.596mgL which toxicologist Mr. Posey
23 testified was a <u>lethal dosage</u>. In addition, Mr. Greer had a history of cardiomyopathy. The 46 year
24 old Mr. Greer was 5'11" and weighed 380 pounds. (Declaration of Owen T. Rooney, Exhibit L,
25 Posey deposition, p. 26:12-27:28:1 and 30:16-31:6.) Given the combination of Mr. Greer's pre-
26 existing heart condition and a lethal dose of PCP, the actions of Sgt. Tougas in subduing Mr. Greer
27 was not a proximate cause of his death.

28

Gilbert, Kelly
Crowley & Jennett LLP
Attorneys at Law

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## G. BART is Immune under Government Code §845.6

Government Code §845.6 provides in pertinent part:

> Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but, except as otherwise provided by Sections 855.8 and 856 [concerning mental illness and addiction], a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care.

"Public entities in California are not liable for tortious injury unless liability is imposed by statute. (Government Code § 815) "[S]overeign immunity is the rule in California; governmental liability is limited to exceptions specifically set forth by statute. Section 844.6, subdivision (a)(2) establishes the State's immunity to liability for injuries to prisoners. Section 845.6 both affirms the public entity immunity to liability for furnishing medical care, and creates a narrow exception to that immunity." *Castaneda v. Dept. of Corrections and Rehabilitation* (2013) 212 Cal. App. 4th 1051, 1070-1071.

"The first clause of section 845.6 establishes the immunity generally of both the public entity and its employees from liability "for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody. The second phrase creates a limited public-entity liability when: (1) the public employee "knows or has reason to know [of the] need," (2) of "immediate medical care," and (3) "fails to take reasonable action to summon such medical care." *Id.* (Italics added.)

Liability "does not extend to furnishing, monitoring, follow-up, or subsequent care for the same condition" for which medical care was originally summoned. *Estate of Prasad ex rel. Prasad v. County of Sutter*, 958 F. Supp. 2d 1101, 1117 (E.D. CA, 2013). There, Prasad was booked on minor parole-rated charges. While in custody, he experienced multiple organ failure and other conditions caused by a bacterial infection and ultimately passed away. He had initially contracted a staphylococcus aureus (MRSA) infection a year earlier while in custody and jail

1 officials knew that he had a long-standing problem with bacterial infections; in fact, when he was

2 last booked into jail, several officials reviewed his history of mental illness and recurrent MRSA

3 infections. Id. at p. 1106. The decedent was subsequently transferred to an outside facility for

4 emergency medical care, whose staff knew that the jail did not provide around the clock medical

5 care. The emergency room physician, who not been provided with the decedent's complete

6 medical history, discharged the decedent back to the jail. Over the next few days, jail officials

7 noted the decedent's deteriorating condition, but failed to provide emergency medical care.

8

9 Several deputies sought dismissal of plaintiffs' claim based on Government Code §845.6.

10 The Court held "Prasad was already or concurrently under medical supervision when observed by

11 these Defendants. Accordingly, since §845.6 does not extend to furnishing, monitoring or follow-

12 up once care has been summoned, and since it would be redundant to read §845.6 as requiring

13 Defendants to summon care when care was already there and further action was not required" and

14 the action was dismissed. Id. at p. 1117.

15 As indicated above, the Hayward Fire Department had been previously summoned and

16 staged nearby in order for the scene to be secured. The Hayward Fire Department and paramedics

17 had already been summoned. The firefighter-paramedic staged a short distance away for 1-2

18 minutes until the scene was cleared for their safety. (Declaration of Owen T. Rooney, Exhibit J,

19 Brassfield deposition, p. 5:11-13, 14:3-11, p. 15:13-16: 4 and 17:25-18:3.) Mr. Greer went into

20 cardiac arrest after the paramedic arrived. (Declaration of Owen T. Rooney, Exhibit J, Brassfield

21 deposition, p. 40:3-41:6.)

22

23 **H. There Is No Viable Monell Claim**

24 Local governments can be sued directly under Section 1983 if the public entity engages in a

25 policy or custom which has resulted in a violation of plaintiff's constitutional rights. *Monell v.*

26 *Department of Social Services*, 436 U.S. 658, 690-691, 98 S.Ct. 2018, 56 L. Ed. 2d 611 (1978).

27 There is no vicarious liability under §1983. *Id.*

28 There are three ways to show a policy or custom of a municipality: 1) by showing a long-

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Gilbert, Kelly
Crowley & Jennett LLP
Attorneys at Law

4157172.1  08433-00004

1  standing practice or custom which constitutes the standard operating procedure of the local

2  governmental entity; 2) that the decision-making official was, as a matter of state law, a final

3  policymaking authority whose edicts or acts may fairly be said to represent official policy; or 3)

4  that an official for final policymaking authority either delegated that authority to, or ratified the

5  decision of, by a subordinate. *Manetta v. City of Seattle*, 409 F. 3d 1113, 1147 (9th Cir., 2005) .

6  The policy or custom must consist of more than "random acts or isolated events" and instead, it

7  must be the result of a "permanent and well-settled practice." *Thompson v. City of Los Angeles*, 885

8  F. 2d 1139, 1143 (9th Cir., 1988). There must be a "long-standing practice or custom which

9  constitutes the standard operating procedure of the local government entity. The custom must be so

10 persistent and widespread that it constitutes a permanent and well-settled city policy." *Trevino v.*

11 *Gates*, 99 F3d 911, 918 (9th Cir., 1996.) Liability cannot be predicated on "isolated or sporadic

12 incidents; it must be founded upon practices of sufficient duration, frequency and consistency that

13 the conduct has become a traditional method of carrying out policy." *Id.*

14       The viability of the Monell claim is dependent on the excessive force claim. McSherry v.

15 City of Long Beach, 584 F. 3d 1129, 1147(9th Cir., 2009.) Proof of a single incident of

16 unconstitutional activity does not impose Monell liability unless there is proof of an

17 unconstitutional municipal policy. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824, 105 S. Ct.

18 2423, 85 L.Ed. 2d 791 (1985).

19       Here, there is no evidence of a long-standing practice or custom which constitutes the

20 standard operating procedure of the BART Police Department or any other decision-making

21 official regarding use of excessive force or lack of medical care. (Declaration of Lance Haight ¶ 5).

22       Similarly, there is no evidence that the BART Police Department failed to train, supervise

23 or discipline Sgt. Tougas. In fact, the evidence is to the contrary. The declaration of Dep. Chief of

24 Police Haight indicates that BART requires forty hours of POST training per year which is

25 substantially more than the twenty-four hours every two years required by POST. (Declaration of

26 Lance Haight ¶ 9).

27       BART also has a multi-level use of force review process. In addition, Internal Affairs and

28 the Office of Independent Police Audit can conduct their own investigations into an excessive force

Gilbert, Kelly
Crowley & Jennett LLP
Attorneys at Law

4157172.1  08433-00004

1  claim. Thus, the goal is to ensure transparency and accountability within the BART Police

2  Department.  If BART simply "rubber stamped" constitutional violations, they would not have a

3  multi-level review process  (Declaration of Lance Haight, ¶¶6-8).

4      **I.  Sgt. Tougas Did Not Have an Opportunity to Intercede**

5      While not specifically pled in the Second Amendment Complaint, in the event that plaintiff

6  attempts to argue that Sgt. Tougas could have interceded to prevent any unconstitutional violations

7  by Hayward officers, such an argument is unsupported by the evidence and the law.  "Police

8  officers have a duty to intercede when their fellow officers violate the constitutional rights of a

9  suspect or other citizen."  (*Cunningham v. Gates* 229 F.3d 1271, 1289-1290 (9th Cir., 2000)) as

10  amended on October 31, 2000 ("finding that officer's presence at a shooting had no "realistic

11  opportunity" to prevent an attack by another officer."  Of note, "officers can be held liable for

12  failing to intercede only if they had an opportunity to intercede." *Id*. at p. 1271.

13                            **IV.  CONCLUSION**

14      For the foregoing reasons, defendants BART and Tougas respectively request that this

15  Court grant their Motion for Summary Judgment.

16  Dated: November 29, 2016         GILBERT, KELLY, CROWLEY & JENNETT, LLP

17

18                           _/s/_

                        OWEN T. ROONEY, Attorney for Defendants

19

20

21

22

23

24

25

26

27

28

Gilbert, Kelly
Crowley & Jennett LLP
Attorneys at Law

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT