# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSEPH JAMES GREER,

Plaintiff,

vs. No. 3:15-CV-02307-WHO

CITY OF HAYWARD, BAY AREA RAPID TRANSIT DISTRICT, et al.,

Defendants.

_______________________________/

VIDEOTAPED DEPOSITION OF LIEUTENANT JEFF LUTZINGER

Taken before LORI A. YOCK, CSR, RPR

Certified Shorthand Reporter No. 5801

Registered Professional Reporter No. 18667

State of California

Monday, September 19, 2016

**A.** That's when I got hired by the Hayward Police Department. 10:11:00 10:11:05

**Q.** And why did you go from the Fremont Police Department to the Hayward Police Department? 10:11:05 10:11:10

**A.** I wanted to be a cop, not work in the jail. So I had tested with Fremont and Hayward concurrently, and Hayward hired me first. 10:11:12 10:11:15 10:11:19

**Q.** And you were hired as an officer? 10:11:21

**A.** Yes. 10:11:23

**Q.** And have you been regularly employed with the Hayward Police Department on a full-time basis from 1990 to the present? 10:11:24 10:11:30 10:11:34

**A.** Yes. 10:11:35

**Q.** Let me ask you about promotions during the course of those years. So from 1990 -- beginning in 1990, what was your first promotion? 10:11:37 10:11:40 10:11:45

**A.** I was -- Hayward has a promotion -- a position of inspector, which is a promotion. It's the investigations. I was an acting inspector so that was a temporary promotion. I'm estimating 2003. 10:11:49 10:11:58 10:12:03 10:12:07

**Q.** Is when you became a temporary inspector? 10:12:15

**A.** Yes. And that was only for six months or so and then -- actually, no, it wouldn't be 2003. It would probably be 2004, and then I became an acting sergeant right after that in late 2004, 2005, somewhere in there. 10:12:18 10:12:21 10:12:27 10:12:33

**Q.** Do you remember what time -- let me just ask you what had you done between the time you got to work that day and the time you went out on patrol. 10:49:11 10:49:15 10:49:18

**A.** I would have -- right at the beginning of my time, met with the off-going watch commander for any pass-down information, for anything going on in the city, in the department, in the jail, gotten that information. I would have attended briefing. I typically had dinner, you know, sometime around 8:00 o'clockish, and, you know, reviewed e-mails, reviewed any other paperwork that was pending for the watch commander, you know, general administrative duties. 10:49:21 10:49:26 10:49:33 10:49:36 10:49:39 10:49:45 10:49:49 10:49:54 10:49:58 10:50:01

**Q.** Okay. And then what time did you go out on patrol that night? 10:50:02 10:50:05

**A.** I don't recall. 10:50:06

**Q.** Going back to the three months before, if you remember, had you made any arrests for driving under the influence in the three months before? 10:50:11 10:50:14 10:50:18

**A.** Yes. 10:50:20

**Q.** How many? 10:50:23

**A.** One to three. 10:50:26

**Q.** On those occasions, had you done all the arrests by yourself or had you called to have someone assist you? 10:50:30 10:50:36

**A.** Well, it is normal practice -- common practice 10:50:40

to have another officer requested for -- you know, to come assist. 10:50:43 10:50:48

**Q.** All right. In that timeframe, is it fair to say that any DUI arrest, generally you don't have an officer do it by himself? He always has someone come and assist him? 10:50:49 10:50:55 10:51:00 10:51:04

**A.** That is the desired procedure, yes. 10:51:05

**Q.** All right. Do you remember how long you were out on patrol before you noticed what came to be Mr. Greer's truck? 10:51:10 10:51:15 10:51:21

**A.** Again, no, I do not. 10:51:21

**Q.** Do you remember what time it was that you first had your attention drawn to Mr. Greer's truck? 10:51:23 10:51:26

**A.** Not exactly. I know it was in the 10:00 o'clock hour. 10:51:28 10:51:32

**Q.** And what drew your attention to Mr. Greer's truck? 10:51:33 10:51:36

**A.** I was traveling southbound on Mission Boulevard and approaching the intersection of Mission and Berry Avenue. 10:51:37 10:51:40 10:51:45

MR. ROONEY: Did you say Berry? 10:51:46

THE WITNESS: Berry. 10:51:49

MR. ROONEY: Thank you. 10:51:52

THE WITNESS: Berry, B-E-R-R-Y, Avenue. As I approached that intersection, the signals for southbound 10:51:53 10:51:56

traffic was red. I saw the green arrow for southbound traffic to turn left to go eastbound on Berry Avenue turned green. There was a truck, which turned out to be Mr. Greer's truck, in the left turn pocket. When the light turned green -- a green arrow, he proceeded straight and then had to make a right-hand lane change to the right to continue southbound on Mission Boulevard. There was a vehicle traveling northbound Mission Boulevard in the left turn pocket to go east -- I'm sorry -- westbound on Berry Avenue. So when the two vehicles should have turned left, it wouldn't have been any problem. However, since Mr. Greer's truck continued straight, that car had to, you know, stomp on his brakes real quick. I could tell that by the headlights dipping and coming to a fairly abrupt stop. And then Mr. Greer's truck continued southbound in the No. 1 lane. 10:52:00 10:52:05 10:52:10 10:52:13 10:52:16 10:52:21 10:52:27 10:52:31 10:52:35 10:52:40 10:52:46 10:52:48 10:52:51 10:52:57 10:53:01 10:53:05 10:53:08

BY MR. HALEY: 10:53:08

Q. Okay. And did you decide to follow the truck? 10:53:08

A. Yes. 10:53:11

Q. Did you activate your lights at that point? 10:53:11

A. At that point, no. 10:53:13

Q. Tell me what happened next. 10:53:14

A. Then the truck continued southbound to the intersection of Torrano Avenue -- that's T-O-R-R-A-N-0 10:53:16 10:53:22

-- again, he got into the left turn pocket to go westbound on Torrano, but then -- and, again, this is an uncontrolled intersection, but when he got up to the intersection, instead of turning left, he again veered to the right back into the No. 1 lane of southbound Mission and continued straight. 10:53:31 10:53:33 10:53:37 10:53:41 10:53:44 10:53:47

I was just about catching up to him at this time, because back at Berry where we had the light I was a little distance behind. 10:53:48 10:53:52 10:53:56

The next intersection south of Torrano on Mission is Devon, D-E-V-O-N. Traffic going southbound on Mission cannot turn on Devon because of the center median. So I'm using the intersection of Devon just as a geographical point of reference. Right there he came to a stop in the No. 1 lane and just stopped. 10:53:59 10:54:03 10:54:09 10:54:13 10:54:17 10:54:20

At this point, I pulled up behind him. I radioed in my location, and, you know, I believe I even said at that point I suspected that it might be an intoxicated driver. 10:54:25 10:54:28 10:54:33 10:54:36

I sat there for a second just to see what was going on. No movement. So at that point I did activate my lights, opened the door, started to get out. I paused a second at the door. Again, from experience, I know frequently people will drive away at that point, as this truck did. So as I'm standing at my door, the 10:54:38 10:54:42 10:54:49 10:54:52 10:54:57 10:55:00

truck drives away. I get back in and continue following it southbound on Mission Boulevard. 10:55:04 10:55:09

Q. All right. How fast was he going southbound on Mission Boulevard after he had driven away? 10:55:10 10:55:14

A. Not fast. It did not appear that he was attempting to flee, if that's kind of what your thought was. He was just casually driving away, which furthered in my mind that he may be intoxicated. It's not an uncommon thing. 10:55:17 10:55:21 10:55:26 10:55:32 10:55:36

Q. All right. And then what happened? 10:55:38

A. Then we got to the intersection of Mission Boulevard and Harder Road, continued straight through that intersection. At the southwest corner of Mission and Harder is a retail parking lot, which is the Kmart store. 10:55:40 10:55:43 10:55:47 10:55:56 10:56:01

So as we went southbound, the first driveway goes into a small little retail section. I think it has a car stereo. He bypassed that driveway, pulled into the second driveway which goes into the Kmart parking lot, which is quite large. He pulled in there, turned in the very first lane where parking stalls are. The parking lot was empty, but he just stopped in the lane. He didn't park in a parking stall or anything. He just stopped. 10:56:02 10:56:06 10:56:09 10:56:13 10:56:17 10:56:23 10:56:28 10:56:32 10:56:39

Q. From the time you activated your lights, I assume 10:56:39

you kept them on the whole time until he stopped? 10:56:42
**A.** I did. 10:56:45
**Q.** Did you use any other device to get his attention other than just the lights? 10:56:46 10:56:51
**A.** I would have used my siren also. 10:56:52
**Q.** Do you remember when in the series of events you used your siren? And what I have in mind is can you tell me, did you use it as soon as he turned into the parking lot? Did you use it as soon as he left? Do you remember? 10:56:55 10:56:59 10:57:03 10:57:07
**A.** As soon as I got back into the car and drove after him, I would have turned it on. I turned it on. 10:57:10 10:57:13
**Q.** And he did pull over and stop in this parking lot lane; is that true? 10:57:24 10:57:29
**A.** Yes. 10:57:30
**Q.** In the parking lot there? 10:57:31
**A.** Yes. 10:57:33
**Q.** And at that point, you were suspicious that he might be driving under the influence? 10:57:40 10:57:43
**A.** I was. 10:57:44
**Q.** Were you suspicious that he committed any other kind of a crime at that point? 10:57:45 10:57:48
**A.** No. I was thinking more of an intoxicated subject. 10:57:50 10:57:53
**Q.** Okay. All right. And then did you -- where did you park your patrol vehicle in relation to the truck? 10:57:54 10:58:00

**A.** You can use plain English. "Give me -- give me another unit. We have a Code 8" is the code we use. You can use either, like I said, plain English or Code 8. 10:59:39 10:59:46 10:59:53 10:59:58

**Q.** And it's fair to say that while you don't specifically remember doing it, you would be shocked if you didn't seek a Code 8 or assistance from another unit? 11:00:01 11:00:04 11:00:08

**A.** Yes. 11:00:11

**Q.** All right. After your patrol car came to a stop, what did you do? 11:00:11 11:00:17

**A.** Excuse me. Turned on the spotlights. I opened my door, and I stood outside my door, and I called out to the driver and told him to turn off the car, because I didn't want him driving away again. So I told him, "Turn off the car." 11:00:20 11:00:24 11:00:30 11:00:35 11:00:39

**Q.** Okay. Did he turn off the car? 11:00:41

**A.** Not immediately. He was, you know, verbally challenging -- not in an aggressive way, but in a questioning why. "Why are you stopping me? What are you picking on me for? What do you need? What do you want?" 11:00:43 11:00:47 11:00:52 11:00:55 11:00:58

**Q.** Okay. And so you are about 30 feet behind his car with your patrol door open? 11:00:58 11:01:04

**A.** Uh-huh. 11:01:06

MR. ROONEY: Objection; misstates testimony. 11:01:06

**Q.** -- for the reasons you indicated. And then was his window up or down? 11:02:13 11:02:16

**A.** He opened the window -- or the window was open. I don't know when he opened it or if he had been driving with it open, but I was able to yell to him, and he was able to yell right back to me. 11:02:19 11:02:25 11:02:28 11:02:32

**Q.** And do you remember whether or not you asked him to open the window? 11:02:34 11:02:37

**A.** I didn't. 11:02:38

**Q.** Do you know whether or not he voluntarily opened the window, recognizing there was a Hayward police officer that had pulled him over? 11:02:39 11:02:42 11:02:45

**A.** Again, I do not know when the window was opened. 11:02:47 11:02:49

**Q.** Did he try to roll the window up at any point so you couldn't talk with him? 11:02:49 11:02:53

**A.** No. 11:02:55

**Q.** And then I want to know the words that you remember saying to him from your position behind the door and what he said back. 11:02:55 11:02:57 11:03:01

**A.** I can't tell you verbatim what was said, but I know I told him to turn off the truck. He -- like I said, he was questioning, "Why are you stopping me? What do you want" -- things like that. And I continued to tell him, "Turn off the truck." I believe one time 11:03:02 11:03:06 11:03:10 11:03:12 11:03:15

when he said, "why," I said, "I don't want you to drive away again." And eventually he did turn off the truck. 11:03:18 11:03:22

**Q.** All right. Would it be fair to characterize that as you asked him to turn off the truck, he several times asked you, "why am I" -- "why are you asking me to do this" kind of thing, and finally he turned the truck off? 11:03:25 11:03:28 11:03:34 11:03:39

**A.** Yes. 11:03:42

**Q.** Was he combative at all during that? 11:03:43

**A.** Combative, no. 11:03:46

**Q.** Okay. Then what did you do? 11:03:47

**A.** Then I had him -- I instructed him to drop the keys outside. I wanted to make sure the keys weren't in the ignition so he couldn't crank up and drive away as I walked up. I told him to drop the keys outside. He was again questioning, challenging verbally why. "Why are you stopping me? Why are you bothering me? Why do I need to do that? I don't want to throw my keys out." 11:03:49 11:03:54 11:03:57 11:04:02 11:04:06 11:04:10 11:04:12

So I told him put the keys on the roof, which after a little back and forth he complied and put the keys on the roof. 11:04:16 11:04:19 11:04:23

**Q.** And, again, this discussion happened with you standing next to your patrol car? 11:04:24 11:04:27

**A.** Yes. 11:04:27

**Q.** Okay. How long was it from the time you initially asked him to turn his truck off until he turned 11:04:30 11:04:32

his truck off? 11:04:36

**A.** Not excessively. I would say maybe 10 seconds, 15 seconds, somewhere. 11:04:37 11:04:43

**Q.** And then how long was it from the time you initially said "drop your keys" until the time he put them up on the roof of the truck? 11:04:44 11:04:47 11:04:52

**A.** Again, not real excessive. Ten, 15 seconds. It was just a couple of banters back and forth. He asked questions. I told him why. 11:04:53 11:04:58 11:05:00

**Q.** But other than asking, "Why did you stop me; what are you doing," did he say anything else? 11:05:01 11:05:04

**A.** No. You know, "why are you bothering me" type things. 11:05:06 11:05:09

**Q.** Right. Okay. 11:05:09

**A.** Did he say anything? Not that I recall. 11:05:14

**Q.** Okay. What happened next? 11:05:17

**A.** Then I walked up to the driver door. I made contact with Mr. Greer. I asked him for his driver's license, which, you know, he eventually gave me. You know, he asked repeatedly, "Why are you stopping me? Why are you bothering me?" I explained that he had made some driving maneuvers, that I had a concern about his intoxication. He was argumentative. You know, "I'm not drunk" type, you know, statements. Again, I don't remember verbatim what he said. Asked him for his 11:05:18 11:05:24 11:05:28 11:05:32 11:05:36 11:05:41 11:05:45 11:05:51 11:05:55

driver's license. 11:05:59

At the time, I could see being up close to him, you know, his face was flushed. His eyes were, you know, glassy. He was just incoherent -- not incoherent -- but having difficulty, you know, following train of thought. When he was looking for his driver's license in his wallet, he was fumbling trying to get the driver's license out of his wallet, all which furthered my, you know, belief that he was under the influence of something. I'm not sure what yet. 11:06:01 11:06:04 11:06:08 11:06:15 11:06:19 11:06:22 11:06:26 11:06:30 11:06:33

**Q.** All right. Did you -- I want to slow you down. 11:06:35

**A.** All right. 11:06:40

**Q.** You asked him to give you his driver's license? 11:06:41

**A.** Yes. 11:06:44

**Q.** Did he do that? 11:06:44

**A.** Eventually, yes. 11:06:45

**Q.** And after you asked him to give you his driver's license, did he reach someplace and get his wallet? 11:06:46 11:06:52

**A.** Yes. I don't remember where, if it was in his pocket or the center console. I don't recall where it came from. 11:07:00 11:07:03 11:07:06

**Q.** Was he able to grab the wallet from wherever it was without any difficulty? 11:07:06 11:07:11

**A.** I don't recall. 11:07:13

**Q.** And then his driver's license was in the wallet? 11:07:13

**A.** Yes. 11:07:16
**Q.** And he opened the wallet to give you the driver's license? 11:07:16 11:07:20
**A.** Yes. 11:07:20
**Q.** And then he had some difficulty in reaching into the wallet and grabbing the driver's license and removing it from the wallet? 11:07:21 11:07:24 11:07:29
**A.** Well, he had problems with his, you know, fine motor movements. You know, identifying the driver's license. He was fumbling through it. It was right in the stack of cards that he was looking through, but he was fumbling as he procured it. 11:07:30 11:07:33 11:07:36 11:07:40 11:07:43
**Q.** So he had a stack of papers in his wallet? 11:07:47
**A.** I don't know if they were papers or miscellaneous contents. 11:07:51 11:07:53
**Q.** But whatever they were, he had to go through them, and he had some difficulty going through them until he found his driver's license? 11:07:54 11:07:57 11:08:01
**A.** Yes. 11:08:02
**Q.** And he gave you the driver's license? 11:08:03
**A.** Yes. 11:08:05
**Q.** And during that timeframe, he also wanted to know why you were pulling him over? 11:08:05 11:08:08
**A.** Correct. 11:08:10
MR. VUCINICH: In five minutes, could we take a 11:08:11

brief break? 11:08:14

MR. HALEY: Yes. Okay. Good. 11:08:15

All right. And after he gave you the driver's license, what did you do? 11:08:18 11:08:20

**A.** Based on his driving -- his driving away from me, his verbally challenging me when I told him to stop the car or turn off the car, and then with the keys, making contact with him up at the door, saw he was quite large, I knew I wanted to do further examination, but I wanted to wait until another officer was there. So I told him -- you know, I had his driver's license. I instructed him to wait there and I would be back, and I went back to my car and waited for another officer to arrive. 11:08:23 11:08:28 11:08:32 11:08:35 11:08:40 11:08:43 11:08:47 11:08:51 11:08:54 11:08:58

**Q.** All right. And did he stay in his car while you went back to your car? 11:08:58 11:09:02

**A.** He did. 11:09:03

**Q.** What did you do when you got back to your car? 11:09:11

**A.** Very soon after I got back to my car is when the BART officer, Tougas, arrived. 11:09:16 11:09:25

**Q.** Had you known Officer Tougas from before? 11:09:29

**A.** No. 11:09:34

**Q.** Was he the first officer to arrive on the scene? 11:09:34

**A.** Yes. 11:09:38

**Q.** And if you know, how does that happen that a BART 11:09:39

police officer responds to a Hayward Police Department's call? 11:09:43 11:09:45

MR. ROONEY: Objection; calls for speculation and assumes facts not in evidence. 11:09:45 11:09:48

BY MR. HALEY: 11:09:52

Q. If you know. 11:09:52

A. It would be my expectation he was not responding to my request for another unit. 11:09:53 11:09:56

Q. He was perhaps just driving by and saw you? 11:09:59

A. Correct. 11:10:02

Q. All right. So did he come up and talk -- were you seated in your patrol car when he arrived? 11:10:03 11:10:06

A. No. 11:10:09

Q. Standing outside? 11:10:09

A. Yes. 11:10:11

Q. All right. And did he come up to you? 11:10:11

A. Yes. 11:10:13

Q. And what did he say? 11:10:14

A. He asked if everything was okay, if I wanted him to stand by. 11:10:15 11:10:18

Q. And what did you say? 11:10:20

A. I said yes, the guy was a little, you know, argumentative and a very large guy. So, yes, if he didn't mind standing by. 11:10:21 11:10:24 11:10:31

Q. Had Mr. Greer been combative at any point before 11:10:34

the BART police officer arrived? 11:10:38

MR. VUCINICH: I'll object to the form of the word "combative." It's vague, ambiguous. 11:10:40 11:10:42

THE WITNESS: Physically combative, no. Argumentative, attitude-wise, um, uncooperative, you know, partially. 11:10:47 11:10:51 11:10:58

BY MR. HALEY: 11:10:58

Q. Well, had he been uncooperative or not? 11:11:03

A. Well, very challenging. 11:11:06

Q. Did you consider him asking you why you were pulling him over to be challenging? 11:11:08 11:11:12

A. The question of why I pulled him over, no, that's a fair question. But the repeated questions of, "What are you doing? Why are you bothering me? Why are you bothering me" -- that goes towards the, okay, this is a potential issue, you know, because if he is in the mindset of I'm bothering him. If a normal driver who is not intoxicated knew they just made a left -- went straight on a left-turn lane on a left arrow, continued down, went straight from a left-turn lane into the straight lane, stopped in the middle of the traffic, a police car got behind him, turned on the lights, and you drove away -- a reasonable, non-intoxicated subject would know exactly why they are being stopped and wouldn't have the notion of the police are bothering me. 11:11:16 11:11:19 11:11:23 11:11:26 11:11:29 11:11:32 11:11:37 11:11:42 11:11:45 11:11:49 11:11:52 11:11:57 11:12:00 11:12:03

A reasonable person would not. 11:12:06

**Q.** I'll just close this at this point. Was the fact that he said to you why are you bothering -- why are you bothering him -- something that made you think he may become violent or combative? 11:12:09 11:12:12 11:12:17 11:12:20

**A.** The totality of everything is what made me believe that. 11:12:23 11:12:28

**Q.** Including the fact that he asked you why were you bothering him? 11:12:28 11:12:33

**A.** Including that. That was part of the totality, yes. 11:12:33 11:12:38

**Q.** Okay. So you asked the BART police officer to stay there with you; true? 11:12:44 11:12:47

**A.** Yes. 11:12:49

**Q.** All right. And what happened next? 11:12:49

**A.** I told Officer Tougas that I was waiting for a Hayward officer to arrive also, and then very shortly thereafter, Officers Clark and Lewandowski arrived. 11:12:52 11:12:57 11:13:04

**Q.** At any point before Officer Clark and Lewandowski arrived, had you made any radio calls saying anything like, "I'm concerned about this guy. He's big. He is" -- I've forgotten what word we used -- "he is not being cooperative." Had you said that to anybody to get Hayward police officers there faster? 11:13:15 11:13:17 11:13:21 11:13:26 11:13:30 11:13:37

**A.** No, I don't believe so, because I knew they 11:13:39

Is that what you used that night -- that term? 11:30:11

**A.** I don't remember. I conveyed that sentiment, but I don't remember exactly what words I used. 11:30:13 11:30:15

**Q.** You used those words or something like those words? 11:30:17 11:30:20

**A.** Something like, yes. 11:30:20

**Q.** All right. And did they say anything to you that you remember? 11:30:22 11:30:28

**A.** They would have acknowledged, but I don't remember any specific questions or statements. 11:30:30 11:30:33

**Q.** All right. And then did you go back to the truck? 11:30:35 11:30:38

**A.** Yes. 11:30:39

**Q.** All right. And when you went back to the truck, it would be you, Officer Clark, Officer Lewandowski, and Officer Tougas? 11:30:39 11:30:41 11:30:47

**A.** Yes. 11:30:48

**Q.** All right. And what happened when you went back to the truck? 11:30:49 11:30:52

**A.** I went to the driver's door. I know Officer Clark was within a few feet of me. At that time, I do not recall where Officer Lewandowski was or Officer Tougas, but I do remember Officer Clark being right in my immediate presence. 11:30:53 11:30:59 11:31:03 11:31:09 11:31:13

**Q.** Okay. 11:31:15

A. And then so I got to the car and I asked Mr. Greer to step out of the car. 11:31:17 11:31:21

Q. Okay. And what did he do? 11:31:26

A. He stepped out. You know, during the whole contact, he was asking me why -- you know, repeatedly asking, "Why? What's going on? What are you doing?" But he did -- he complied. He got out of the car. 11:31:29 11:31:33 11:31:37 11:31:39

Q. Do you recall if you opened the car door for him or did he open it himself? 11:31:42 11:31:45

A. I do not. 11:31:47

Q. All right. Did he say anything different from what he had been saying to you during all the earlier contacts -- "why are you bothering me; why are you stopping me" -- anything different in that? 11:31:50 11:31:56 11:32:00 11:32:02

A. Not that I recall. I don't remember the verbatim conversation. 11:32:04 11:32:07

Q. All right. And then so he got out of the truck? 11:32:09

A. Yes. 11:32:12

Q. And then where did he go? 11:32:13

A. I had him stand right next to the truck, right at the end of the cab, beginning of the bed. 11:32:14 11:32:17

Q. Okay. 11:32:20

A. And I explained to him, you know, that I wanted to evaluate his intoxication. I asked him if he had any weapons, told him I wanted to pat search him. I told 11:32:20 11:32:23 11:32:30

him that he was not under arrest at that time, just being detained. And I believe he turned around to put his hands on the car, which I -- when people do that, I customarily tell them, you know, just relax. I would hold onto -- if I held onto his left hand --

**Q.** Let me slow you down a little bit.

**A.** Okay.

**Q.** You are down the road with me.

**A.** Okay.

**Q.** So he got out of the truck?

**A.** Yes.

**Q.** And then you are there and somewhere nearby is Officer Clark?

**A.** Yes.

**Q.** And then you explain to him why you pulled him over?

**A.** Yes.

**Q.** And did he stand there and listen to you while you said that?

**A.** Yes.

**Q.** Other than perhaps repeating what he had been saying, did he say anything new during that time while you are standing with him just outside the passenger door of the truck?

**A.** Again, I don't remember the exact conversation.

facing the truck still when I conducted the pat search. 11:34:40

**Q.** And what was the purpose of the pat search? 11:34:44

**A.** Like I said, just checking for weapons. 11:34:46

**Q.** And did you have any assistance from Officer Clark or anyone else to do the pat search? 11:34:48 11:34:53

**A.** Yes. Like I said, I did the left side, and I believe I actually told Clark, due to his size, I couldn't check the right side and asked, "Can you check the right side." 11:34:54 11:34:57 11:35:02 11:35:05

**Q.** And did you find any weapons on the right side? 11:35:05

**A.** I checked the left side. 11:35:09

**Q.** Sorry about that. Did you find any weapons on the left side? 11:35:11 11:35:14

**A.** I don't believe so. I know there was a pocket knife, but I believe that came from the right side. 11:35:15 11:35:19

**Q.** And other than the pocket knife, were there any weapons? 11:35:21 11:35:24

**A.** No. 11:35:25

**Q.** I take it the pocket knife was removed? 11:35:26

**A.** Yes. 11:35:29

**Q.** And so you were satisfied at that point that he did not have any weapons? 11:35:29 11:35:32

**A.** Correct. 11:35:34

**Q.** During the pat down search, did he swing at you or give you the chicken bones, anything like that to 11:35:40 11:35:43

**A.** To get a sense of alcohol intoxication level. 11:37:00

**Q.** Does it give you any sense -- I'm asking -- any sense of PCP intoxication? 11:37:03 11:37:08

**A.** The horizontal gaze nystagmus does not. 11:37:13

**Q.** What instructions did you give him before performing the horizontal gaze nystagmus test? 11:37:20 11:37:24

**A.** I typically explain that I'm going to hold my finger in front of the face, move my finger from left to right. I want them to -- the subject to follow my finger with their eyes only, keeping their head still. I frequently use, "Keep your nose lined up with my nose. Follow with your eyes only." 11:37:28 11:37:31 11:37:35 11:37:40 11:37:45 11:37:50

**Q.** Okay. And you give him those instructions? 11:37:52

**A.** Yes. 11:37:53

**Q.** Do you put your finger in front of his nose or raise it higher to make him look up? 11:37:54 11:37:59

**A.** For the horizontal, it's pretty much eye level. 11:38:02

**Q.** And what were the results of the horizontal gaze nystagmus test? 11:38:07 11:38:13

**A.** I don't remember specifically, but I do -- I don't remember specifically. What you are looking for is two things. The eyes bounce at the -- you know, where the eyes will start to bounce, which is the nystagmus part, but then also rough pursuit -- excuse me. So as I was doing that, he had to be -- I know I 11:38:14 11:38:17 11:38:19 11:38:27 11:38:30 11:38:35

had to tell him a couple times, "No, just follow -- don't move your head. Follow with your eyes. Move your eyes. My finger is over here. Move your eyes over here." So I don't remember specifically where his eyes were bouncing, if they were. I know I saw some bottles in the car, which I suspected were alcohol, but at that point we were just getting started right there. 11:38:39 11:38:41 11:38:46 11:38:50 11:38:53 11:38:59 11:39:02

Q. Okay. Did he fail the horizontal gaze nystagmus test? 11:39:05 11:39:09

A. That's not a pass or fail test. 11:39:09

Q. Were your findings on the horizontal gaze nystagmus test consistent with driving under the influence of alcohol? 11:39:13 11:39:16 11:39:20

A. I don't recall it specifically being, you know, something that stood out -- stands out in my mind. 11:39:23 11:39:26

Q. Okay. Sometimes at the end of that, the officer says, "Well, that test indicates to me that there was bouncing at the extremes. That indicates alcohol use to me." What was your feeling at the end of the test with him? 11:39:29 11:39:32 11:39:38 11:39:42 11:39:45

A. That I needed to conduct further sobriety tests. 11:39:45 11:39:50

Q. Did you learn anything else on the horizontal gaze nystagmus test other than what you've already told us? 11:39:53 11:39:59 11:40:01

A. No. 11:40:01

Q. Did he cooperate during the performance of the test? 11:40:02 11:40:07

A. I believe his intent was to, but he was having difficulty cooperating. 11:40:07 11:40:10

Q. Due to impairment, you suspected? 11:40:12

A. Correct. 11:40:15

Q. So he tried to perform the test but -- what part of the test, in your mind, was he unable to perform? 11:40:15 11:40:19

A. Well, just like I explained, following the finger. You know, frequently people who are under the influence will stare straight at you when your finger is over to the side. I can see your finger. So it's just reminding, "No, move your eyes" -- so basically following the instructions. 11:40:24 11:40:27 11:40:30 11:40:35 11:40:39 11:40:42

Q. I don't mean to belabor the point, but you held your finger up and told him to follow your finger? 11:40:43 11:40:47

A. Yes. 11:40:51

Q. And when you moved your finger, did he follow the finger? 11:40:51 11:40:55

A. Not initially. 11:40:55

Q. What did he do initially? 11:40:57

A. Just continued to look. 11:40:58

Q. Look straight at you? 11:41:00

A. Yes. 11:41:01

Q. And then after some moments, he then began to follow the finger? 11:41:02 11:41:06

A. After -- yes. 11:41:07

Q. Okay. Other than not initially following the movement of your finger, was he unable to do any other part of the horizontal gaze nystagmus test that you gave him? 11:41:08 11:41:15 11:41:21 11:41:24

A. I don't recall that he wasn't. 11:41:25

Q. At the end of that test, based on everything you had seen, did you have any suspicion that he was under the influence of PCP? 11:41:33 11:41:37 11:41:40

A. I believed he was under the influence of something. I hadn't narrowed it down to what yet. 11:41:42 11:41:44

Q. Including PCP? You thought maybe this guy is on PCP? 11:41:48 11:41:52

MR. VUCINICH: That misstates his testimony. 11:41:53

MR. ROONEY: Misstates his testimony. 11:41:55

BY MR. HALEY: 11:41:55

Q. Since they both said it, they must be right. So let me try it again. 11:41:57 11:42:01

I'm good. 11:42:15

Okay. What did you do next? 11:42:16

A. Then I wanted to move in towards the balance type testing, but right next to the truck was a little bit of an incline. So on the opposite side of the truck 11:42:17 11:42:21 11:42:24

between the truck and the edge of the parking lot towards Mission Boulevard were the parking stalls which appeared to be a little more level. So I explained, "Let's move around to the other side where we can be a little more level." 11:42:31 11:42:35 11:42:40 11:42:43 11:42:47

Q. And did he walk around that side of the truck with you and go where you wanted him to go? 11:42:47 11:42:51

A. Yes. 11:42:53

Q. And was he cooperative in doing that? 11:42:54

A. Yes. Continuing -- throughout the whole thing, he was constantly questioning, "What's going on? Why are we doing this? Why are you bothering me?" So physically cooperative, yes. Mentally, he's not there. 11:42:57 11:43:00 11:43:04 11:43:07

Q. But other than asking you why you were doing what you were doing and why are you bothering him, did he say anything else that made you feel he was not cooperative at any point up until the time you brought him to the other side of the truck? 11:43:16 11:43:20 11:43:26 11:43:30 11:43:34

A. No. 11:43:35

Q. And there is nothing wrong, I take it, for a suspect to ask you why you are doing what you are doing; is that true? 11:43:36 11:43:43 11:43:47

A. Once, maybe twice, sure. But repeatedly, there's something wrong with that. That shows an altered level of, you know, awareness and cognition. 11:43:48 11:43:51 11:43:54

That builds on the, you know, suspicion that he is under the influence of something. 11:43:59 11:44:03

Q. All right. How about asking you, "Why are you bothering me?" Is there anything wrong with him asking you that once or twice? 11:44:04 11:44:12 11:44:16

A. Well, I think I already covered that. 11:44:18

MR. VUCINICH: Let me object to the form of the question. It depends how somebody asks. So it's kind of a vague question. 11:44:20 11:44:22 11:44:26

MR. HALEY: You can object to it or you can answer it. 11:44:27 11:44:30

MR. VUCINICH: I can do both. 11:44:31

BY MR. HALEY: 11:44:32

Q. I'm just wondering in your training as a lieutenant in the Hayward Police Department that night, if a subject asks you, "Why are you bothering me," do you take that to be in some way uncooperative? 11:44:33 11:44:36 11:44:38 11:44:41

A. Again, you have to keep it in context. 11:44:45

Q. All right. 11:44:47

A. It could; it could not. And in that night, his repeated asking -- like I explained earlier, a normal, reasonable, unintoxicated individual who displayed the driving attributes that I articulated, they would know what's going on. So him repeatedly asking that is just building my suspicion that this guy is loaded on 11:44:48 11:44:51 11:44:56 11:45:00 11:45:05 11:45:09

attempted to do was a standing test where you just stand upright, hands down to your side, tilt your head back, close your eyes. 11:46:45 11:46:51 11:46:55

The intent to that one is to see the balance. Do they sway from side to side. Do they sway circularly. Basically the intoxication of alcohol or drugs would impact that. So that's the first test that I attempted to have him do. 11:46:56 11:47:01 11:47:04 11:47:07 11:47:10

**Q.** Okay. And where, if you remember, was Officer Clark, Lewandowski, and Tougas as you began that test? 11:47:11 11:47:16

**A.** Okay. So if I am facing Mr. Greer, I believe Clark was to my left and to Greer's right rear. Lewandowski was to my right and to Greer's left. Officer Tougas I believe was further away back towards -- you know, somewhere off to the left, but I don't know exactly where. 11:47:23 11:47:31 11:47:38 11:47:45 11:47:51 11:47:54

**Q.** All right. What do we call that test you are giving, a balance test? 11:47:55 11:48:02

**A.** Balance test. Some people called it standing modified. It's different names. 11:48:03 11:48:07

**Q.** Okay. I'll call it the balance test. And did you perform the balance test? 11:48:08 11:48:12

**A.** I attempted to have him do it. He -- you know, he began it but did not complete. 11:48:13 11:48:18

**Q.** You asked him to put his feet together? 11:48:20

A. Yes. 11:48:23
Q. And he put his feet together? 11:48:23
A. He attempted to, yes. 11:48:25
Q. Was he able to put his feet together? 11:48:26
A. I think eventually, yes. And I demonstrated put your heels together. Put your toes together. And eventually he was able to. 11:48:29 11:48:32 11:48:35
Q. And then what did you ask him to do next? 11:48:37
A. To stand upright, tilt his head back, and close his eyes. 11:48:40 11:48:44
Q. And did he do that? 11:48:45
A. Very briefly. 11:48:46
Q. So what were the results of that test? 11:48:50
A. It was incomplete. 11:48:52
Q. Because? 11:48:54
A. Because Mr. Greer stopped performing it. 11:48:56
Q. So he was able to do the test for a brief period of time but he didn't hold it long enough to pass the test? 11:49:00 11:49:04 11:49:07
MR. ROONEY: Objection; misstates the testimony. 11:49:07 11:49:09
THE WITNESS: Again, it's not pass or fail. None of the sobriety tests are pass or fail. 11:49:10 11:49:13
BY MR. HALEY: 11:49:16
Q. Okay. 11:49:16

A. Tilting the head back and closing the eyes -- you generally want to do it for 15 to 30 seconds. He only did it for, you know, two or three seconds. And when he stopped is when he responded and now is where he is becoming much more aggressive of, "What are you doing? What are you guys bothering me for" -- you know, being more confrontational -- verbally confrontational of, "What are you guys doing to me?" 11:49:17 11:49:21 11:49:26 11:49:30 11:49:35 11:49:39 11:49:42 11:49:47

Q. Okay. Let me just go back. I'm going to get to that point, but I want to go back a little bit to the balance test. 11:49:50 11:49:54 11:49:57

Is it fair to say that Mr. Greer was able to do as instructed by you on the balance test but he just couldn't continue to do it? 11:49:59 11:50:04 11:50:09

A. No, I don't think so. 11:50:11

Q. So where is that statement wrong? 11:50:14

A. He was instructed to, you know, tilt his head back and close his eyes and stay that way, and he could not or would not do it. 11:50:18 11:50:22 11:50:28

Q. Okay. So just for the record, you told him to tilt his head back and close his eyes? 11:50:30 11:50:35

A. Right. 11:50:38

Q. He did that; true? 11:50:38

A. For two seconds -- two to three seconds, yes. 11:50:39

Q. And then he stopped doing it? 11:50:43

BY MR. HALEY: 11:51:58

**Q.** Are you aware that Officer Lewandowski had pulled out his Taser and held it behind his back while you were doing the balance test? 11:51:58 11:52:02 11:52:06

**A.** I was not aware of that. 11:52:07

**Q.** Had you asked him to do that? 11:52:08

**A.** I had not. 11:52:10

**Q.** Did he tell you he was going to do that? 11:52:11

**A.** He did not. 11:52:13

**Q.** Has he ever explained to you why he was at the ready with a Taser? 11:52:14 11:52:18

**A.** We have not discussed the incident. 11:52:20

MR. VUCINICH: Outside the presence of counsel. 11:52:22

MR. HALEY: Outside the presence of counsel. Okay. 11:52:23 11:52:26

At any point before the balance test was completed, had you pulled your Taser out? 11:52:27 11:52:31

**A.** No. 11:52:34

**Q.** We've talked about the words he was using, and you've indicated that when he stopped the balance test, he became more confrontational than he had before; true? 11:52:49 11:52:58 11:53:04

**A.** Correct. 11:53:08

**Q.** What additional words did he use by which you concluded he was more confrontational? 11:53:10 11:53:16

**A.** Again, I don't remember the verbatim exact 11:53:19

words, but the context was instead of being more general, his -- it was more individually focused of, "Why are you doing this to me? What are you doing to me? What is going on here?" So he was personalizing it much more. So he -- you know, much more paranoid, I guess. 11:53:22 11:53:28 11:53:34 11:53:39 11:53:44 11:53:50

Q. Okay. And so we are clear, before he had asked you, "Why are you doing this; why are you bothering me," but the two words he added were, "Why are you doing this to me?" Those are the words that made him more confrontational? 11:53:50 11:53:54 11:53:59 11:54:05 11:54:08

A. It's not the words. It's the inflection and the body position and the moving. You know, it's the demeanor. 11:54:09 11:54:12 11:54:15

Q. So it wasn't so much the words, it was the demeanor? 11:54:16 11:54:18

A. Demeanor and context and body language. You can't nail it to one specific word or action. It's the totality of the circumstances. 11:54:19 11:54:24 11:54:27

Q. Okay. Please tell me what Mr. Greer did at the conclusion of the balance test which made you conclude he was now confrontational. 11:54:29 11:54:34 11:54:38

A. He stopped. He looked down -- or he had been looking up. He looked back normally horizontal towards me and was again rephrasing -- asking the same questions 11:54:42 11:54:46 11:54:50

-- "What are you doing? Why are you doing this to me?" You know, that type of question. And eventually he started to walk away. 11:54:54 11:54:58 11:55:00

**Q.** I'll ask you about that, but before he walked away, I'll ask you about that. 11:55:02 11:55:05

**A.** But it's all the same. That's what he did when he stopped. There was no pause. There was nothing in between. What he did was walk away as he was asking those questions. You can't separate them. 11:55:07 11:55:10 11:55:13 11:55:19

**Q.** So let me ask you, though, had you in your head decided he is becoming much more confrontational before he walked away or was it the walking away that made you say he is more confrontational? 11:55:20 11:55:24 11:55:29 11:55:33

**A.** It's the totality of all the words, the ceasing of the test, and walking away at the same time. 11:55:35 11:55:39

**Q.** Okay. 11:55:42

**A.** That, yes, this is -- you know, he is no longer interested in participating. 11:55:42 11:55:46

**Q.** Okay. And I've heard it described as different ways, but some people say he took a couple steps sideways, a couple steps backwards. How would you describe the steps that he took? 11:55:48 11:55:52 11:55:55 11:55:59

**A.** Laterally. I don't know which way he turned his feet, but from where I was looking at him, he moved to my right, his left. 11:56:00 11:56:03 11:56:08

the officers at the scene would not be able to stop him? 11:58:57
**A.** I don't recall having that concern, no. 11:59:00
**Q.** He was a large guy who wasn't going anywhere; is that true? 11:59:03 11:59:07
**A.** Well, no -- 11:59:07
MR. ROONEY: Objection; argumentative. 11:59:08
MR. HALEY: Yes, that's argumentative. Withdraw. Thank you. 11:59:09 11:59:11
After Mr. Greer took a couple steps to the side, what happened next? 11:59:12 11:59:22
**A.** I believe I asked him, "Where are you going" or "stop" -- something along -- and I grabbed hold of his right arm. 11:59:25 11:59:28 11:59:32
**Q.** Okay. And then what happened? 11:59:33
**A.** I attempted to use a twist lock control hold and told him you know, to stop. I was trying to, you know, get him to stop moving and detain him, and that's when he became physically resistive. 11:59:35 11:59:39 11:59:43 11:59:46
**Q.** Okay. And what happened next? 11:59:50
**A.** Again, I know I had his right arm. The other officers involved were immediately there trying to hang onto him. I know I told him, you know, "Stop resisting. Put your hands behind your back." I felt in my mind, okay, based on the driving, the contact at the window, all the exchanges, I believed he was intoxicated. So I 11:59:54 11:59:59 12:00:05 12:00:11 12:00:15 12:00:18

wasn't going to just let him go.

So I continued to hold onto the twist lock trying to control his right arm, allowing officers to control the left so we could try to handcuff him.

**Q.** Okay.

**A.** Because by this time we had moved around to the back of the truck. So he had gotten several steps -- as I grabbed onto his left arm, we continued moving. He wasn't stopping.

MR. ROONEY: I'm sorry. You said "left arm" in your last answer.

THE WITNESS: I'm sorry. Right arm.

BY MR. HALEY:

**Q.** And how many officers were engaged with Mr. Greer as you went around to the back of the truck?

**A.** I know myself, and I believe Officer Lewandowski and/or Clark. I do not know where Officer Tougas was at that time.

**Q.** All right. Did Officer Lewandowski ask you if you wanted to Tase him?

**A.** If -- I do not recall him --

MR. ROONEY: Objection; vague as to time.

BY MR. HALEY:

**Q.** As you were going -- okay. As -- from the time he took the steps until the time he went down on the

12:00:24 12:00:27 12:00:30 12:00:34 12:00:38 12:00:38 12:00:42 12:00:45 12:00:49 12:00:49 12:00:52 12:00:53 12:00:54 12:00:55 12:00:58 12:01:00 12:01:05 12:01:10 12:01:10 12:01:14 12:01:16 12:01:19 12:01:21 12:01:23 12:01:27

ground, did Officer Lewandowski ask you if you wanted to Tase Mr. Greer? 12:01:31 12:01:36

**A.** I am not aware of him asking me that. 12:01:38

**Q.** All right. Irrespective of whether you were asked or not, did you want to Tase Mr. Greer at that moment? 12:01:40 12:01:44 12:01:47

**A.** Personally, I did not. 12:01:47

**Q.** You were comfortable that you would be able to get the situation under control without Tasing him; true -- "comfortable" might be too strong a word. 12:01:49 12:01:53 12:01:56

**A.** "Comfortable" -- that's a strong word, but I personally was not to that level of force yet. 12:02:00 12:02:02

**Q.** Okay. Did you instruct the -- 12:02:04

Mr. Greer then went to the ground; is that true? 12:02:16

**A.** We all went to the ground. 12:02:18

**Q.** Including Mr. Greer? 12:02:20

**A.** Yes. 12:02:21

**Q.** Before he went to the ground, was it your intent to take him down to the ground? 12:02:23 12:02:28

**A.** Again, not my intent. I was holding onto his right arm, believing the other officers were attempting to get the left arm, and I know I was having difficulty. It was not my intent to take him to the ground. I don't know if anybody intended to take him to the ground. We just ended up on the ground. 12:02:30 12:02:34 12:02:38 12:02:42 12:02:47 12:02:51

Q. Did you order any of the officers to take Mr. Greer to the ground? 12:02:52 12:02:55

A. No. 12:02:56

Q. And I believe you've indicated it wasn't your intent at that point to take him down; true? 12:02:57 12:02:59

A. Correct. 12:03:02

Q. Have you ever asked Officer Lewandowski or Clark if they intended to take him down to the ground? 12:03:03 12:03:06

A. I don't believe I have, no. 12:03:09

Q. Did any Hayward police officer take Mr. Greer to the ground? 12:03:10 12:03:15

A. I would think your question of "take" -- 12:03:15

MR. ROONEY: Objection; vague. 12:03:19

THE WITNESS: -- is vague. What do you mean by "take"? I do not know how we got to the ground. I don't know if -- in the defensive tactics trainings, there are things called takedowns, which are intended to, you know, take a subject to the ground. But then there are three, four, maybe five people right there with a very strong, uncooperative individual. Feet could have gotten tangled. I don't know how we got to the ground. 12:03:20 12:03:22 12:03:26 12:03:30 12:03:33 12:03:37 12:03:40 12:03:45 12:03:49

BY MR. HALEY: 12:03:49

Q. Okay. Are there policies about takedowns -- written policies about takedowns and when and how to do it 12:03:49 12:04:00

right at the tail end, tailgate, rear bumper area. I don't know if when we initially went to the ground if he had broken the plane of the rear bumper and to be underneath, or I assume he had not because otherwise he would have hit the thing on the way down -- or somebody would have. So it seems to me that we were down beyond the plane of the rear of the truck, but then in the struggle, eventually his head was under the bumper. 12:05:08 12:05:17 12:05:21 12:05:25 12:05:28 12:05:31 12:05:35 12:05:38

**Q.** Okay. And when his head was under the bumper -- 12:05:43

MR. VUCINICH: He said his hand. 12:05:46

THE WITNESS: Head. 12:05:47

MR. VUCINICH: Head? 12:05:48

THE WITNESS: Yes. 12:05:49

BY MR. HALEY: 12:05:49

**Q.** And was he looking up? 12:05:50

**A.** He was still face up, yes. 12:05:51

**Q.** And then what happened next? 12:05:53

**A.** It was a continual struggle trying to maintain control of his hands, tell him to roll over, try to get him onto his stomach so we could handcuff him. 12:05:55 12:06:00 12:06:04

**Q.** At the moment when he was on his back with his head underneath the truck, was it your intent to get him to roll over on his stomach and cuff him? 12:06:08 12:06:12 12:06:16

**A.** Yes. 12:06:21

**Q.** And were you, perhaps with the assistance of 12:06:22

other officers, able to roll him over on his stomach? 12:06:24

**A.** Eventually, yes. 12:06:28

**Q.** Do you have any sense of how long that took -- how long it took from the time he was on his back underneath the bumper until the time that he was on his stomach? 12:06:30 12:06:32 12:06:35 12:06:38

**A.** Not off the top of my -- it was a constant struggle. By this time, I no longer have his right arm. I am on his left side trying to get -- it was a minute, two minutes. That's just, you know, best recollection. 12:06:40 12:06:45 12:06:53 12:06:57

**Q.** At the moment where everybody went down to the ground, what arm did you have ahold of? 12:07:01 12:07:07

**A.** Prior to the fall, I had his right. After the fall, I didn't have either, and then I reengaged onto -- actually, I guess it would still be his right. Now he is face up. I know I lost control of it. After the fall, he is face up. I am still on his right side and continued to grab that arm, I believe. 12:07:10 12:07:13 12:07:20 12:07:26 12:07:29 12:07:33

**Q.** Did you have the right arm doing the wrist lock while he was laying down facing up? 12:07:35 12:07:40

**A.** Doing the wrist lock, no. 12:07:42

**Q.** Just holding onto his right -- what were you doing with the right arm or wrist? 12:07:44 12:07:47

**A.** Just trying to maintain control of it. 12:07:49

**Q.** Once you turned -- once he turned over, however 12:07:51

it happened, he was then on his stomach face down? 12:07:55

**A.** Correct. 12:07:58

**Q.** And did Officer Lewandowski put his knee on Mr. Greer's shoulder blades once he was down facedown on the ground? 12:07:59 12:08:08 12:08:15

**A.** Once he was facedown, that's a significant time between the two, but I do not, you know, independently -- my focus was on the hands, not at the upper torso. I was looking at where is his hand, because once he was rolled over, I was now on his left, because I didn't move. He just rolled over. I am working on the left arm, and I am focusing -- I know Lewandowski was up to my left, which face down would have been Greer's left side. Clark was across Greer from me. So I was focusing on what Clark was doing with the hands -- you know, looking for the hand and maintaining the left hand, trying to get a handcuff on it. 12:08:16 12:08:20 12:08:25 12:08:30 12:08:34 12:08:38 12:08:42 12:08:46 12:08:49 12:08:53 12:08:59 12:09:03

**Q.** All right. Before he rolled over on his stomach, was the method of control used just officers grabbing his arms and trying to hold onto him? 12:09:05 12:09:15 12:09:18

**A.** Yes. 12:09:20

**Q.** There were no Tasers used at that time? 12:09:21

**A.** Not by me, and I'll just -- I have no recollection of Officer Lewandowski's Taser used personally. I know from reading the report it was. I 12:09:23 12:09:27 12:09:31

**A.** Correct. 12:10:55

**Q.** If you can, what were you trying to do? You were trying to pull his left hand around behind his back so you could put a cuff on it? 12:10:55 12:11:07 12:11:11

**A.** Initially just trying to get a handcuff onto one wrist, which I eventually did. And due to his size, I knew we were not going to be able to get both hands secured with one pair of handcuffs. We were going to needs to daisy chain them together. 12:11:13 12:11:17 12:11:21 12:11:26 12:11:30

**Q.** He was just too big to get his arms behind his back? 12:11:32 12:11:37

**A.** Yes, and quite strong. 12:11:37

**Q.** And quite strong. As far as you were concerned, were you the first one to Tase him? 12:11:38 12:11:52

**A.** Again, I have no recollection of when Officer Lewandowski Tased him. So I know I Tased him. I don't know if that was before, after, or in conjunction with Officer Lewandowski. 12:11:54 12:12:00 12:12:03 12:12:07

**Q.** Did you hear Officer Lewandowski say, "Stop or I'm going to Tase you"? 12:12:07 12:12:11

**A.** I did not. 12:12:13

**Q.** Did you, before you Tased him, say, "Stop or I'm going to Tase you," or something to that effect? 12:12:15 12:12:22

**A.** To that effect, yes. 12:12:24

**Q.** Both times you Tased him? 12:12:25

**A.** You know, I -- I know I did a couple of times prior to the first one. I don't recall if I did the second time or not. 12:12:29 12:12:36 12:12:39

**Q.** What happened first? Were you able to get a handcuff on one hand before you Tased him? 12:12:40 12:12:48

**A.** I believe so, but I'm not absolutely sure. 12:12:52

**Q.** Do you know if when you got your one side of the handcuff on the left hand if anyone had been able to get one side of a handcuff on his right hand? 12:12:55 12:12:59 12:13:03

**A.** At what point? 12:13:07

**Q.** When you got your cuff on his left hand. 12:13:09

**A.** I believe I was the first one. 12:13:12

**Q.** And I have an image of him face down on the ground with his arms going down to the side of his body. But how is he resisting it? Was he just not giving you his arm, resisting with his arm, shaking around? What was he doing? 12:13:14 12:13:19 12:13:24 12:13:29 12:13:33

MR. ROONEY: Objection; misstates or assumes facts not in evidence. 12:13:34 12:13:37

THE WITNESS: When I say I was holding onto his left arm or left wrist, that wasn't a constant. It got away from me a couple of times. I know at one point his hands were underneath him. Eventually I was able to handcuff his left hand, but during the whole event, he had his hands underneath him. He had his hands as if he 12:13:38 12:13:41 12:13:45 12:13:49 12:13:52 12:13:58

still on his stomach? 12:30:13

**A.** Yes. 12:30:15

**Q.** And why did he get the Wrap? 12:30:18

**A.** Because even though Mr. Greer -- you know, he was on the ground, and he is still struggling trying to get up, and at this time he is flailing his feet and legs. So the Wrap restraint device is specifically for that, to help further control, you know, resistive or combative individuals. 12:30:21 12:30:26 12:30:30 12:30:35 12:30:41 12:30:46

**Q.** When had he started flailing his feet and legs? 12:30:47

**A.** During this whole struggle while we were on the ground. From shortly after we ended up on the ground. 12:30:52 12:30:55

**Q.** Were there any officers attempting to hold down his feet and legs? 12:31:01 12:31:05

**A.** Yes, but I couldn't tell you who. 12:31:06

**Q.** And during that process, you witnessed Mr. Greer kicking his feet and legs at officers attempting to hold them down? 12:31:17 12:31:20 12:31:24

**A.** I would not agree to that, no. 12:31:24

**Q.** Did you witness Mr. Greer kicking his feet and legs at any point while you were assisting with him facedown on the ground? 12:31:27 12:31:30 12:31:33

**A.** Yes. 12:31:34

**Q.** And was it the whole time? 12:31:35

**A.** It was, you know, repeatedly during -- whether 12:31:42

he paused periodically, I would expect he probably did. I didn't -- I was watching his hands, looking at his hands. I'm aware of his legs moving around, flailing around. You know, the duration thereof, how many times he started, stopped, I couldn't tell you. If he was kicking an officer or kicking towards an officer, I couldn't tell you. I was focusing towards the upper torso. 12:31:47 12:31:51 12:31:56 12:32:00 12:32:04 12:32:06 12:32:09 12:32:13

**Q.** Did you see the officers holding his legs down? 12:32:13

**A.** No. 12:32:17

**Q.** You gave a recorded statement a couple of days after it happened? 12:32:30 12:32:33

**A.** Yes. 12:32:34

**Q.** I'm not going to go into great detail about it, but were you truthful when you gave that statement? 12:32:35 12:32:38

**A.** Yes. 12:32:40

**Q.** Do you remember whether or not you talked about the kicking in that statement? 12:32:40 12:32:45

**A.** I do not remember. 12:32:46

**Q.** All right. We now have him handcuffed. And did then somebody put the Wrap on his lower legs? 12:32:47 12:32:55

**A.** After he is handcuffed, yes, they did. 12:33:03

**Q.** So he is handcuffed face down, and then somebody put the Wrap on his lower legs; true? 12:33:07 12:33:10

**A.** No. 12:33:13

**Q.** Okay. What's wrong with that? 12:33:13
**A.** The Wrap is a multicomponent thing. There is a wrist strap which goes -- I mean, not a wrist -- an ankle strap that goes at the ankles. The Wrap itself goes on the upper legs, not the lower legs. 12:33:15 12:33:19 12:33:22 12:33:28
**Q.** On that night, what was the first part of the Wrap that was applied? 12:33:32 12:33:34
**A.** The ankle strap, per training, is always the first thing to be applied. 12:33:35 12:33:39
**Q.** And did you see the ankle strap applied? 12:33:41
**A.** I did not. 12:33:44
**Q.** And after the ankle strap was applied, was the rest of the Wrap applied while he laid face down? 12:33:45 12:33:54
MR. VUCINICH: Can I just -- I want to make sure we are on the same page. Is there a foundation that he saw this versus what he believes happened? 12:33:58 12:34:00 12:34:04
MR. HALEY: I don't know. I should lay a foundation. Maybe he didn't see any of this. 12:34:06 12:34:09
So did you see any part of the Wrap applied? 12:34:11
**A.** The -- as I said, it was multicomponent. The wrist strap, the part that goes on the upper legs, there is also a chest/torso harness. I saw that part begin to be applied. 12:34:18 12:34:23 12:34:27 12:34:34
**Q.** The chest/torso harness? 12:34:35
**A.** Yes. I did not see it completed being applied. 12:34:44

the upper portion or the torso portion of the Wrap on? 12:36:02

**A.** Correct. Well, that's -- when they rolled him over from his stomach to his back? 12:36:06 12:36:10

**Q.** Yes. 12:36:13

**A.** Correct. He would not have. 12:36:14

**Q.** And to the extent he may have had any portion of the Wrap on his legs, you just didn't see it? 12:36:16 12:36:19

**A.** Correct. 12:36:23

**Q.** Okay. And did you see Mr. Greer once they rolled him over? 12:36:23 12:36:27

**A.** Yes. 12:36:28

**Q.** Did he appear to be unconscious? 12:36:29

**A.** Possibly. You know, I don't know what his level of consciousness. I know when officers rolled him over, somebody said -- you know, asking him, "Are you okay? Hey, are you" -- to where -- sort of checking his level of consciousness. 12:36:32 12:36:39 12:36:43 12:36:46 12:36:54

**Q.** Did you hear one of the officers say, "He is unconscious"? 12:36:56 12:36:59

**A.** I don't have independent recollection. I remember hearing that on the video, I believe. But I know based on the officer's, you know, starting to, "Hey, are you okay," trying to arouse him, you know, the fire department was already there. So then I immediately went to the fire engine to tell the 12:37:01 12:37:04 12:37:09 12:37:13 12:37:19 12:37:22

 face appeared to you to be like it does in Exhibit 3? 12:50:24

**A.** Mr. Greer's face, you know -- he had his eyes closed. 12:50:28 12:50:33

**Q.** Okay. At what moment did you first say to yourself, "This guy needs emergency medical care"? 12:50:34 12:50:39

**A.** When I heard the officer checking his level of consciousness. You know, the fire department was already on scene. And so I went there just out of an abundance of caution. I had not determined yet that he needed emergency medical care. Since they were on scene already, I wanted to get them over to him as quickly as possible. 12:50:44 12:50:48 12:50:52 12:50:57 12:51:01 12:51:05 12:51:08

**Q.** Okay. Did you instruct the officers putting the Wrap on as you left, "Don't put the Wrap on"? 12:51:08 12:51:18

**A.** No. 12:51:21

**Q.** As you were leaving, did you say, "Is he unconscious?" 12:51:21 12:51:24

**A.** I don't recall if I asked that or not. 12:51:25

**Q.** Did you ask any of them if they thought he needed emergency medical care? 12:51:27 12:51:31

**A.** I do not. 12:51:32

**Q.** Did you ask any of them if they thought he was faking it and really wasn't having the trouble that he pretended to have? 12:51:33 12:51:36 12:51:40

**A.** No. 12:51:41

see? 12:53:10

**A.** I didn't go towards Mr. Greer because I know the firefighters were coming right behind me with their medical stuff. So then I started checking everybody else -- is everybody else okay. 12:53:10 12:53:13 12:53:18 12:53:22

**Q.** Did you see Mr. Greer again? 12:53:24

MR. ROONEY: Objection; vague. 12:53:28

BY MR. HALEY: 12:53:30

**Q.** So I have the impression you called for aid with the fire department, and then you walked back towards where Mr. Green was -- Mr. Greer, I should say. But you've indicated that you didn't go back and look at Mr. Greer? 12:53:30 12:53:33 12:53:37 12:53:40 12:53:44

**A.** Right. As I walked right back to the proximity, the paramedics are obviously more highly trained than we are. They were right there. I am letting them take care of Mr. Greer to where I am now looking at the overall scene, trying to check the status of the officers, make sure everybody was okay, and then go into, you know, the scene stabilization. 12:53:44 12:53:47 12:53:51 12:53:55 12:53:58 12:54:02 12:54:06

**Q.** How long was it from the time -- well, let me ask you this. Did you hear any of the emergency personnel, the fire department, ask the Hayward Police Department to take the Wrap off? 12:54:10 12:54:14 12:54:18 12:54:21

**A.** I did not, no. 12:54:22

was removed. 12:57:02

**Q.** Do you know who removed -- let's just say the chest portion of the Wrap? 12:57:04 12:57:06

**A.** I do not. 12:57:07

**Q.** Okay. Did you ever see any Hayward police officer perform CPR, other than what you may have described with trying to rouse him? 12:57:11 12:57:20 12:57:23

**A.** I did not. 12:57:25

**Q.** Did you see any firemen perform chest compressions on Mr. Greer? 12:57:30 12:57:36

**A.** Again, once the firemen -- I pulled myself out, and I did not observe whether they did or did not. 12:57:39 12:57:43

MR. HALEY: Okay. Why don't I let Owen go. 12:57:47

EXAMINATION 12:57:47

BY MR. ROONEY: 12:57:47

**Q.** Okay. I just have a few follow-up questions. 12:57:53

**A.** Okay. 12:57:56

**Q.** Just for the record, my name is Owen Rooney. I represent BART and Officer Tougas. 12:57:57 12:58:00

That evening, sir, did you see Officer Tougas at any time use a Taser? 12:58:03 12:58:06

**A.** I did not. 12:58:07

**Q.** Have you read any documents indicating that Officer Tougas did use a Taser? 12:58:10 12:58:13

**A.** I have not. 12:58:16

**Q.** Conversely, have you seen any -- read any documents that Officer Tougas did not use a Taser? 12:58:17 12:58:21

**A.** I have not read any BART documents, or I don't recall anything about Officer Tougas in the Hayward portion that I read. 12:58:24 12:58:28 12:58:31

**Q.** That evening in the Kmart parking lot, did you see Officer Tougas use a baton on Mr. Greer? 12:58:32 12:58:37

**A.** I did not. 12:58:40

**Q.** Did you see Officer Tougas at any time that evening in the parking lot use an ASP? 12:58:41 12:58:45

**A.** I did not. 12:58:49

**Q.** Was Officer Tougas involved in the handcuffing process of Mr. Greer, to your knowledge? 12:58:53 12:58:56

**A.** I believe he was, yes. 12:58:58

**Q.** What was his involvement? 12:59:01

**A.** Again, that's kind of where things are kind of a jumbled mess. As see were on the ground trying to get control of the hands, I know Officer Tougas was right there in with us. I don't know if he had hands, arms, elbows, legs, feet. I don't know what his attempt -- his task was, but he was there in the mix. 12:59:03 12:59:08 12:59:14 12:59:18 12:59:24 12:59:28

**Q.** Okay. So when Mr. Greer was on his stomach, you were holding his left wrist; correct? 12:59:32 12:59:36

**A.** On his stomach, yes. 12:59:38

**Q.** Where was Officer Tougas when Mr. Greer was on 12:59:40

his stomach? 12:59:43

A. I believe he was on Mr. Greer's right side. 12:59:45

Q. Did you see Officer Tougas actually have his metal handcuffs out and trying to apply them to Mr. Greer? 12:59:48 12:59:52

A. I did not. 12:59:56

Q. So you don't know if he was grabbing his feet or his hands or what? 13:00:00 13:00:04

A. Correct. 13:00:05

Q. At any time that evening, did you see Officer Tougas punch Mr. Greer? 13:00:13 13:00:17

A. I did not. 13:00:18

Q. At any time that evening in the Kmart parking lot, did you see Officer Tougas kick Mr. Greer? 13:00:20 13:00:25

A. I did not. 13:00:29

Q. That evening in the Kmart parking lot, did you see Officer Tougas do anything that you think was excessive or unreasonable force in trying to control Mr. Greer? 13:00:31 13:00:35 13:00:39 13:00:42

A. I did not. 13:00:43

Q. By the way, how long did this struggle last -- beginning until the time that you say Mr. Greer was handcuffed? 13:00:46 13:00:49 13:00:53

A. Approximately five minutes. 13:00:57

Q. At any time that evening, did you see Officer Tougas straddling Mr. Greer's upper torso? 13:01:24 13:01:25

**A.** I did not. 13:01:29

MR. ROONEY: That's all I have. Thank you. 13:01:35

MR. HALEY: Do we have anything else? 13:01:37

EXAMINATION 13:01:37

BY MR. GOFF: 13:01:37

**Q.** Regarding Mr. Tougas, did you ever see Officer 13:01:39 Tougas performing CPR on Mr. Greer once he appeared to be 13:01:43 nonresponsive? 13:01:47

**A.** I did not. 13:01:49

MR. GOFF: Thank you. 13:01:50

MR. HALEY: Done. 13:01:51

MR. VUCINICH: Thank you. Thank you very much. 13:01:52

THE VIDEOGRAPHER: Okay. This marks the end of 13:01:53 DVD No. 2 in the deposition of Jeff Lutzinger. Going 13:01:55 off the record, the time is 1:02. 13:02:00

(The deposition was concluded at 1:02 p.m.)

______________________________
LIEUTENANT JEFF LUTZINGER

EMERICK AND FINCH
Certified Shorthand Reporters
18 Crow Canyon Court, Suite 125
San Ramon, California 94583
(925) 831-9029

Date: ____________

LIEUTENANT JEFF LUTZINGER
c/o JEFFREY M. VUCINICH, ESQ.
Clapp, Moroney, Vucinich, Beeman, Scheley, A.P.C.
505 Montgomery Street, 11th Floor
San Francisco, CA 94111

Re: GREER v. CITY OF HAYWARD, ET AL.,
USDC 3:15-CV-02307-WHO

Dear Lieutenant Lutzinger:

Your deposition in the above matter is now available at this office. You may wish to discuss with your attorney whether he or she requires that it be read, corrected, if necessary, and signed before it is filed with the court, if so ordered. Your rights regarding signature of this deposition are contained in the Code of Civil Procedure.

Since the original deposition may not be released from our custody, if you wish to sign it, please appear at this office, 18 Crow Canyon Court, Suite 210, San Ramon, California, within the next 30 days on any weekday between the hours of 9:00 a.m. and 4:00 p.m. It is necessary that you bring this letter with you.

In the alternative, you may wish to read your attorney's copy of the deposition and notify this office by letter of any changes that you desire to be made.

Very truly yours,
EMERICK AND FINCH

______________________________
LORI A. YOCK, CSR NO. 5801

cc: All Counsel
Original

# EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSEPH JAMES GREER,

Plaintiff,

vs. No. 3:15-cv-02307-WHO

CITY OF HAYWARD, BAY AREA RAPID TRANSIT, and DOES 1-50,

Defendants.

_______________________________/

# DEPOSITION OF SERGEANT JON TOUGAS

Taken before LISA LOUNDAGIN

Certified Shorthand Reporter

State of California

CSR 9213

Wednesday, September 28, 2016

Q All right. Okay. At the conclusion of that training, was it your view that if someone you had in custody was unconscious, you should get that person immediate attention?

MR. ROONEY: Objection. Vague as to the term unconscious and immediate medical attention as being vague and calling for expert opinions.

MR. KADOTANI: Join.

THE WITNESS: Yes.

MR. HALEY: Q. Okay. You had received training on the WRAP device before this incident?

MR. ROONEY: Objection. Misstates testimony.

THE WITNESS: No.

MR. HALEY: Q. Okay. All right. At the time of this incident, did you know what a WRAP device was?

A Yes.

Q All right. Had you ever applied a WRAP device before this incident?

A We did not have the WRAP.

Q Okay. You answered a little bit differently. Had you ever applied the WRAP?

A No.

Q Okay. I'm going to turn to -- before this, had you applied leg restraints as your work as a BART Police Officer?

What brought you to the scene where this incident happened on May the 23rd of 2014?

**A** I saw --

MR. ROONEY: Objection. Assumes facts not in evidence.

MR. HALEY: Hmm?

MR. ROONEY: Assumes facts not in evidence. You can answer.

THE WITNESS: I saw a Hayward Police Officer by himself, so it appeared, in the Kmart parking lot at Mission and Harder. And I was -- I don't know if I was going from Fremont or Union City back to Hayward, where our police office is. And I saw him in the parking lot, so I made a U-turn to see if he needed cover.

MR. HALEY: Q. All right. And do you remember where you were coming from or where you were going to?

MR. ROONEY: He just answered that.

THE WITNESS: I don't remember if I was coming back from Fremont or Union City, but it would have been south of where he was at, heading back to our Hayward Police office.

MR. HALEY: Q. All right. And why were you going back to your Hayward Police office at that time?

**A** I believe to pick up the graveyarder.

**Q** Was your shift ending?

**Q** Did you know the officer who you initially went over to cover before that evening?

**A** No.

**Q** Okay. And you'd never met him before?

**A** No.

**Q** Okay. Did you hear anything over your radio or from your dispatch about the officer in the parking lot with the subject before you got there?

**A** No.

MR. ROONEY: Objection. Lacks foundation.

MR. HALEY: Q. Okay. Can you hear Hayward Police Department dispatches over your radio? Could you hear them at that time?

**A** No.

**Q** All right. So it just was happenstance you came by and saw him there and went over to help him?

**A** Yes.

**Q** Okay. And then when you pulled over, who was present when you initially came to a stop?

**A** At that time?

**Q** Right.

**A** I thought he was a police officer. Now I know -- or a patrol officer. Now I know he was a lieutenant.

**Q** All right. And he was there with his vehicle

guess. When you say, "I probably said" --

**A** Oh, okay.

MR. ROONEY: Yeah.

THE WITNESS: Sorry.

MR. ROONEY: Definitely don't guess.

THE WITNESS: Sorry, sorry.

MR. ROONEY: Give him an accurate --

MR. HALEY: Q. Yeah.

**A** So I stuck around --

**Q** Okay.

**A** -- for cover.

**Q** Did he ask you to stick around?

**A** Did he ask me to stay?

**Q** Yes.

**A** I don't think so.

**Q** All right. And was Mr. Greer still in his vehicle when you got there?

**A** Yes.

**Q** All right. From the time you arrived until the time Mr. Greer got out of the truck, I want you to tell me everything you remember you said to the lieutenant and everything the lieutenant said to you.

**A** So from the time I approached the lieutenant to when?

**Q** To when Mr. Greer got out of the truck.

A So I walked up to now the lieutenant, that I know now. I think I asked him, "Do you want me to stick around?

"Yes.

"If I do, I have to turn on my camera.

"Go ahead."

I turned on my camera.

I think he said, "I've got another unit coming."

As soon as another unit arrived on scene, he told me he was gonna do -- or no. Initially, he told me, "He pulled away from me twice," which I now know was a traffic stop.

So I said, "Okay." So I stayed.

Oh, he also told me, "He's a big man.

"Okay."

Q Okay. Do you remember anything else he said to you or you said to him from the time you arrived until the time Mr. Greer got out of the truck?

A Other than he was gonna do FSTs on him.

Q Okay. All right. I'm going to keep asking you that question until you say you don't remember anything else.

So other than what you've told me, do you remember anything else you said to him or he said to you?

A Not that I recall.

**Q** Well --

**A** No, I didn't.

**Q** Yeah. Some of these questions I'm going to go the whole night because I know you were close to him at some points during the night.

**A** Right.

**Q** But your point is well-taken. But let me just cut to the chase.

At any point that evening during your interactions with Mr. Greer, did you smell alcohol on his breath?

**A** I did not.

**Q** All right. Did Mr. Greer appear to understand the lieutenant when he asked him if he had been drinking?

MR. ROONEY: Objection. Calls for speculation.

MR. KADOTANI: Join.

THE WITNESS: Yeah.

MR. HALEY: Q. All right. And he was able to respond appropriately?

**A** Yes.

**Q** Okay. And then what next happened?

**A** I believe the lieutenant told him, "I'm going to do FSTs on you."

I don't remember at what point Mr. Greer said, "Why you messing with me?"

He says, "I just need to make sure" -- well, he says, "I need to -- I'm going to do FSTs on you."

**Q** Okay. Did Mr. Greer refuse to take the FSTs?

**A** I don't think so.

MR. ROONEY: Objection to the term refuse to take as being vague.

THE WITNESS: I don't think so.

MR. HALEY: Q. Okay.

**A** Later on he did.

**Q** All right. Well, we'll get -- I'm going to try to go through sequentially.

**A** Okay.

**Q** When he first -- when Mr. Greer first got out of the truck, he was on the driver's side of the truck; is that correct?

**A** Yes.

**Q** All right. When he -- when the FSTs were given, was he still on the driver's side of the truck?

**A** The initial nystagmus, yes.

**Q** All right. Do you remember whether or not he was patted down for weapons before the original nystagmus test?

**A** Yes.

**Q** All right. And was he cooperative during the pat down for weapons?

**A** Yes.

**Q** All right. And just to put it in sequence, he got out of the truck, was pat down for weapons, and then the nystagmus test?

**A** I believe so.

**Q** All on the driver's side of the truck?

**A** Yes.

**Q** Okay. And did you watch the nystagmus test?

**A** From a distance.

**Q** All right. Were you able to tell from where you were how his eyes reacted during the nystagmus test?

**A** No, sir.

**Q** Were there any officers standing near you during the nystagmus test?

MR. ROONEY: Objection. Vague.

THE WITNESS: Not that I recall.

MR. HALEY: Q. Do you know where the other two Hayward officers were during the nystagmus test?

**A** I don't remember.

**Q** Were you equipped with a taser that night?

**A** Yes.

**Q** Okay. Did you feel the need to take your taser out of your holster at any point during the FSTs?

**A** I did not.

**Q** Okay. So now we have him doing the nystagmus

test on the driver's side of the truck. Tell me anything you remember about the nystagmus test.

MR. KADOTANI: Vague.

THE WITNESS: It was performed.

MR. HALEY: Q. Okay. And from your vantage point, I take it, you were not able to see how he performed on the nystagmus test, true?

**A** No, sir. Correct.

**Q** Okay. From your vantage point, did it appear that Mr. Greer was cooperative in performing the nystagmus test?

**A** Yes.

**Q** All right. And then what happened after the nystagmus test?

**A** I believe the lieutenant was looking for a level ground so he could perform the balance test, the walking test, so he moved, and explained to him, to the other side of the truck.

**Q** All right. And did Mr. Greer appear to understand that instruction and follow it?

**A** Yes.

MR. ROONEY: Objection. Calls for speculation.

MR. HALEY: Q. And he was cooperative in walking around to the other side of the truck?

**A** Yes.

put his head back?

**A** I don't recall.

**Q** All right. Was Mr. Greer asked to put his arms at his sides?

**A** I think so --

**Q** All right.

**A** -- yes.

**Q** All right. And did he do that?

**A** Eventually, yes.

**Q** All right. Did he put his arms at his sides before the attitude change?

**A** Yes.

**Q** All right. Would I be correct if I said to you that it was after he had put his feet together and put his arms at his side at the request of the lieutenant that the attitude began to change?

MR. ROONEY: Objection. Lacks foundation, assumes facts not in evidence.

THE WITNESS: I don't think you'd be correct.

MR. HALEY: Q. All right. I think you told me it was after he put his feet together that the attitude began to change so --

**A** No, I --

MR. ROONEY: I think that misstates his testimony.

 THE WITNESS: I think he was already verbalizing, "Why are you messing with me? Why are you messing with me?" And then, without having the video right here in front of me, when he was told to put his feet together, I believe he did.

When he was told to put his hands at his sides -- part of the FSTs is the ability to follow simple instructions. When he was told to put his hands to his sides, he moved them up, and then he put them to his sides. And then it went -- I think that's when it went south.

MR. HALEY: Q. Okay. And all I'm really trying to ask you is when it went south, when --

**A** Exactly when, I can't tell you exactly.

**Q** All right. But it was some point after the lieutenant and Mr. Greer began the balance test, true?

**A** It was during that test. Not after, during.

**Q** Okay. You used the term began to go south, so I'm going to use that term. And earlier on in the deposition, you said you knew something was gonna go -- you knew that it was gonna go badly.

Was that the moment where you knew it was gonna go badly during the field sobriety tests? I'm going to call that the balance test. During the balance test?

**A** When we went to the other side of the truck,

during that process. I don't doubt my gut, and my gut -- I mean, you get the hair standing up. I just -- I knew something was gonna happen.

**Q** Okay. That's the moment I'm going to try to really pin you down on, the moment you knew something was going to happen.

**A** The minute I knew something was going to happen --

MR. ROONEY: There's no question pending.

THE WITNESS: Oh, I'm sorry.

MR. HALEY: Q. That moment didn't happen certainly until Mr. Greer was on the driver's side of the truck, true? The passenger's side of the truck.

**A** Correct.

**Q** All right. And it hadn't come when the balance test began, correct?

**A** That's when the tone, I think, changed.

**Q** Okay. I just want to know when the hairs went up on your arms, and you knew something was gonna go down. Did it --

MR. ROONEY: Then ask him that.

MR. HALEY: All right. I'm trying to.

MR. ROONEY: No, you're trying to lead him.

MR. HALEY: Q. All right. When during the balance test did you reach that point?

**A** I don't --

MR. ROONEY: Assumes facts not in evidence.

THE WITNESS: I don't know if it was during the balance test, but when he pulled up his shorts and started to look around, based on my experience, those are preassaultive behaviors.

**Q** Okay. So I thought we were past that. Now we're going to have to back up. Because I think you'd already told me that there was no problem up until the time the balance test started. Now you seem to say that the problem started when he looked down at his shin. Again --

**A** No, I didn't.

MR. ROONEY: That's not what he said.

MR. HALEY: Q. Okay. So the problems had not started -- that feeling you had, you didn't have it when he looked down at his shin, true?

**A** True.

**Q** All right. And then the next thing that happened after he looked down at his shin was the lieutenant began to give him the balance test, true?

**A** Based on my recollection, that test was never begun.

**Q** All right.

**A** Only instructions.

Q Did you see any other officer holding a taser at that point?

A No.

Q At any point before the physical scuffle began, did you see any officer with a taser in their hand?

A No.

Q At any point before the physical tussle began, did you in your head say, "I really better get this taser out"?

A No.

Q All right. Okay. Now I'm going to keep going through. Your memory is he never -- your memory is Mr. Greer did not comply with any of the lieutenant's requests as it related to the balance test, true?

A True.

Q All right. And then what happened?

A Mr. Greer tried walking away --

Q Okay.

A -- from the lieutenant.

Q All right. Did he turn his back and start walking away?

A I think he -- I don't recall --

Q All right.

A -- which way he turned.

Q It's on the video. I won't ask you. He took a

couple steps to the side, correct?

A I believe so.

Q All right. And is that what you have described as him walking away when he took a couple steps to the side?

MR. ROONEY: Assumes facts not in evidence that it was a couple steps.

MR. HALEY: Q. Yeah, and I don't mean to put a couple in it, but there was --

A I would say he was going to walk away from the lieutenant.

Q All right. My question is a little different. He did, in your memory and on the video, take some number of steps sideways. Do you recall that?

A I don't know if they were sideways or if he turned.

Q All right. Did he turn and walk away from the lieutenant?

A I think so.

Q All right. What did you do in response to that?

A Approached Mr. Greer.

Q And what did you do then?

A I believe I grabbed the back of his T-shirt.

Q Okay. And then what happened next?

A The struggle was on.

**Q** All right. And did you have assistance from the lieutenant?

**A** I believe so.

MR. ROONEY: Objection. Vague.

MR. HALEY: Q. Okay. And the other two -- by that point, did you realize there were two more Hayward officers there?

**A** The entire time I thought there was Lieutenant Lutzinger, another Hayward officer, and myself.

**Q** Okay. And when the struggle began, that was when you thought there was just the three of you and Mr. Greer?

**A** Yes, sir.

**Q** All right. Did you take Mr. Greer down to the ground?

MR. ROONEY: Objection. Vague.

MR. KADOTANI: Join.

MR. ROONEY: Do you mean with takedown technique taught in defensive tactics?

MR. HALEY: Q. You can go ahead and answer the question.

MR. ROONEY: The question is vague. You can answer it if you can.

THE WITNESS: I tried, along with the other two.

MR. HALEY: Q. All right. And you and the

other two officers tried to take Mr. Greer down?

**A** Initially, no. Mr. Greer was given instructions to put his hands behind his back.

MR. KADOTANI: Belated objection. Calls for speculation as to what the other officers were trying to do.

MR. HALEY: Q. He was asked to put his hands behind his back by who?

**A** A Hayward officer. I don't know who, which one.

**Q** And then did he comply with that?

**A** No.

**Q** Do you know whether or not due to his size Mr. Greer was able, physically able, to put his hands behind his back?

MR. ROONEY: Objection. Calls for speculation.

MR. KADOTANI: Join.

THE WITNESS: I don't know.

MR. HALEY: Q. All right. After he did not put his hands behind his back, is that when you grabbed his T-shirt?

**A** During that, yeah.

**Q** All right.

**A** I think I remember giving him verbal commands.

**Q** Okay. And what verbal commands did you give him?

**A** "Calm down. Relax."

**Q** All right.

**A** "You're gonna be okay." All the nar -- trying to give him --

**Q** I think I'm -- it's my fault. I'm not being specific as to time. But I'm now asking about the moments where you initially physically engage Mr. Greer. Are you with me on that?

**A** Mm-hmm.

**Q** And I believe you said the first memory you have of physically engaging him is grabbing his T-shirt; is that accurate?

MR. ROONEY: He said the back of the shirt.

THE WITNESS: The back of his T-shirt.

MR. HALEY: Q. Okay. And then you and the other officers tried to take him down?

MR. KADOTANI: Calls for speculation.

MR. ROONEY: Objection. Misstates testimony.

THE WITNESS: No, sir.

MR. HALEY: Q. All right.

**A** Initially, I remember hearing verbal commands, "Put your hands behind your back."

**Q** Okay. And then he didn't comply, true?

**A** True.

**Q** And then you grabbed the T-shirt, some part of

the T-shirt?

**A** True.

**Q** And the other officers grabbed other parts of him, true?

**A** I assume.

**Q** All right. And --

**A** Nope, sorry.

MR. ROONEY: Don't guess what other officers did.

THE WITNESS: I don't know what they were doing.

MR. HALEY: Q. Okay. But your effort was to take him to the ground --

**A** Yes.

**Q** -- true?

MR. ROONEY: Objection.

MR. HALEY: All right. Don't --

THE WITNESS: I'm sorry.

MR. ROONEY: A, it's vague as to time. B, the term take to the ground is vague and calls for an expert opinion.

MR. HALEY: All right.

MR. ROONEY: Just because he suggests something, you don't have to agree with it.

THE WITNESS: When --

MR. HALEY: Q. Well --

A Sorry.

Q -- the question's been asked and answered, so I'm going to move on.

A Can I clarify that or --

Q When you get the transcript.

MR. ROONEY: So you're --

THE WITNESS: Eventually, I wanted to get him to the ground.

MR. HALEY: Q. All right. And that was your effort during the struggle to get him down on the ground?

A Initially, no.

Q After the initial efforts to get him to comply, did you try to get him down to the ground?

A When he failed to comply.

Q Right.

A That's when I wanted to get him to the ground.

Q All right. The Hayward officers, do you know what they were doing during those moments where you were trying to get Mr. Greer down to the ground?

MR. ROONEY: Objection.

MR. KADOTANI: Calls --

MR. ROONEY: He's never said that he tried to take him to the ground. You're misstating testimony. He said he wanted him on the ground, not that he actually took him to the ground.

 MR. KADOTANI: Calls for speculation.

MR. ROONEY: There's a difference.

MR. HALEY: Q. All right. In those moments where you wanted to take Mr. Greer to the ground, did you know what the Hayward Police Officers were doing?

MR. KADOTANI: Calls for speculation.

THE WITNESS: I know that he was not complying putting his hands behind his back.

MR. HALEY: Q. Right. But in terms of physically what they were grabbing onto and what they were doing, can you describe that for me?

A No.

Q All right. Did you have the sense that they were providing you some kind of assistance in dealing with Mr. Greer?

A I'm sorry?

Q I know you can't -- so I'm --

A They weren't providing me assistance. I was providing them assistance.

Q Okay. I'm making this more complicated than it is. I just want to know if -- in those moments where you wanted Mr. Greer to go down on the ground, where were the Hayward officers?

MR. KADOTANI: Calls for speculation.

MR. ROONEY: It's also compound.

THE WITNESS: On his sides.

MR. HALEY: Q. Okay.

**A** His right and left side.

**Q** And this is gonna sound like a stupid question, but I have to ask it. Do you know whether they wanted, as you did, to take Mr. Greer down to the ground?

MR. KADOTANI: Calls for speculation, lacks foundation.

MR. ROONEY: So stipulated.

THE WITNESS: I don't know.

MR. ROONEY: Calls for speculation.

MR. HALEY: Q. All right. Well, they didn't say anything like, "Get him down. Get him down"? Did you hear either one of them yell anything like that?

**A** I don't recall.

**Q** All right. Were you able to take him down to the ground?

**A** Was I?

**Q** Perhaps with the assistance of the Hayward officers.

**A** We ended up on the ground.

**Q** All right. I believe I read somewhere that he landed on top of you. Is that -- do you remember that? Do you remember how you landed on the ground?

MR. ROONEY: I'm sorry, what was the question?

him"?

A Generally, that's the easier way, yes.

Q All right. And -- all right. Once he was on his stomach, where did you go?

A I believe I was on -- still underneath the bumper on his right side.

Q Okay. So if he's on his stomach, that would be the right -- his right side would be the passenger's side of the truck?

A Yes. Initially, he was on his -- he was on his right side.

Q So when he went to the ground, he landed and, I guess, stopped lying on his right side?

A Yes.

Q All right. That's about the time you yourself were underneath the trailer hitch of the truck?

A When we landed?

Q Yeah.

A No, I was not under the trailer hitch at that time.

Q Okay. So when he landed on his right side, where did you land?

A Basically on my right side, as well.

Q Okay. And were you closer to the passenger's side of the truck or the driver's side of the truck?

A Passenger's side.

Q Okay.

A Rear fender/bumper area.

Q And then somehow or another, you ended up underneath the truck. How did that happen?

A Well --

MR. ROONEY: Well, he said under the trailer hitch, not under the truck. Go ahead.

THE WITNESS: When we were able to get him moved off of -- basically, 'cause his -- his shear weight was not on top of me. We were able to push him over, and I believe his -- on his right side. His right arm was underneath him. And we -- obviously, you can't handcuff somebody that way. So the easiest way to do it is to finish rolling him over and grabbing and pulling his right arm behind his back.

MR. HALEY: Q. Okay. Rolling him over on his stomach?

A Yes.

Q All right. All right. After he's rolled over on his stomach, what position were you in?

A I was on his right side.

MR. HALEY: Let's take a break.

(Recess taken.)

MR. HALEY: Q. I want to take you back to the

on his shoulder?

MR. KADOTANI: Calls for speculation, lacks foundation.

THE WITNESS: I don't remember.

MR. HALEY: Q. Okay. By that, just so it's clear, that may have happened? That may not have happened? You just don't remember one way or another, true?

MR. KADOTANI: Same objections.

THE WITNESS: I don't know -- I don't know if it was on his shoulder. I think it was on his shoulder, the knee, later on, not during the initial struggle.

MR. HALEY: Q. Okay. Later on while he's on his stomach?

**A** I believe so.

**Q** All right. I'll get to that. Remind me when we get to that moment. But I'm going back now to the -- when you get the right wrist out from underneath him, and then the next thing you said is he's trying to do push-ups. He's trying to get up. Describe that for me.

**A** He just kept trying to push himself up.

**Q** Okay.

**A** I mean, it was like I described at Hayward Homicide. It was like I've never felt. I mean, it was, I think I told them, like super -- Superman, super human

strength or something. I mean, it was -- I just remember my head hitting that bumper or one -- the tow hitch or the bumper as he's trying to push up, push up. And obviously, I mean, it was -- it was a struggle.

**Q** Okay.

**A** I mean --

**Q** Were you still under the bumper when you were able to pull his right wrist out from underneath him?

**A** I believe my head -- the -- my whole body wasn't under there.

**Q** Okay.

**A** It was just my head.

**Q** All right. So your head was still underneath the bumper after you were able to pull his right wrist out from underneath him?

**A** At some point, yes, I think I was able to pull his right arm out. How I did it, I don't remember.

**Q** Okay. And then you've talked about how after you pull the right arm out, he's doing push-ups, and you're bumping your head up against the -- some part of the truck, true?

**A** I don't remember exactly at which point, if it was -- I think he was doing the -- trying to push himself up prior -- prior to me grabbing his right arm.

**Q** All right. So just to make it smooth, his

efforts to do push-ups where your head was hitting the bottom of the truck or the trailer hitch, whatever it is, that was going on before you were able to get his right wrist out from underneath him? Is that your memory?

**A** I believe so.

**Q** All right. And then you're able to get the right wrist out from underneath him, right?

**A** I believe so.

**Q** All right. At that moment when you get the right wrist out from underneath him, had he been tased yet?

MR. KADOTANI: Lacks foundation.

THE WITNESS: I don't recall.

MR. HALEY: Q. Okay. At some point he was tased.

**A** I heard the ECD go off.

**Q** And if I were to ask you when in the process that happened, I take it it's all fuzzy, runs together, when in the process he was tased?

**A** Yeah, I don't -- I re -- I remember hearing the verbal commands, and then I heard the ECD go off.

**Q** Okay.

**A** Taser.

**Q** And did you hear the ACD go off?

**A** E.

**Q** ECD, sorry. I should know that by now. Did you hear the ECD go off more than one time?

**A** I believe I heard it twice.

**Q** All right. After you get the wrist out from underneath him, does he stop doing the push-ups?

**A** The struggle was continuing.

**Q** A little different. I mean, there's different ways to struggle, and one way you've described is him doing push-ups. After you pull his right arm out from underneath him, did the push-ups stop?

**A** At some point, yes. I don't remember when.

**Q** All right. All right. And then you've got his right hand out from underneath him. What do you do with the right hand?

**A** I don't remember.

**Q** All right. Ultimately, were you able to get a cuff on the right hand?

**A** Me? No.

**Q** All right. Ultimately, did you see someone get a cuff on the right hand?

**A** I didn't see it. Somebody did.

**Q** All right. And were you still holding onto the right hand when the cuff went on?

MR. KADOTANI: He just said he didn't see it.

THE WITNESS: I don't remember.

MR. HALEY: Q. Did you ever let go of the right hand, as far as you know, before it was cuffed?

**A** I think so.

**Q** All right. And why did you let go of the right hand?

**A** 'Cause I believe the left hand was free with the handcuff --

**Q** Okay.

**A** -- in the air.

**Q** All right. So while you're holding onto the right hand, you see the left hand has now been freed, and there's a cuff on the left hand?

**A** Yes. I believe it was actually in front of him, but the left hand was free with the handcuff.

**Q** All right. But the left hand was not behind his back with the cuff on it?

**A** No.

**Q** All right. So some -- I won't ask how that happened. That would be speculation. But you noticed that Mr. Greer's left hand was underneath him but now had a cuff on it?

**A** It was not underneath him.

**Q** Where was the left hand?

**A** Up above his left shoulder.

**Q** Okay. And was somebody -- if you remember, was

there an officer holding the left hand, or was it free?

**A** I don't recall.

**Q** All right. But you did see that his left hand was not underneath him anymore, and there was a cuff on it?

**A** Yes.

**Q** All right. And was it your decision at that point, knowing that the left hand had a cuff on it, and you had freed his right hand, that you could let it go so that someone could attach the cuff to the other hand?

**A** What? Sorry.

**Q** Okay. I read a lot more into your answer than I perhaps should have. It sounded to me like the reason you let go of the right hand was because you saw that the left hand had a cuff on it.

MR. ROONEY: Misstates testimony.

THE WITNESS: I don't know why I let go of it.

MR. HALEY: Q. Okay.

**A** If there was another person that had it, I don't know.

**Q** Okay.

**A** All I know is I wanted that left handcuff secured. That's very dangerous.

**Q** Okay. So after you let go of the right hand, what did you do?

**A** I believe I grabbed the handcuffs on the left arm until somebody else was able to assist.

**Q** Okay. And did you have to switch to the other side of Mr. Greer, or did you do that from where you were when you had your -- had a hold of his right wrist?

**A** Like I said, I think I let go of his right wrist.

**Q** All right.

**A** And I don't -- I don't know if someone else had it or what, but I grabbed that left handcuff.

**Q** Okay. And so my question -- and maybe you don't know this, but I have you holding onto his right wrist, and then you let it go. Do you have to move anywhere in order to grab the left wrist, or do you stay right where you were?

**A** Again, I don't know if I let go of his right wrist. I don't know if somebody else took it.

MR. ROONEY: The question was: Did you reposition yourself when you grabbed the left handcuff?

THE WITNESS: No.

MR. HALEY: Q. All right.

**A** Sorry.

MR. ROONEY: Just listen to the question.

MR. HALEY: Q. It's okay. And anytime you want to take a break, you're the second most important person

From the time you grabbed the chain on the left wrist until the time you said or saw or knew he was handcuffed, whatever it is, do you know whether or not you ever let go of the chain on the left wrist?

**A** I don't -- I don't recall.

**Q** All right. At some point did you see a Hayward Police Officer with his knee on Mr. Greer's shoulder?

MR. KADOTANI: Calls for speculation.

MR. ROONEY: Asked and answered.

THE WITNESS: Answer it?

MR. ROONEY: Go ahead if you can.

THE WITNESS: During the incident, no.

MR. HALEY: Q. Did you see it -- did you see a video of it happening?

**A** Yes.

**Q** All right. So on the video, you saw an officer with his knee on Mr. Greer's shoulder?

**A** Yes.

**Q** All right. During -- I guess I have to ask you this. From the time you went down to the ground until Mr. Greer was handcuffed, did you hear him say anything?

**A** Yes.

**Q** All right. What was he saying?

**A** I think he said, "You don't know who you're fucking with." I don't -- he was yelling but -- or

shouting, but exactly what, I don't recall.

**Q** All right. Did he say, "You don't know who you're fucking with," during that timeframe?

**A** I think so.

**Q** All right. Did he say, "What are you guys doing?"

**A** At some point. I don't recall if it was on the ground or if we were still standing up at that time.

**Q** All right. At any point before he was handcuffed, did you notice him to stop saying anything?

**A** I think right at the end when he was handcuffed.

**Q** All right. A couple other specific questions. Did you see any officer use a baton up around Mr. Greer's head or neck during the struggle?

**A** During the incident?

**Q** Yes.

**A** I did not recall that.

**Q** During the struggle, do you remember any officer reaching with a gloved hand beneath Mr. Greer's chin and pulling up?

**A** During the struggle?

**Q** Yeah.

**A** No.

**Q** Did you see that on the video?

**A** Yes.

rolled him over, was -- in your mind, it was just you and two Hayward Police officers, or were you aware that others had arrived?

**A** No, I knew there was more now.

**Q** Okay. And after you rolled him over, what did you see?

**A** His eyes were closed. And I just told whoever was there, "Hey, he's unconscious."

**Q** All right. As soon as you rolled him over, was it your impression that he was unconscious?

**A** Yes.

**Q** All right. Did you have any sensation that he was faking being unconscious?

**A** Didn't think of that.

**Q** All right. At the moment you rolled him over, had any part of the WRAP been put on his -- put on him?

**A** I think I heard them saying they were putting the ankle part.

**Q** Okay. Did you see them putting the ankle part of the WRAP on before you rolled him over?

**A** No.

**Q** Okay. When you rolled him over, did you look and see an ankle portion on the -- on his legs?

**A** I don't recall.

**Q** When you rolled him over -- you may not know

**A** That's it.

**Q** All right. And he was unconscious?

**A** I thought so.

MR. ROONEY: Objection. Calls for an expert opinion.

MR. KADOTANI: Join.

MR. HALEY: Q. Okay. Because of all the drama, let me ask you. After they rolled him over, he appeared to be unconscious to you?

**A** Yes.

**Q** All right. What did you do in response to his appearing unconscious to you?

**A** I advised the other officers, "He looks unconscious."

**Q** All right.

**A** I actually said, "He's unconscious."

**Q** Could you hear yourself on the video? I heard somebody say it on the video. Do you remember that to be you?

**A** Yes.

**Q** All right. Other than saying, "He's unconscious," did you do anything else?

**A** No, sir.

**Q** <u>Okay. Did any of the other officers do anything that you could see in response to you saying, "He's</u>

unconscious"?

MR. KADOTANI: Calls for speculation.

THE WITNESS: I remember seeing someone checking for a pulse.

MR. HALEY: Q. Okay. And do you remember who that was?

**A** No.

**Q** And did he say anything after he checked for the pulse?

**A** "He's got a pulse."

MR. ROONEY: Who's he?

THE WITNESS: Oh, sorry.

MR. ROONEY: Who's he?

MR. HALEY: Well, we don't know who he is because he doesn't know who it was.

MR. ROONEY: No. You said, "Did he say anything after checking for a pulse?"

MR. HALEY: Oh. The person that checked for the pulse.

MR. ROONEY: Thank you.

MR. HALEY: Did he say anything?

**A** "There's a pulse."

**Q** All right. Did he say, "We should get medical aid here right away"?

**A** I think aid was already there.

moments after you said, "He's unconscious"?

**A** I believe I got up and walked away.

**Q** All right. What did you do after that? Let me go back.

So after you got up and walked away, you couldn't see what was going on with Mr. Greer, I take it.

**A** I think you're right.

**Q** And I take it that's why you can't tell me who or when the other portions of the WRAP were put on 'cause you didn't see that, true?

MR. KADOTANI: Assumes facts not in evidence, lacks foundation.

THE WITNESS: True.

MR. HALEY: Q. All right. Did you -- when you got up and walked away, did you see whether or not emergency personnel were standing by?

**A** I remember hearing somebody stating, "Medical's on scene," or medics or whoever, however they said it.

**Q** Okay. So you heard somebody say that, right?

**A** Yes.

**Q** Did you see any medics on scene as you turned to go away from Mr. Greer?

**A** I remember seeing a fire truck.

**Q** Okay. Was it a fire truck or an ambulance or a paramedic truck that you saw?

EMERICK & FINCH
Certified Shorthand Reporters
18 Crow Canyon Court, Suite 125
San Ramon, California 94583
Telephone (925) 831-9029

Job No.________

_________________, 2016

SERGEANT JON TOUGAS
c/o OWEN T. ROONEY, Esq.
Gilbert, Kelly, Crowley & Jennett, LLP
44 Montgomery Street, Suite 2080
San Francisco, California 94104

Re: GREER vs. CITY OF HAYWARD, et al.

Dear SERGEANT JON TOUGAS:

Your deposition in the above matter is now available at this office. You may wish to discuss with your attorney whether he or she requires that it be read, corrected, if necessary, and signed before it is filed with the court, if so ordered.

Since the original deposition may not be released from our custody, if you wish to sign it, please appear at this office, 18 Crow Canyon Court, Suite 125, San Ramon, California, within the next 30 days on any weekday between the hours of 9:00 a.m. and 4:00 p.m. It is necessary that you bring this letter with you.

In the alternative, you may wish to read your attorney's copy of the deposition and notify this office by letter of any changes you desire to be made.

Very truly yours,
EMERICK & FINCH

__________________________________
LISA LOUNDAGIN, CSR No. 9213

cc: All Counsel

# EXHIBIT C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSEPH JAMES GREER

Plaintiff,

vs. No. 3:15-CV-02307-WHO

CITY OF HAYWARD, BAY AREA RAPID TRANSIT DISTRICT, et al.,

Defendants.

_______________________________/

VIDEOTAPED DEPOSITION OF OFFICER BRIAN LEWANDOWSKI

Taken before LORI A. YOCK, CSR, RPR

Certified Shorthand Reporter No. 5801

Registered Professional Reporter No. 18667

State of California

Monday, September 19, 2016

**Q.** And was that just training or were you also doing patrol during that training? 13:54:13 13:54:17

**A.** It was patrol training. So it was patrol and training. 13:54:19 13:54:22

**Q.** When did you complete that six months? 13:54:25

**A.** I don't recall the exact date. 13:54:28

**Q.** Okay. And then what did you do after that? 13:54:30

**A.** I was assigned to Transit Services Bureau in downtown Los Angeles. 13:54:33 13:54:41

**Q.** And what did you do there? 13:54:45

**A.** There I was assigned to patrol the rails, buses, train systems throughout LA County. 13:54:46 13:54:51

**Q.** How long did you do that? 13:54:58

**A.** Until I left. Until 2013. 13:54:59

**Q.** And when you left, you went to the Hayward Police Department? 13:55:08 13:55:17

**A.** Yes. 13:55:17

**Q.** Have you been regularly employed by the Hayward Police Department ever since you started there in 2013? 13:55:20 13:55:23

**A.** Yes. 13:55:26

**Q.** The Baca case -- the Lee Baca case -- your deposition in that case, did that deposition -- the questions ask about any particular part of your duties as an LA County sheriff, like one jail in particular, or all the jails, or not a jail at all? 13:55:27 13:55:35 13:55:38 13:55:43 13:55:48

that night? 14:09:17

**A.** He was my beat partner. He was working the beat adjacent to me. 14:09:18 14:09:21

**Q.** So you worked one beat? 14:09:23

**A.** Correct. 14:09:25

**Q.** And then he worked the beat adjacent to you? 14:09:26

**A.** Correct. 14:09:29

**Q.** And how long had you been at the parking lot with Officer Clark before you left there? 14:09:29 14:09:39

**A.** Don't recall honestly. 14:09:42

**Q.** All right. And then what caused you to leave the parking lot? 14:09:46 14:09:51

**A.** Lieutenant Lutzinger advised via the radio that he was going on a traffic stop and advised that he was requesting a Code 8 backup request, and at that point dispatch normally assigns someone to take the cover. Officer Clark was assigned to take that cover, and I attached myself. I can self attach to calls. 14:09:53 14:09:58 14:10:01 14:10:06 14:10:12 14:10:17

**Q.** All right. If you can be more specific and tell me how that happens. The Code 8 request, is that the first thing that happened that advised you that the lieutenant needed someone? 14:10:23 14:10:27 14:10:32 14:10:34

**A.** It did, because sometimes Code 8's will automatically -- or someone will automatically be dispatched by dispatch for a cover officer. But when 14:10:37 14:10:45 14:10:47

another officer specifically requests a backup, it's usually because they have something that's making that area on the back of their neck stand up. So -- 14:10:52 14:10:56 14:11:00

**Q.** So the first thing -- going back to basics here, the first thing is you hear something on your vehicle radio? 14:11:03 14:11:08 14:11:13

**A.** Yes. 14:11:13

**Q.** And is it Lieutenant Lutzinger or is it the dispatch? 14:11:13 14:11:17

**A.** It's Lieutenant Lutzinger. 14:11:18

**Q.** And that was also, I take it, broadcast in Officer Clark's car? 14:11:19 14:11:26

**A.** Correct. 14:11:27

**Q.** And what did the lieutenant say? 14:11:28

**A.** I don't recall his exact words. Something along the lines of, "Can I get a Code 8." 14:11:31 14:11:35

**Q.** All right. And what does a Code 8 mean? When they say Code 8, what does that mean? 14:11:38 14:11:43

**A.** An additional officer for backup. 14:11:46

**Q.** In routine DUI arrests before that, was it common that someone would request a Code 8? 14:11:48 14:11:53

**A.** Yes. 14:11:56

**Q.** At some point, I understand that you had the hairs on the back of your neck up before you ever went -- before you arrived at the scene; is that true? 14:11:57 14:12:09 14:12:13

A. Correct. 14:23:16

Q. And you didn't notice before you came around that the subject was uncooperative or refusing or doing anything? As far as you know, he just got out of the vehicle? 14:23:17 14:23:19 14:23:24 14:23:26

A. Correct. 14:23:26

Q. And that had to be reassuring to you, too? 14:23:27

A. Yes. 14:23:31

MR. VUCINICH: Well -- okay. 14:23:31

MR. ROONEY: Objection; vague. 14:23:32

BY MR. HALEY: 14:23:34

Q. Okay. All right. And then you get on the other side of the truck. And what happens next? 14:23:34 14:23:39

A. Lieutenant Lutzinger explains to Mr. Greer that he was going to conduct a field sobriety test on him. At first, they conducted a pat-down for weapons. 14:23:44 14:23:49 14:23:55

Q. And who conducted the pat-down? 14:23:59

A. It was Lieutenant Lutzinger and Officer Clark. 14:24:02

Q. And were you able to see them conduct the pat-down? 14:24:04 14:24:08

A. Yes, I was. 14:24:08

Q. All right. And were you able to determine from the pat-down that he had no weapons? 14:24:09 14:24:16

A. He was in possession of a pocket knife. 14:24:18

Q. Okay. Were you able to see one of the officers 14:24:21

take that knife into possession? 14:24:24

**A.** I saw Officer Clark take the pocket knife. 14:24:26

**Q.** And the subject never brandished the pocket knife, never tried to hurt anybody with the pocket knife; true? 14:24:30 14:24:33 14:24:38

**A.** True. 14:24:38

**Q.** And the subject was cooperative in letting both officers pat him down for weapons? 14:24:38 14:24:42

**A.** It appeared so. 14:24:47

**Q.** Okay. So what happens next? 14:24:49

**A.** The suspect turned around, and Lieutenant Lutzinger explains to him the horizontal gaze nystagmus test which he is going to perform on him. 14:24:52 14:24:58 14:25:03

**Q.** And they are both still on the driver's side of the truck? 14:25:05 14:25:08

**A.** Correct. 14:25:08

**Q.** That's my understanding. So -- and so -- and so then what happens? 14:25:09 14:25:20

**A.** Lieutenant Lutzinger attempts to perform the test, and from my understanding, he is unsuccessful. 14:25:21 14:25:24

**Q.** I just want to ask you what you saw. Okay? So did you see the test administered? 14:25:31 14:25:35

**A.** Yes, I did. 14:25:37

**Q.** And from your perspective, did you see any problems with the way the detective -- the lieutenant 14:25:38 14:25:44

administered the test? 14:25:48

**A.** No, I did not. 14:25:49

**Q.** Did you see any problems with the way the subject responded to the test? 14:25:50 14:25:53

**A.** Yes. 14:25:55

**Q.** Okay. And what did you see? 14:25:55

**A.** I was able to see his eye movement, and it was -- I noticed lack of -- lack of smooth pursuit in his eyes in following the lieutenant's finger. His eyes were darting back and forth. He was unable to keep his head steady, just wanted to follow the lieutenant's finger with his head instead of just his eyes. It appeared he was unable to complete the test. 14:25:57 14:26:00 14:26:07 14:26:10 14:26:14 14:26:18 14:26:22

**Q.** And where were you standing when you saw the -- 14:26:27

**A.** I was standing behind Lieutenant Lutzinger to the right. 14:26:33 14:26:36

**Q.** How far away? 14:26:37

**A.** I would approximate no more than ten feet. 14:26:39

**Q.** If you would then tell me all of the things you saw in the horizontal gaze nystagmus test that the lieutenant gave the subject that you found to be abnormal or inconsistent with sobriety. 14:26:56 14:27:06 14:27:10 14:27:16

**A.** Well, normally a sober person has smooth pursuit. 14:27:19 14:27:23

**Q.** And you were able, from your spot, to determine 14:27:23

feet away, you were able to see that his -- it was not smooth at the extremes on that test? 14:30:08 14:30:14

MR. ROONEY: Objection; misstates testimony. He said no more than ten feet. 14:30:16 14:30:19

BY MR. HALEY: 14:30:29

**Q.** Okay. What happened next after the horizontal gaze nystagmus test? 14:30:30 14:30:38

**A.** I believe Officer Lutzinger decided he wanted to administer the walk and turn test and the balance test. Due to the area on the driver's side of the vehicle was uneven, he elected to move to the passenger side of the vehicle where there was more level ground. 14:30:41 14:30:46 14:30:50 14:30:53 14:30:57

**Q.** Okay. And did you from your vantage point see the lieutenant and the subject walk around the truck to get to where the lieutenant wanted them to go? 14:31:00 14:31:04 14:31:08

**A.** Yes. 14:31:11

**Q.** And the subject was able to do that? 14:31:11

**A.** Yes. 14:31:13

**Q.** And he followed the lieutenant's instructions on "let's go over here" and he went over there? 14:31:14 14:31:16

**A.** He went over there, yes. 14:31:19

**Q.** You seemed hesitant to say that he went over there. Is there any reason that you are hesitant to say that when the lieutenant asked him to walk around the truck, he walked around the truck? 14:31:21 14:31:24 14:31:29 14:31:32

and went around to his right side, you walked behind Mr. Greer? 14:39:03 14:39:07

**A.** I believe so. 14:39:08

**Q.** And when you walked behind Mr. Greer, the lieutenant was looking right at Mr. Greer as part of the balance test? 14:39:08 14:39:12 14:39:16

**A.** He was facing Mr. Greer. I can't speculate on whether he was actually looking at him. 14:39:17 14:39:20

**Q.** Okay. And he was facing you, too, as you walked behind Mr. Greer? 14:39:26 14:39:29

**A.** Correct. 14:39:30

**Q.** All right. Did you have your Taser unholstered while you walked past them? 14:39:31 14:39:36

**A.** No, I did not. 14:39:38

**Q.** And then you get over on the right side of Mr. Greer. And what happens when you get over there? 14:39:39 14:39:42

**A.** I observed Lieutenant Lutzinger attempting to perform the balance test and explain it to Mr. Greer. Mr. Greer was continually spreading his feet out, moving around, unable to stand on -- or even -- almost pretty much participate in the test. He began asking in a somewhat agitated voice, "Why are you doing this to me? Why are you doing? What are you doing" over and over again questioning it. And at that point, as I could sense his agitated state and repeated questions is when 14:39:44 14:39:48 14:39:53 14:39:57 14:40:01 14:40:06 14:40:09 14:40:11 14:40:14

I withdrew my Taser. 14:40:18

**Q.** Okay. Had you seen the 3 on the leg while you were on his left side or when you walked all the way around to his right side? 14:40:19 14:40:23 14:40:27

**A.** When I was on his left side. 14:40:29

**Q.** All right. And then nothing else raised the hackles on your neck until you went all the way around to the right side? 14:40:31 14:40:33 14:40:37

**A.** Correct. 14:40:38

**Q.** And then when you got on the right side, something happened during the balance test that raised the hackles sufficiently on your neck that you unholstered your Taser? 14:40:38 14:40:42 14:40:46 14:40:49

**A.** Correct. 14:40:50

**Q.** Okay. So let me ask you about that. When you got to the right side and you saw what you were going to see, was he confrontational during the balance test? 14:40:50 14:40:53 14:40:57

MR. ROONEY: Objection; vague. 14:41:02

MR. VUCINICH: Same objection. It's vague -- confrontational. 14:41:04 14:41:05

MR. ROONEY: And I'll also object. I think you misstated his testimony when you talked about the hairs on the back of his neck, but go ahead. 14:41:07 14:41:09 14:41:12

MR. VUCINICH: Go ahead. 14:41:14

// 14:41:16

BY MR. HALEY: 14:41:16

Q. At any point before the conclusion of the balance test, before it stopped, did you conclude that the subject was confrontational? 14:41:16 14:41:20 14:41:26

MR. ROONEY: Same objection as being vague. 14:41:29

MR. HALEY: I think it's his word, just so you know. 14:41:32 14:41:35

THE WITNESS: In my opinion, based on the totality of the circumstances, the way he was moving around and repeatedly in what appeared to be an aggravated voice, not normal talking like you and I are doing right now, it appeared he was being uncooperative. 14:41:35 14:41:38 14:41:41 14:41:45 14:41:50

BY MR. HALEY: 14:41:55

Q. All right. In your mind, do you distinguish uncooperative from confrontational? 14:41:55 14:41:57

A. Confrontational in my mind would be me confronting you in an aggressive manner versus being uncooperative and not doing what you are told to do and raising your voice. Confrontational would be basically almost like me going after you. 14:42:00 14:42:04 14:42:09 14:42:13 14:42:17

Q. Okay. And at any point before that conclusion of the balance test, you would agree with me that Mr. Greer was not confrontational? 14:42:20 14:42:23 14:42:26

A. That's open to interpretation. 14:42:28

Q. Well, I'm just asking you. I'll let you use 14:42:30

to what appeared to be like he was walking away. 14:43:48

**Q.** We'll get to that. I want to go before he walked away. 14:43:51 14:43:55

**A.** Okay. 14:43:56

**Q.** You had drawn -- taken your Taser out of the holster before he started walking away? 14:43:59 14:44:04

**A.** Correct. 14:44:07

**Q.** So I wanted to ask what was going on before that and I think I have the list. One of them was refusing to follow instructions? 14:44:07 14:44:10 14:44:14

**A.** Correct. 14:44:14

**Q.** Did you see Mr. Greer refuse to follow any of the lieutenant's instructions before he walked away? 14:44:15 14:44:23

**A.** He is refusing to perform the test and continued asking, "Why are you doing this? Why are you doing this?" And in my mind, that's a refusal. 14:44:28 14:44:33 14:44:37

**Q.** So he refused to perform one of the tests? 14:44:39

**A.** He either refused or he was unable to. 14:44:42

**Q.** In your mind as a police officer, do you distinguish between a subject who refuses to do something and somebody who can't do it? 14:44:45 14:44:48 14:44:52

**A.** Somebody who can't do it, I distinguish by specifically stating why they can't do it. 14:44:54 14:44:57

**Q.** Did you see the subject refuse to follow any of the lieutenant's orders? 14:45:01 14:45:10

A. At what point? 14:45:13
Q. At any point before he walked away -- took those steps to the side or back, whatever you want to say. 14:45:14 14:45:18
A. Well, he followed orders when asked to get out of the car. He followed orders to remain calm when he was doing the pat-down search. He followed orders when he was asked to walk over to the other side of the car. He was unable to perform -- I don't know whether it was by refusal or unable to do so during the horizontal gaze nystagmus test. And he appeared to be refusing to follow directions -- orders during the balance test. 14:45:21 14:45:24 14:45:30 14:45:32 14:45:34 14:45:37 14:45:42 14:45:47
Q. In any event, to cut it short, in your mind, there were some orders that the lieutenant gave the subject that he refused to follow? 14:45:50 14:45:54 14:45:56
A. Yes. 14:45:59
Q. And that was one of the reasons you had taken your Taser out? 14:46:00 14:46:02
A. Yes. 14:46:04
Q. And then you said he didn't spread his feet? 14:46:04
A. Balance test requires you to -- 14:46:08
MR. ROONEY: Misstates testimony. 14:46:10
BY MR. HALEY: 14:46:10
Q. Was one of the other reasons that you felt he was being uncooperative -- extremely uncooperative that he did not spread his feet during the balance test? 14:46:13 14:46:18 14:46:24

pants. 14:51:44

**Q.** Did he hike up his pants -- 14:51:45

**A.** His shorts. 14:51:47

**Q.** -- after the lieutenant asked him to put his hands at his side? 14:51:48 14:51:51

**A.** I don't recall the exact step by step, frame by frame time details of when he did it. 14:51:53 14:51:56

**Q.** Do you remember the lieutenant asking if he had any injuries? 14:52:00 14:52:02

**A.** No, I do not. 14:52:04

**Q.** Do you know whether or not Mr. Greer lifted his pants up in response to the lieutenant asking him if he had any injuries? 14:52:05 14:52:10 14:52:15

**A.** I don't recall. 14:52:16

**Q.** All right. Tell me what you remember about the end of the balance test. What I really want to do is I want you to just tell me everything you remember about the balance test and how it ended, and then I'll leave you alone -- on that issue. 14:52:17 14:52:26 14:52:31 14:52:35 14:52:39

MR. ROONEY: Totally alone? 14:52:41

MR. HALEY: Totally alone. 14:52:43

THE WITNESS: Towards the end of the balance test, I noticed the subject was still agitated, still asking questions as to, "Why are you doing this to me? Why are you doing this to me" -- something to that 14:52:45 14:52:47 14:52:53 14:52:56

effect. Don't quote me on his exact phrases. 14:53:00

MR. VUCINICH: He will quote you on the exact phrases so you better be careful. 14:53:03 14:53:06

THE WITNESS: Something similar to the effect of, "Why are you doing this? What are you doing this?" I don't know which order he was saying those. Then he began -- he took a couple of steps to the side like he was trying to walk away. That's when I told Lieutenant Lutzinger, "Hey, I have my Taser." And I don't recall if he heard me or not. At that point, I saw the lieutenant grab one of his hands. 14:53:10 14:53:12 14:53:18 14:53:21 14:53:24 14:53:29 14:53:32 14:53:35

BY MR. HALEY: 14:53:38

Q. Okay. I want to go back just a little bit. I don't mean to interrupt you. I apologize, but I want to go through sequentially. 14:53:39 14:53:41 14:53:44

Let's talk about the timeframe up until the time you asked the lieutenant -- what did you -- you said, "I have a Taser. Do you want me to use it?" 14:53:47 14:53:50 14:53:54

A. I said, "I have my Taser." 14:53:56

Q. Okay. And anything else? 14:53:57

A. No. 14:53:58

Q. Okay. And what was going on when you said to the lieutenant, "I have my Taser"? 14:53:59 14:54:01

A. The lieutenant was trying to grab ahold of one of the subject's hands and was trying to guide him back 14:54:02 14:54:06

over towards the truck -- towards the side of the truck. At that point, I believed he was going to be taken into custody and saw the lieutenant -- he appeared to be struggling to bring the subject's hand behind his back. So at that point, I said -- I advised Lieutenant Lutzinger that I had a Taser, which for the duration of the time I had left behind my left thigh out of sight just in case. 14:54:10 14:54:13 14:54:17 14:54:21 14:54:25 14:54:29 14:54:33 14:54:39

**Q.** Did Mr. Greer during the balance test look over at you? 14:54:41 14:54:47

**A.** Not that I recall. 14:54:47

**Q.** The sequence of events, I think you are saying, is that the balance test came to an end. Then Mr. Greer took a couple steps in some direction. Is that your memory of what happened? 14:54:50 14:55:02 14:55:09 14:55:13

**A.** It's my -- 14:55:16

MR. ROONEY: Objection; vague as to the term "came to an end." 14:55:16 14:55:18

THE WITNESS: I don't think it ever really started, but at some point during the balance test, yes, he did take a few steps to -- I believe it was to his left. 14:55:19 14:55:22 14:55:26 14:55:30

BY MR. HALEY: 14:55:30

**Q.** Okay. And Mr. Greer was an obese man. Agree with me? 14:55:31 14:55:39

**A.** Not that I'm aware of. 15:12:19

**Q.** In that timeframe, had Mr. Greer ever struck any officer? 15:12:21 15:12:26

**A.** Not that I'm aware of. 15:12:26

**Q.** And we talked earlier about the times that he refused to comply with the lieutenant's orders. 15:12:28 15:12:38

Other than what we've talked about, were there any other times during that episode that Mr. Greer refused to comply with the lieutenant's orders? 15:12:43 15:12:48 15:12:53

**A.** From which point to which point? 15:12:57

**Q.** From the time you got there until the time Mr. Greer took the two steps to the side. 15:12:59 15:13:01

**A.** Other than what we discussed, I don't recall any other times. 15:13:05 15:13:08

**Q.** All right. After Mr. Greer took the two steps to the side, did the lieutenant instruct you to do anything? 15:13:14 15:13:19

**A.** No. 15:13:22

**Q.** Did you hear the lieutenant instruct any of the other officers there to do anything? 15:13:23 15:13:26

**A.** I didn't hear. 15:13:29

**Q.** I believe you said the first thing that you noticed was the lieutenant taking ahold of one of Mr. Greer's arms? 15:13:37 15:13:39 15:13:43

**A.** Correct. 15:13:44

**Q.** All right. What happened next? 15:13:45

**A.** The next part is kind of fuzzy for me, but I do recall him -- at one point he was grabbing onto -- Lieutenant Lutzinger was grabbing onto one of Mr. Greer's arms, and I believe another officer was grabbing onto the other arm in an attempt to place his hands behind his back. 15:13:49 15:13:54 15:14:02 15:14:04 15:14:08 15:14:12

**Q.** Okay. And who was the other officer? 15:14:13

**A.** I don't recall. I don't recall whether it was the BART officer or Officer Clark. I was focused on what Mr. Greer was doing. 15:14:16 15:14:18 15:14:23

**Q.** But as far as you know, at that time it was just the five officers there? 15:14:24 15:14:26

**A.** Four. 15:14:27

**Q.** Four. Okay. And what did you do after you saw the second officer grab Mr. Greer's other arm? 15:14:29 15:14:35

**A.** I stayed -- that's when I informed the lieutenant that I have my Taser. It was within a split second between the lieutenant grabbing the one hand and the other officer grabbing the other, and I could see them kind of struggling to get Mr. Greer's hands behind his back. At that point, it didn't appear that the Taser would be necessary so I holstered my Taser. 15:14:39 15:14:45 15:14:49 15:14:51 15:14:55 15:14:59 15:15:04

**Q.** Okay. 15:15:14

**A.** He wasn't active -- he wasn't fighting or throwing any punches. So that is why I holstered my 15:15:16 15:15:20

Taser at that time. 15:15:24

**Q.** Okay. 15:15:24

**A.** I formed an opinion at that point that if the Taser was needed, I could readily deploy it again. 15:15:25 15:15:28

At that point I went in to assist the officers in trying to control his hands. I grabbed one of the hands or one of the arms. 15:15:31 15:15:34 15:15:38

**Q.** Do you recall which arm? 15:15:39

**A.** I don't recall which arm at this time. The next thing I know, we ended up on the ground behind the pickup truck. 15:15:41 15:15:44 15:15:48

**Q.** In the Hayward Police Department at that time, there was a maneuver called the takedown? 15:15:57 15:16:00

**A.** Yes. 15:16:04

**Q.** And you had been trained in the takedown? 15:16:05

**A.** Yes. 15:16:08

**Q.** Both in Hayward and in the LA County Sheriff's Office? 15:16:08 15:16:12

**A.** Yes. 15:16:12

**Q.** All right. Did anyone take Mr. Greer down? 15:16:12

**A.** Not that I'm aware of. 15:16:18

**Q.** Do you know what caused him to go down to the ground? 15:16:20 15:16:23

**A.** I do not know what caused him to go to the ground. 15:16:23 15:16:26

**Q.** Did you see anything that might cause him to trip or fall or slip? 15:16:26 15:16:29
**A.** No, I did not. 15:16:30
**Q.** Was it your intent when you went over to engage Mr. Greer and assist the other two officers that he be taken down to the ground? 15:16:31 15:16:36 15:16:39
**A.** No. 15:16:41
**Q.** And is that because you did not think that he needed to be taken down to the ground in order to get him to comply? 15:16:41 15:16:44 15:16:48
**A.** Could you rephrase that? 15:16:49
**Q.** Would it be fair to say that in that moment when you went over to assist, you didn't think that Mr. Greer's conduct was such that he should be taken down to the ground? 15:17:01 15:17:05 15:17:08 15:17:12
MR. VUCINICH: I'll object. No foundation. Go ahead. 15:17:12 15:17:18
THE WITNESS: In my mindset at the time, if a person needs to be taken down to the ground, then attempts will be made to take them to the ground. At that point, I was not trying to take him to the ground. We were trying to restrain him in handcuffs using as little force as necessary. 15:17:18 15:17:20 15:17:23 15:17:29 15:17:31 15:17:35
BY MR. HALEY: 15:17:36
**Q.** So I won't use the word "takedown" because -- let 15:17:36

MR. VUCINICH: Yeah, I don't want him to speculate. You already did ask him that question and he said he didn't know. 15:18:55 15:18:57 15:19:00

THE WITNESS: I have no idea how we got to the ground. 15:19:00 15:19:04

BY MR. HALEY: 15:19:04

**Q.** It's fair to say, though, that it was nothing that you did that caused him to go down to the ground? 15:19:07 15:19:09

**A.** It's fair to say that. 15:19:12

**Q.** Okay. And when he went down to the ground, when he first got down, was he on his stomach, back, side? Explain that to me. 15:19:14 15:19:17 15:19:22

**A.** I don't recall what position he was in. I believe he may have been on his side or on his back at the time. 15:19:24 15:19:26 15:19:33

**Q.** Okay. And we heard earlier that his head when he first went down was somewhere near the rear of the pickup truck. Does that comport with your memory? 15:19:33 15:19:38 15:19:42

**A.** Correct. We ended up near the rear of the pickup truck. 15:19:44 15:19:48

**Q.** And there was some talk about there is a trailer hitch on the truck and his head was somewhere under or near the trailer hitch? 15:19:48 15:19:50 15:19:55

**A.** It was near there. 15:19:55

**Q.** When his head was near the trailer hitch, was he 15:19:56

was tucking his arms in close to the body, not allowing 15:20:47
us to put them behind his back. So it was a matter of 15:20:51
trying to gain control and gain leverage to place his 15:20:55
hands behind his back so he could be detained. 15:20:59

**Q.** In your mind, when you see him with his arms 15:21:03
clutched against his chest refusing to let them go, was 15:21:08
that when he was on his stomach? 15:21:12

**A.** It was during the entire incident. 15:21:14

**Q.** Okay. Do you have a memory of him being on his 15:21:16
back with his arms folded across his chest not letting you 15:21:20
or anyone pull his arms? 15:21:25

**A.** I don't recall at what point -- at what 15:21:27
point -- where his arms were positioned exactly during 15:21:34
the incident. All I remember is we were having trouble 15:21:37
getting them behind his back. 15:21:40

**Q.** And I take it the goal was to get his arms behind 15:21:42
his back so you could put handcuffs on him and control? 15:21:46

**A.** That was a goal. 15:21:49

**Q.** And at some point, did you get him on his 15:21:52
stomach? 15:21:56

**A.** At some point, he ended up on his stomach. 15:21:57

**Q.** Did he roll over on his stomach voluntarily or 15:22:00
was that a purposeful effort on your part to get him on 15:22:04
his stomach so you could handcuff him? 15:22:09

**A.** I don't know -- 15:22:11

MR. VUCINICH: Go ahead. 15:22:13

THE WITNESS: I don't know whether it was voluntary or intentionally. Our goal was always to get him on his stomach because it's kind of hard to handcuff somebody when they are lying on their back. 15:22:14 15:22:17 15:22:22 15:22:25

BY MR. HALEY: 15:22:28

Q. Okay. Can you tell me anything about what you remember -- I know it's fuzzy, but I just want to know, can you remember anything that you can tell me happened from the time that he went down on the ground until the time he was on his stomach? 15:22:28 15:22:30 15:22:34 15:22:37 15:22:41

A. All I can tell you is it's hazy. We were trying to grab at whatever parts of his arms or hands that we could just trying to control him and put them behind his back. 15:22:43 15:22:48 15:22:52 15:22:56

Q. Okay. 15:22:56

A. I don't recall who had what arm or who was where at the time. 15:22:57 15:23:00

Q. All right. Once he was on his stomach, what did you do? 15:23:04 15:23:08

A. Once he was on his stomach, he still had his hands tucked under his body. I was reaching across to try and -- I believe it was his right arm that I was trying to grab -- right or left -- trying to grab either one. At some point I was grabbing at his left hand and 15:23:08 15:23:13 15:23:18 15:23:22 15:23:26

then at another point I was trying to grab his right arm. I don't remember the exact sequence of events -- which arm I was grabbing when, but just trying to assist in any way to get his arms behind his back. 15:23:30 15:23:33 15:23:36 15:23:40

**Q.** And without going into specifics, generally the other officers are trying to grab the other arm? 15:23:43 15:23:46

**A.** Exactly. 15:23:49

**Q.** And at some point, did you put a knee on top of his -- between his shoulder blades? 15:23:50 15:23:53

**A.** At some point, I did place my knee on his back near his -- I believe it was his left shoulder blade between his -- the shoulder blade, and then I don't know what specific area this would be between the neck and the shoulder blades. 15:23:56 15:24:00 15:24:03 15:24:09 15:24:12

**Q.** All right. Since we have a camera here, if you could put your hand or your fingers -- the tips of your fingers on the part of his body where you put your knee. 15:24:13 15:24:16 15:24:19

**A.** It would be approximately this area right here. 15:24:24

**Q.** Okay. And on that side, that would be on his left side? 15:24:27 15:24:32

**A.** I believe so, yeah. 15:24:32

**Q.** All right. And what was your purpose in doing that? 15:24:33 15:24:33

**A.** My purpose in doing that is to place a knee there to prevent the subject from either, A, getting 15:24:36 15:24:39

back up, or, B, trying to roll over -- attempting to roll over. It is meant as a control technique. It's not the full weight of the body or it's not the full weight of my body on his body. The knee is placed there -- just positioned there with very little -- very little weight placed on it, and it's positioned there to where if he was to start pushing up, I could push more weight down if need be to control him and keep him down on the ground, or if he attempted to roll over, that force could be used to prevent him from rolling over. 15:24:43 15:24:48 15:24:52 15:24:56 15:24:59 15:25:02 15:25:06 15:25:11 15:25:16 15:25:19

**Q.** Okay. Did you have to apply more pressure in that area during the course of time where he was down on his stomach? 15:25:23 15:25:25 15:25:28

**A.** I don't recall exactly if I had to put a lot of pressure there. It was mostly just positional, trying to get leverage -- I don't believe I ever put my entire weight on him. 15:25:29 15:25:33 15:25:37 15:25:42

**Q.** When you first put your knee in that spot, am I correct that you didn't put all your weight on it? 15:25:43 15:25:46

**A.** That's correct. 15:25:49

**Q.** You put -- I don't know how you can quantify it -- but you put very little of your weight on? 15:25:49 15:25:53

**A.** I had -- my knee was there more positioning to prevent him from rolling over. 15:25:56 15:25:59

**Q.** And you did not have to exert a great deal of 15:26:02

underneath him, and you put your knee on there but without applying pressure or any significant pressure? 15:27:35 15:27:40

**A.** Correct. 15:27:43

**Q.** And then the other officers are doing whatever they are doing. And then at some point, he gets his arms underneath and he is starting to push up? 15:27:44 15:27:46 15:27:48

**A.** Correct. 15:27:51

**Q.** All right. How long after you initially put your knee on the shoulder did he start to push up like that? 15:27:51 15:27:54

**A.** I don't recall the exact timeframe. It was anywhere between one and two minutes. It's -- like I said, I don't recall the exact sequence of events as to when he pushed up or when he rolled over -- the timeframes. 15:27:58 15:28:01 15:28:04 15:28:07 15:28:11

**Q.** Okay. And then when he did push up, did you push down with your knee? Did you push down to try to get him to stay down? 15:28:12 15:28:17 15:28:21

**A.** I attempted to at first, but he was stronger than I was. 15:28:22 15:28:25

**Q.** So he was able to continue lifting you up -- 15:28:26

**A.** Correct. 15:28:29

**Q.** -- with your knee bearing down on him? 15:28:29

**A.** Correct. 15:28:32

**Q.** Was there anybody else holding down his torso? 15:28:32

**A.** I don't recall. 15:28:36

 **Q.** And then as I understand it, when you couldn't get him to go back down, you released the knee. You got off him? 15:28:36 15:28:40 15:28:44

**A.** Correct. 15:28:45

**Q.** And why did you do that? 15:28:45

**A.** Because I couldn't maintain my balance with his back being so high. 15:28:47 15:28:50

**Q.** And then what did you do? 15:28:51

**A.** Since his arms were up, at that point I would have a better chance of going in from the side to grab his arms to see if I could pull them up from underneath. 15:28:53 15:28:57 15:29:01

**Q.** Okay. And when you took your knee off, both of his arms were still underneath him? 15:29:05 15:29:08

**A.** Both of his arms were still tucked underneath him. 15:29:10 15:29:13

MR. VUCINICH: Go ahead. 15:29:13

MR. HALEY: Sorry. 15:29:14

Okay. So what happened next? Were you able to get one of the arms? 15:29:15 15:29:18

**A.** I believe we managed to get some of the arms, and at one point handcuffs were applied on each hand, but they were not connected. Because he was such a large man, we were unable to restrain him with just one set of handcuffs. So I believe there was one set of handcuffs put on before he was able to tuck his arms -- 15:29:19 15:29:23 15:29:26 15:29:30 15:29:36 15:29:39

bring his arms back underneath him. 15:29:41

**Q.** So I think I get you. So after you took your knee off, you went around. You tried to grab his arm. You continued to have trouble grabbing his arm? 15:29:46 15:29:51 15:29:54

**A.** Correct. 15:29:57

**Q.** That continued until someone -- was it you perhaps -- was able to get one cuff on one arm? 15:29:57 15:30:01

MR. VUCINICH: Go ahead. But the question was someone, perhaps you. That's two questions in one. 15:30:05 15:30:07

MR. HALEY: Counsel is right. 15:30:11

THE WITNESS: I don't know who got one of the handcuffs on. I know I was able to get one of my handcuffs on at some point because one of my handcuffs was attached to him at the end. 15:30:13 15:30:15 15:30:18 15:30:23

BY MR. HALEY: 15:30:25

**Q.** Do you remember if that was his left arm or right arm? 15:30:26 15:30:28

**A.** I don't recall. 15:30:28

**Q.** So you were able to get one of your cuffs on one of his arms? 15:30:28 15:30:32

**A.** I believe it was either on one of his arms or it was when we linked the two -- the three sets of handcuffs together. I don't recall whether it was on his hand or on his arms. Because I believe the last two sets of handcuffs went on almost simultaneously. 15:30:33 15:30:36 15:30:39 15:30:41 15:30:45

**Q.** So I have the image of one handcuff on one hand and then ultimately somebody gets the other handcuff on the other hand, but he is so big that they can't link them so they have to have a third set of handcuffs to link the first two that are on each hand? 15:30:49 15:30:53 15:30:56 15:30:59 15:31:04

**A.** You are correct to the part where I don't recall exactly at what point the second set of handcuffs went on. 15:31:05 15:31:07 15:31:09

**Q.** The handcuff on whatever the other arm was? 15:31:10

**A.** One of the arms -- at that point, I do believe one set of handcuffs was on because I do recall someone saying, "Hey, we have got a handcuff on." But his arms immediately tucked back in, and I recall someone saying, "I lost his arm." 15:31:13 15:31:15 15:31:18 15:31:22 15:31:27

**Q.** Okay. So what I think happened is someone got a cuff on one of the hands but he still was able to put his hands back underneath him? 15:31:29 15:31:33 15:31:36

**A.** Correct. 15:31:37

**Q.** Okay. And were both his hands again underneath him at that point? 15:31:37 15:31:40

**A.** To my recollection, yes. 15:31:40

**Q.** Okay. And then it continued until both arms were able to be brought out and brought behind his back; right? 15:31:42 15:31:45

**A.** What continued? 15:31:50

**Q.** The efforts -- the efforts to get his arms, now 15:31:51

with the handcuffs on him, out from underneath him. 15:31:56

**A.** That effort continued until he was eventually handcuffed. 15:32:00 15:32:04

**Q.** Okay. Do you remember who it was that got the handcuff initially on his right hand? 15:32:05 15:32:07

**A.** I don't recall. 15:32:10

**Q.** Do you remember who it was that got the handcuff initially on his left hand? 15:32:10 15:32:14

**A.** I don't recall. 15:32:15

**Q.** Do you remember who it was that linked the handcuff on the right hand with the handcuff on the left hand with their handcuffs? 15:32:16 15:32:19 15:32:23

**A.** I don't recall. 15:32:24

**Q.** Was the fact that he was so big -- did that make it difficult for him to get his arms back behind his back to be handcuffed? 15:32:25 15:32:28 15:32:31

**A.** It may have played a part, but it appeared to me that he was physically resisting us trying to get his hands behind his back. His size is what limited our ability to use one set of handcuffs. 15:32:33 15:32:40 15:32:44 15:32:48

**Q.** Do you remember the moment when he was handcuffed who said, "Okay, we have him," anything like that? 15:32:51 15:32:53

**A.** I don't recall who said anything. 15:32:56

**Q.** But at some point, you realize he is now, in fact, handcuffed? 15:32:57 15:33:00

**A.** Correct. 15:33:01
**Q.** A couple of other events I just want to try to put them into perspective because I'm not sure -- I'll do it in terms of handcuffing. 15:33:02 15:33:05 15:33:08
Before he was handcuffed, you indicated that you did something with your baton to try to pry his arm away from his torso? 15:33:10 15:33:13 15:33:17
**A.** Correct. 15:33:18
**Q.** Was that before he was handcuffed? 15:33:18
**A.** It was -- I believe they may have -- there was one set of handcuffs on prior to me using my baton. 15:33:20 15:33:23
**Q.** Okay. And did you use the baton on the arm that did not have one handcuff on it? 15:33:27 15:33:30
**A.** I don't recall which hand had a handcuff on it at the time. 15:33:32 15:33:36
**Q.** Okay. When you used your baton to pull his arm out, do you know what the status was of the opposite arm and whether there was a handcuff on it? Do you have any sense of that? 15:33:36 15:33:42 15:33:46 15:33:48
**A.** Somebody else was actively working on that hand. I wasn't paying attention. My focus was on getting his right arm behind his back and out from underneath him. 15:33:49 15:33:52 15:33:55 15:33:59
**Q.** When you used the baton, did it work to get the arm out from underneath him? 15:33:59 15:34:03

**Q.** Have I asked you all the questions about when he sat up, what he looked like when he sat up -- let me ask you this. 15:49:50 15:49:54 15:49:54

When you got him up and before they added the second and third portions of the Wrap, was he conscious? 15:49:55 15:49:58

**A.** His head -- 15:50:02

MR. ROONEY: Objection; asked and answered. 15:50:02

MR. VUCINICH: Calls for medical opinion. Go ahead. 15:50:04 15:50:06

THE WITNESS: His head was lulled to the side. I can't make a determination whether he was conscious or faking it. I don't know. Hence the reason I checked for a pulse. 15:50:06 15:50:08 15:50:12 15:50:15

BY MR. HALEY: 15:50:18

**Q.** And did it enter your mind that he might be faking it? 15:50:19 15:50:24

**A.** It always enters my mind. 15:50:25

**Q.** All right. And was that part of the reason that you checked his pulse, to make sure he wasn't faking it? 15:50:27 15:50:29

**A.** Correct. 15:50:32

**Q.** And did you make the determination after checking his pulse whether or not he was faking it? 15:50:33 15:50:37

**A.** I was unable to determine when I was checking his pulse, as he was still moving around. Well, I don't know if it was from him or from people putting on the 15:50:39 15:50:42 15:50:46

Wrap. His body was still moving. So I was unable to get a good feeling on his jugular vein. At that point I said, "I don't know if I can feel a pulse." And as I looked to the side, I noticed the fire engine was already there. Paramedics were already on scene. 15:50:50 15:50:54 15:50:59 15:51:02 15:51:05

**Q.** Okay. So just to walk you through that, sat him up -- 15:51:08 15:51:12

MR. VUCINICH: He didn't sit him up, though. Other people. 15:51:12 15:51:15

BY MR. HALEY: 15:51:16

**Q.** They sat him up. And while they sat him up, somebody else puts the second and third portions of the Wrap on him? 15:51:16 15:51:20 15:51:23

**A.** Correct. 15:51:24

**Q.** In the meantime, you check his pulse? 15:51:24

**A.** Correct. 15:51:27

**Q.** And you don't know whether there is a pulse or not? You can't tell? 15:51:28 15:51:32

**A.** I can't tell. 15:51:33

**Q.** And they continue to put the Wrap on him while you are checking his pulse? 15:51:34 15:51:38

**A.** Correct. 15:51:39

**Q.** Somewhere in one of your statements, you said somebody said, "He is unconscious." Did somebody at some point say, "He is unconscious"? 15:51:44 15:51:46 15:51:52

**A.** I don't know if they said -- what statement are you talking about? 15:51:53 15:51:55

**Q.** And I may be mistaken, but my memory -- because I do think in your recorded statement you used the word that somebody said, "He is unconscious," and then you took his pulse. 15:51:56 15:51:59 15:52:03 15:52:08

So let me just ask you that. Before you took his pulse, did you hear somebody say, "He is unconscious"? 15:52:08 15:52:11

**A.** I don't recall at this time. If I did -- if I did at that time, I did. There was a lot of people talking, but my main concern was his health and safety, and so that's why I took a pulse. 15:52:15 15:52:19 15:52:22 15:52:26

**Q.** In your recorded statement, it's my memory that you said that somebody yelled he was -- that when you rolled -- that when he was rolled over, his head lulled, somebody said, "He is unconscious," and then you took his pulse. That's my memory. Put that aside. 15:52:29 15:52:32 15:52:36 15:52:41 15:52:44

Is it your memory today that it wasn't until he was at least sat up that you took his pulse? 15:52:47 15:52:51

**A.** He was at least sat up when I took his pulse is my recollection of that incident. 15:52:56 15:53:01

**Q.** Once you took his pulse and couldn't determine whether he had one or not, were you concerned about whether or not he needed immediate medical care? 15:53:09 15:53:12 15:53:15

**A.** I was concerned that he may need medical care. 15:53:17

At the same time, I was concerned with letting the other officers continue to apply the Wrap, and then I could see the fire department personnel already making their way over to him. 15:53:23 15:53:26 15:53:30 15:53:34

**Q.** Okay. Were you there when the fire department personnel got to him? 15:53:36 15:53:38

**A.** I had stepped off at that time. 15:53:39

**Q.** Did you see the fire department personnel treat Mr. Greer on the ground there? 15:53:43 15:53:48

**A.** No, I did not. 15:53:50

**Q.** Did you see any Hayward police officer or BART officer perform any kind of CPR on Mr. Greer? 15:53:50 15:53:53

**A.** No, I did not. 15:53:57

**Q.** How long was it from the time you got the cuffs on until you saw any emergency response team, fire or paramedic, address Mr. Greer? 15:54:03 15:54:07 15:54:18

MR. VUCINICH: Could I just have the question read back, please? 15:54:20 15:54:35

THE REPORTER: "Question: How long was it from the time you got the cuffs on until you saw any emergency response team, fire or paramedic, address Mr. Greer?" 15:54:03 15:54:03 15:54:09 15:54:15 15:54:19

MR. VUCINICH: It's just he didn't put the cuffs on. So that's why -- 15:54:37 15:54:39

MR. HALEY: Yeah, I don't mean to suggest you did, but he was there when they went on. 15:54:41 15:54:42

So do you have the question in mind? 15:54:45

**A.** I do have the -- I'm thinking it over because I didn't specifically see the fire department treating Mr. Greer until much later on when he was loaded in the ambulance. I don't know what they did while he was seated. 15:54:47 15:54:52 15:54:55 15:55:00 15:55:03

MR. HALEY: All right. Let's take a quick break so he can change the tape. I don't think I have too much more. 15:55:03 15:55:05 15:55:09

THE VIDEOGRAPHER: Going off the record, the time is 3:55. 15:55:09 15:55:11

(A recess was taken.) 15:55:15

THE VIDEOGRAPHER: This marks the beginning of DVD No. 2 in the deposition of Brian Lewandowski. Going back on the record, the time is 4:03. 16:02:47 16:03:04 16:03:11

BY MR. HALEY: 16:03:14

**Q.** Okay. I'm going to go back again for a moment and ask you about when you Tased Mr. Greer. You did it one time, I understand? 16:03:15 16:03:20 16:03:24

**A.** Yes. 16:03:25

**Q.** And when you Tased him, did you have your knee on his shoulder as we talked about earlier? 16:03:26 16:03:30

**A.** Yes. 16:03:33

Q. And did you warn him? 16:03:34
A. No, I did not. 16:03:40
MR. VUCINICH: I wasn't sure you were finished with your question. 16:03:42 16:03:45
MR. HALEY: Well, I am now. That's fine. 16:03:45
Did the lieutenant Tase him at or near the same time you Tased him? 16:03:51 16:03:56
MR. VUCINICH: Object. It's vague, ambiguous -- "at or near the same time." 16:03:57 16:04:00
BY MR. HALEY: 16:04:05
Q. Did the lieutenant Tase him? 16:04:07
A. The lieutenant did Tase him. 16:04:08
Q. And was that before or after you Tased him? 16:04:10
A. It was near simultaneous. 16:04:14
Q. And did you hear the lieutenant issue any warning about -- 16:04:16 16:04:18
A. No, I did not. 16:04:19
Q. Okay. Let me finish that one. 16:04:20
A. Sorry. 16:04:22
Q. Did you hear the lieutenant issue any warning about use of -- "I'm going to Tase you if you don't behave"? 16:04:22 16:04:25 16:04:29
A. No, I did not hear anything. 16:04:30
Q. Are you trained before you Tase someone in Hayward that you are to warn them that you are going to 16:04:33 16:04:35

think that's all I've got. Is that all I've got? 16:13:23

MR. GOFF: That's it. That's good. 16:13:26

MR. HALEY: Yes. Owen? 16:13:28

EXAMINATION 16:13:28

BY MR. ROONEY: 16:13:28

Q. Officer Lewandowski, I just have a few questions. 16:13:31 My name is Owen Rooney. I represent the BART Police 16:13:34 Department and Sergeant Tougas. 16:13:38

The evening of the incident with Mr. Greer, did 16:13:40 you see Officer Tougas discharge a Taser at all? 16:13:42

A. No, I did not. 16:13:45

Q. Did you see Officer Tougas use a baton on 16:13:46 Mr. Greer? 16:13:50

A. No, I did not. 16:13:50

Q. Did you see Mr. -- or I should say Sergeant 16:13:51 Tougas use an ASP? 16:13:57

A. No, I did not. 16:13:59

Q. Did you see Sergeant Tougas punch Mr. Greer at 16:14:01 all? 16:14:04

A. No, I did not. 16:14:04

Q. Did you see Mr. -- did you see Sergeant Tougas 16:14:05 kick Mr. Greer at all? 16:14:08

A. I did not. 16:14:09

Q. Did you see at any time Officer Tougas or 16:14:10 Sergeant Tougas straddling Mr. Greer's upper body or torso 16:14:14

area? 16:14:19

A. No, I did not. 16:14:19

Q. Did you see Officer Tougas do anything you thought was unreasonable or would constitute excessive force in your mind? 16:14:20 16:14:27 16:14:30

A. No, I did not. 16:14:31

Q. From the time that Mr. Greer first walked away, when the balance test was being administered until the handcuffs were finally applied and secured, how much time elapsed do you think? 16:14:33 16:14:37 16:14:41 16:14:44

A. At the time, I would estimate it approximately between five to seven minutes. It seemed -- it seemed a lot longer. 16:14:47 16:14:53 16:14:57

MR. ROONEY: That's all I have. Thank you. 16:15:02

EXAMINATION 16:15:02

BY MR. GOFF: 16:15:02

Q. Got two questions. 16:15:04

On the night of the incident, did you ever see BART Officer Tougas perform CPR on Mr. Greer? 16:15:06 16:15:09

A. I did not. 16:15:12

Q. And when you had found or decided that Mr. Greer was nonresponsive, did you ever try to perform CPR on Mr. Greer? 16:15:13 16:15:16 16:15:21

A. I did not. 16:15:21

MR. GOFF: Thank you. No questions -- no 16:15:24

EMERICK AND FINCH
Certified Shorthand Reporters
18 Crow Canyon Court, Suite 125
San Ramon, California 94583
(925) 831-9029

Date: ____________

OFFICER BRIAN LEWANDOWSKI
c/o JEFFREY M. VUCINICH, ESQ.
Clapp, Moroney, Vucinich, Beeman, Scheley, A.P.C.
505 Montgomery Street, 11th Floor
San Francisco, CA 94111

Re: GREER v. CITY OF HAYWARD, ET AL.,
USDC 3:15-CV-02307-WHO

Dear Officer Lewandowski:

Your deposition in the above matter is now available at this office. You may wish to discuss with your attorney whether he or she requires that it be read, corrected, if necessary, and signed before it is filed with the court, if so ordered. Your rights regarding signature of this deposition are contained in the Code of Civil Procedure.

Since the original deposition may not be released from our custody, if you wish to sign it, please appear at this office, 18 Crow Canyon Court, Suite 210, San Ramon, California, within the next 30 days on any weekday between the hours of 9:00 a.m. and 4:00 p.m. It is necessary that you bring this letter with you.

In the alternative, you may wish to read your attorney's copy of the deposition and notify this office by letter of any changes that you desire to be made.

Very truly yours,
EMERICK AND FINCH

_____________________________
LORI A. YOCK, CSR NO. 5801

cc: All Counsel
Original

# EXHIBIT D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSEPH JAMES GREER,

Plaintiff,

vs. No. 3:15-CV-02307-WHO

CITY OF HAYWARD, BAY AREA RAPID TRANSIT DISTRICT, et al.,

Defendants.

_______________________________/

DEPOSITION OF OFFICER NORMAN McADAMS

Taken before LORI A. YOCK, CSR, RPR

Certified Shorthand Reporter No. 5801

Registered Professional Reporter No. 18667

State of California

Tuesday, September 27, 2016

timeframe?

**A.** There were 16 of us.

**Q.** Who was the coroner in those years?

**A.** It was the sheriff.

**Q.** Okay. And then after your 11 years with the Alameda County Sheriff's Department, what did you do?

**A.** I started with the city of Hayward as a police officer.

**Q.** And you have been regularly employed by the Hayward Police Department ever since?

**A.** Yes.

**Q.** I have to ask, in any of the previous law enforcement jobs you had, Highway Patrol, Alameda County Sheriff, were you ever alleged to have engaged in excessive force?

**A.** No.

**Q.** Okay. With respect to all of the other law enforcement jobs you had, did you leave all those on good terms? I mean, you weren't fired or asked to leave on any of those?

**A.** No.

**Q.** All right. And what year did you start with the city of Hayward?

**A.** Well, 2009 as a full-time officer. I was a reserve officer for a period of time.

**A.** No.

**Q.** All right. What did you do next?

**A.** I had Reserve Officer Covarrubias was riding with me that night. As we got out of the car and I am running up, the subject was kicking because the legs weren't being restrained. So I told him take the right leg. I took the left leg, and we tried to restrain those.

**Q.** When you say "kicking," he was face down on the ground?

**A.** Correct.

**Q.** Was he kicking his legs up and down, kicking his feet up and down?

**A.** Yes.

**Q.** Like a crying baby will kick their feet?

MR. ROONEY: Objection; vague as to "crying baby."

BY MR. HALEY:

**Q.** I think it's a pretty good description. A baby on the ground will cry and kick their feet up and down. Do you have that image in mind?

MR. ROONEY: Most babies when they are doing that are actually on their backs.

THE WITNESS: Yes, you could describe it that way, I guess.

**Q.** And he repeated them and repeated them; true?

**A.** Yes.

**Q.** All right. And so you and Reserve Officer Covarrubias each grabbed a leg?

**A.** Yes.

**Q.** And were you able to hold onto that leg?

**A.** Yes, but he was moving me around.

**Q.** And how did you grasp onto the leg?

**A.** I grabbed him at the ankle and put my knee down on the back of his calf.

**Q.** Okay. Was it just your knee on his calf that was holding him down or did you have your hands holding?

**A.** I had my hands. I had the hand on the ankle. I believe most of the time I had my other hand down there and then the knee on the calf.

**Q.** Was he able to kick you at any point before you put the leg down?

**A.** No, he did not kick me, but he was moving me around.

**Q.** And he was able to move you around after you had put your knee and your hand on his calf?

**A.** Yes.

**Q.** When you say move you around, was it a circumstance where you were able to feel him try to move you around or did he kick you off?

BY MR. HALEY:

**Q.** You have CPR training?

**A.** Yes.

**Q.** Provided by the Hayward Police Department?

**A.** Yes.

**Q.** And part of that training, you learn how to identify somebody who has difficulty breathing?

**A.** Yes.

**Q.** Somebody who is unconscious?

**A.** Yes.

**Q.** Somebody whose lips are changing color?

**A.** Yes.

**Q.** And those are all warning signs you look for in a subject because that could be a problem for the subject during the course of their being in custody?

**A.** Yes.

**Q.** So when you stepped away, was Mr. Greer still calling out, "What are you doing? What are you doing? What are you doing?"

**A.** He was still resisting because the legs were still moving around. I don't recall if he was saying anything or not at that point.

**Q.** Okay. But his legs were in the -- the ankle WRAP was on?

**A.** Yes. We were getting it in there. That's when

MR. KADOTANI: Objection; calls for speculation, calls for expert opinion. You can answer.

THE WITNESS: No.

MR. ROONEY: Assumes facts not in evidence also.

BY MR. HALEY:

**Q.** In the police statement -- in the statement that's attributed to you -- this is not your verbal statement -- it says, quote, "McAdams returned while other officers were placing Greer in a seated position." Is that true?

**A.** They were just propping him up as I walked up.

**Q.** So they were in the process of putting him in the seated position?

**A.** Yes.

**Q.** And you noticed that he had slumped over and noticed that his lips were discolored?

**A.** Yes.

**Q.** And you also noticed that emergency medical personnel were actually arriving at the scene at that time?

**A.** Yes.

**Q.** Were any of the Hayward Police officers providing CPR to Mr. Greer?

**A.** No.

EMERICK AND FINCH
Certified Shorthand Reporters
18 Crow Canyon Court, Suite 125
San Ramon, California 94583
(925) 831-9029

Date: ____________

OFFICER NORMAN McADAMS
c/o JEFFREY M. VUCINICH, ESQ.
Clapp, Moroney, Vucinich, Beeman, Scheley, A.P.C.
1111 Bayhill Drive, Suite 300
San Bruno, CA 94066

Re: GREER v. CITY OF HAYWARD, ET AL.,
USDC 3:15-CV-02307-WHO

Dear Officer McAdams:

Your deposition in the above matter is now available at this office. You may wish to discuss with your attorney whether he or she requires that it be read, corrected, if necessary, and signed before it is filed with the court, if so ordered. Your rights regarding signature of this deposition are contained in the Code of Civil Procedure.

Since the original deposition may not be released from our custody, if you wish to sign it, please appear at this office, 18 Crow Canyon Court, Suite 210, San Ramon, California, within the next 30 days on any weekday between the hours of 9:00 a.m. and 4:00 p.m. It is necessary that you bring this letter with you.

In the alternative, you may wish to read your attorney's copy of the deposition and notify this office by letter of any changes that you desire to be made.

Very truly yours,
EMERICK AND FINCH

______________________________
LORI A. YOCK, CSR NO. 5801

cc: All Counsel
Original

# EXHIBIT E

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSEPH JAMES GREER,

Plaintiff,

vs. No. 3:15-CV-02307-WHO

CITY OF HAYWARD, BAY AREA RAPID TRANSIT DISTRICT, et al.,

Defendants.

______________________________/

DEPOSITION OF DETECTIVE BRANDON TONG

Taken before LORI A. YOCK, CSR, RPR

Certified Shorthand Reporter No. 5801

Registered Professional Reporter No. 18667

State of California

Thursday, October 13, 2016

I believe, but I'm not 100 percent sure, that the written and physical were waived because I already established that I already did that.

**Q.** Okay.

**A.** And an interview.

**Q.** All right. What year did you start with the Hayward Police Department?

**A.** That I know. 2006. I got one.

**Q.** And what was your first assignment?

**A.** Patrol officer.

**Q.** During your time at the Hayward Police Department, other than this case, have there been any other allegations of excessive or inappropriate use of force by you?

**A.** I don't recall specifically. Yeah, I don't recall if -- there might have been inquiries in regards to use of forces.

**Q.** Okay.

MR. VUCINICH: Inquiries -- that's different than claims of excessive force.

BY MR. HALEY:

**Q.** What's an inquiry?

**A.** Someone -- I guess for like a Pitchess motion, they would inquire to see what's in my file -- my Internal Affairs file.

MR. HALEY: Right.

THE WITNESS: I don't recall that.

BY MR. HALEY:

**Q.** In reviewing the video, did you see a foot on Mr. Greer's head?

**A.** I did.

**Q.** Were you -- I can't ask that. That was a stupid question. Do you know whose foot that was?

**A.** I do not.

**Q.** Was that your foot?

**A.** No.

**Q.** I'll try to go chronologically. I'm skipping around. I apologize.

You are back. You are concerned about the left arm. What do you do in response to that concern?

**A.** So I did a nerve stimulation technique. It's a pain compliance technique underneath the jawline, kind of in this TMJ area, in efforts that he would comply and stop doing what he was doing.

**Q.** And is there a name for that technique?

**A.** I don't know the exact name. I couldn't tell you the exact name for it.

**Q.** Okay. And on the video -- I'll turn to the video for a brief moment.

**A.** Okay.

**Q.** Can you see yourself performing that on the video?

**A.** Yes, sir.

**Q.** And there is a gloved hand, I believe?

**A.** Yes, sir.

**Q.** And the hand in the video is your hand?

**A.** Yes, sir.

**Q.** Is that technique an approved technique in the Hayward Police Department at that time?

**A.** The nerve stimulation technique?

**Q.** Yes.

**A.** Yes.

**Q.** And who had trained you -- so they trained you in that technique at the Hayward Police Department?

**A.** Yes.

**Q.** And in the Use of Force Policy at the Hayward Police Department, is there a section on that technique, if you know?

**A.** I don't recall.

**Q.** All right.

MR. VUCINICH: At 11:00, can we take a quick break? I just need to make a quick phone call.

MR. HALEY: How close are we?

MR. VUCINICH: Five to 11:00.

MR. HALEY: Let's just do it right now. We'll

take ten.

(A recess was taken from 10:56 a.m. to 11:09 a.m.)

BY MR. HALEY:

**Q.** As far as you know, was this TMJ hold, I'll call it, that you used an approved hold in the city of Hayward?

**A.** The nerve stimulation?

**Q.** Yes.

**A.** Yes, as far as I know.

**Q.** Are you aware if in any of the policies regarding use of force in the Hayward Police Department that hold is described?

**A.** I don't know.

**Q.** Okay. All right. And he was on his stomach when you did the nerve stimulation hold?

**A.** Yes.

**Q.** And tell me what you did.

**A.** So from reviewing the video, I grabbed him with one of my hands, and so he is down on his stomach looking out towards the right, and then basically I grabbed underneath the jawline.

**Q.** Okay.

**A.** And there's a nerve that you can press up against the jawline that will basically -- it's a pain compliance technique to stop a person from doing

whatever they are doing.

**Q.** Okay. Do you lift and grab?

**A.** Lifting and grab what?

**Q.** So in the video, it looks to me like, I believe it's your right hand, you lifted his head up somewhat and then, for lack of a better word, you dug your thumb into somewhere over here. So let me ask you, is that how you did it?

MR. ROONEY: That's going to be a little vague on the record.

BY MR. HALEY:

**Q.** So let me just ask you. As part of the nerve stimulation, did you lift his head up somewhat?

**A.** I don't recall lifting his head up.

**Q.** All right. Did you put your hand underneath his chin?

**A.** His chin?

**Q.** Yes.

**A.** Not to my recollection, no.

**Q.** Okay. Did you put your thumb -- did any part of your hand go into his mouth?

**A.** No. No. Absolutely not.

**Q.** But were all five of your fingers touching some part of his upper torso?

**A.** I don't recall if it was all five of my

**Q.** So how long did it take you from start to finish with that hold -- the nerve stimulation hold?

**A.** I can't recall the timeframe.

**Q.** Okay. And what did you do after that?

**A.** From reviewing the video, I tried a different technique, different nerve stimulation using an improvised Yawara. So that would be my ASP in a closed position.

**Q.** So what is an ASP?

**A.** An ASP is a baton -- a collapsible baton.

**Q.** And when you were finished with the first effort, had anyone said, "Look for a weapon." "He has a weapon." "He doesn't have a weapon"?

**A.** I don't recall.

**Q.** Did you ask anybody, "Does he have a weapon?"

**A.** I did not, no.

**Q.** All right. Had you used the nerve stimulation hold in the Hayward Police Department before that night?

**A.** I have.

**Q.** Okay. All right. How about this -- I'm going to call the second thing you did -- what do we call that?

**A.** Nerve stimulation. There's probably a specific term, but I don't know the -- I don't know off the top of my head what it is.

**Q.** Okay. I want to distinguish the nerve

stimulation, which is what I'm going to call the thing you did with your hand.

**A.** So they are both nerve stimulations because there's nerves along this jawline.

**Q.** Along the jawline?

**A.** Yes.

**Q.** All right. So the second nerve stimulation, you did that with an ASP; is that accurate?

**A.** Yes.

**Q.** And what is an ASP?

**A.** It's a collapsible baton.

**Q.** And what's the diameter of the ASP, if you can tell me?

**A.** I don't know.

**Q.** Like a pencil?

**A.** No.

**Q.** Like a baseball bat? Could you give me any frame of reference?

**A.** Probably a little larger than -- maybe a golf club -- the diameter of a golf club -- maybe the grip -- maybe a little larger.

**Q.** The ASP is collapsible so you can extend it?

**A.** Correct.

**Q.** When it's at its shortest length, how long is it?

**A.** I can't give you an exact number.

collapsed in. You have to open it up to make it get bigger.

MR. HALEY: Thanks, Counsel.

What I have in mind is you have the collapsed baton. You put one end down against the ground and you are holding the other end and then you --

**A.** I'm sorry?

**Q.** Clearly my analysis of this is wrong. So what I want to know is do you have your hand -- did you have your hand on one end of the collapsed baton?

**A.** Yes.

**Q.** And you had your hand on the upper end -- I'll call it the upper end of the baton; correct?

**A.** Yes.

**Q.** Okay. Where was the lower end of the baton when you performed the nerve stimulation?

**A.** The other end of the baton?

**Q.** The bottom end.

**A.** It was in this pocket right behind the ear.

**Q.** Oh, I see. So you actually use the bottom end of the baton and you push that bottom end of the baton into the nerve?

**A.** I use one end of the baton.

**Q.** Exerting force with the other end?

**A.** Applying pressure. And it's pressing that

nerve up against the jawline.

**Q.** Okay. All right. And were you standing or kneeling?

**A.** I believe I was kneeling.

**Q.** And did you have any portion of your body touching Mr. Greer?

**A.** (Shakes head.)

**Q.** You have to answer that.

**A.** Go ahead. Was that the end of your question?

**Q.** That was the end of the question.

**A.** No.

**Q.** So the bottom of the baton was touching Mr. Greer, but no other part of your body was touching Mr. Greer?

**A.** At that specific time?

**Q.** Right.

**A.** My other hand might have been. I don't -- I don't remember.

**Q.** Okay. All right. Is that an approved method of control in Hayward at that time?

**A.** Yes.

**Q.** And were you trained that method by Hayward Police Department?

**A.** Yes.

**Q.** And who trained you in that?

**Q.** Did you tell -- did you hold the opinion at any point that night that Mr. Greer may have been under the influence of some type of illegal substance?

**A.** I did say that.

**Q.** At what point did you say to yourself Mr. Greer may be under the influence of some type of illegal substance?

**A.** I think right off the bat when we arrived on scene.

**Q.** And why did you think that?

**A.** The prolonged struggle, the amount of officers that were there trying to detain him.

**Q.** Okay. Anything else?

**A.** Yeah. His superhuman strength.

**Q.** Okay. Did you see Mr. Greer lift up or try to push up off the ground with Hayward police officers on his back?

**A.** I apologize. I don't recall seeing an officer on his back or officers on his back, and I don't recall seeing him trying to lift up.

**Q.** Okay. All right. In the statement here that is ascribed to you, it says, "Tong estimates the struggle lasted for two to three minutes," but I don't know when that starts and when that ends. So when you said two to three minutes, what was the starting point and what was

MR. VUCINICH: Is that marked as an exhibit?

MR. CAJINA: No, it's not.

BY MR. HALEY:

**Q.** Do you remember what happened after he was sat up? Can you tell me anything more about what happened after he was sat up than you've told me?

**A.** Yeah. I looked over to my right and I saw that there was a fire truck on the scene.

**Q.** Okay. And was the fire truck still parked on the street as opposed to in the parking lot?

**A.** So from my vantage point, they would be in the parking lot.

**Q.** Okay. How about an ambulance? Did you see an ambulance?

**A.** I don't remember.

**Q.** Okay. And so he is seated up. You look to your right and you see a Hayward fire truck?

**A.** A fire truck. I don't know if it was a Hayward one. I assume so because it was our jurisdiction.

**Q.** And did you see near you any of the Hayward firefighters or paramedics?

MR. ROONEY: When he was first sat up? Or at what point in time?

BY MR. HALEY:

**Q.** Let me try to do it. My understanding is you sat

him up and then you looked to your right and you saw the truck; correct?

**A.** Right.

**Q.** And then was there a period of time after you saw the truck and before you actually saw firefighters or paramedics arrived?

**A.** So I moved after he was sat up, and then I don't recall when they came over.

**Q.** Okay. But up until -- when you moved, it's accurate to say that while the fire truck was there, you can't tell me whether or not paramedics had arrived to deal with Mr. Greer?

**A.** I don't -- I don't recall.

MR. ROONEY: Objection; vague as to the term "arrived."

BY MR. HALEY:

**Q.** Well, in my mind, I distinguish between looking at a fire truck and having the firefighters or paramedics dealing with him.

Do you have that distinction in mind?

**A.** I'm sorry? Go ahead.

**Q.** So when you moved away, is it accurate that you saw the fire truck but you had not yet seen paramedics or firefighters treating Mr. Greer?

**A.** I don't remember if they were treating him or

 not. I believe I moved away and then they came in.

**Q.** Okay.

**A.** I'm sorry. I just don't -- I don't recall that.

**Q.** You are doing your best. After you moved away, did you see anything else that happened with Mr. Greer?

**A.** I don't -- I don't recall.

**Q.** Okay. So I won't bug you about that, but it's important that -- because I don't want you to remember things down the road that you don't tell me now.

**A.** I understand.

**Q.** In the video -- there does appear to be an officer propping up Mr. Greer in the sitting position.

**A.** Okay.

**Q.** I know you've seen the video. Do you remember who that was?

**A.** I don't remember.

**Q.** Okay.

**A.** I'm sorry.

**Q.** That's all right. Take a quick look at it and we'll see.

**A.** Okay.

**Q.** Then I'm almost done.

**A.** Sure.

MR. CAJINA: I can play it for a little bit.

By the way, why did you grab the left handcuff itself?

**A.** Just because Mr. Greer's arm is massive. And as you can see, I'm not really a big person. So it was easier for me grab the cuff.

**Q.** But the subject with their hand only partially cuffed, does that pose an officer safety issue if the other link is not attached to anything and his arm is flailing?

**A.** I'm sorry. Go again.

**Q.** If only part of the handcuff is attached -- so one wrist loop is free -- does that pose an officer safety issue?

**A.** Possibly. It depends on the circumstance but possibly.

**Q.** Okay. Did you see the BART officer Tase Mr. Greer that evening?

**A.** I did not.

**Q.** Did you see the BART officer use a baton at all?

**A.** No.

**Q.** Did you see the BART officer use an ASP?

**A.** No.

**Q.** Did you see the BART officer straddle Mr. Greer's back at all?

**A.** No.

**Q.** Did you see the BART officer at any time sitting or kneeling or standing on any portion of Mr. Greer's upper torso?

**A.** No.

**Q.** Did you see the BART officer punch or kick Mr. Greer?

**A.** No.

MR. ROONEY: That's all I have. Thank you.

FURTHER EXAMINATION

BY MR. HALEY:

**Q.** Did you see the BART officer render CPR to Mr. Greer after you said, "He's unconscious"?

**A.** No.

MR. HALEY: All right. That's all I have.

FURTHER EXAMINATION

BY MR. ROONEY:

**Q.** Were the firefighters right there?

**A.** I thought they were there immediately.

MR. ROONEY: Thank you.

FURTHER EXAMINATION

BY MR. HALEY:

**Q.** Okay. You used the word "immediately" so I just want to make sure we are on the same page.

**A.** Okay.

**Q.** The firefighters weren't there when Mr. Greer was

EMERICK AND FINCH
Certified Shorthand Reporters
18 Crow Canyon Court, Suite 125
San Ramon, California 94583
(925) 831-9029

Date: ____________

DETECTIVE BRANDON TONG
c/o JEFFREY M. VUCINICH, ESQ.
Clapp, Moroney, Vucinich, Beeman, Scheley, A.P.C.
1111 Bayhill Drive, Suite 300
San Bruno, CA 94066

Re: GREER v. CITY OF HAYWARD, ET AL.
USDC 3:15-CV-02307-WHO

Dear Detective Tong:

Your deposition in the above matter is now available at this office. You may wish to discuss with your attorney whether he or she requires that it be read, corrected, if necessary, and signed before it is filed with the court, if so ordered. Your rights regarding signature of this deposition are contained in the Code of Civil Procedure.

Since the original deposition may not be released from our custody, if you wish to sign it, please appear at this office, 18 Crow Canyon Court, Suite 210, San Ramon, California, within the next 30 days on any weekday between the hours of 9:00 a.m. and 4:00 p.m. It is necessary that you bring this letter with you.

In the alternative, you may wish to read your attorney's copy of the deposition and notify this office by letter of any changes that you desire to be made.

Very truly yours,
EMERICK AND FINCH

____________________________
LORI A. YOCK, CSR NO. 5801

cc: All Counsel
Original

# EXHIBIT F

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSEPH JAMES GREER,

Plaintiff,

vs. No. 3:15-CV-02307-WHO

CITY OF HAYWARD, BAY AREA RAPID TRANSIT DISTRICT, et al.,

Defendants.

________________________________/

DEPOSITION OF OFFICER JULIAN COSGRIFF

Taken before LORI A. YOCK, CSR, RPR

Certified Shorthand Reporter No. 5801

Registered Professional Reporter No. 18667

State of California

Thursday, October 13, 2016

officer?

**A.** Yes.

**Q.** And then how long did you do vehicle abatement?

**A.** Maybe two years.

**Q.** All right. And then tell me what vehicle abatement involved.

**A.** Just dealing with junk cars in the city of Hayward, either parked on public or private property.

**Q.** All right. And then what did you do after -- what did you do next?

**A.** Got hired as a police officer, and I went to the Police Academy.

**Q.** And what year were you hired?

**A.** 2011.

**Q.** And which academy did you go to?

**A.** The Alameda County Sheriff's Office Academy.

**Q.** And how long was the Academy?

**A.** About six months.

**Q.** And then after you completed the Academy, did you become a Hayward police officer?

**A.** Yes.

**Q.** And what was your first assignment as a Hayward police officer?

**A.** Patrol.

**Q.** All right. And how long were you on patrol?

**A.** Up until the beginning of 2015.

**Q.** Okay. Remind me again when you started as a Hayward police officer.

**A.** 2011.

**Q.** Okay. So you were a patrol officer from the time you started up until the time of this event and then afterward?

**A.** Yes.

**Q.** During any of your time as a community service officer or a police officer, has there been any allegations against you of excessive force?

**A.** I'm not sure how -- can you rephrase that? Allegations?

**Q.** Allegations, right.

MR. VUCINICH: Well, it depends what you mean by "allegations." Somebody screaming at you, "you are doing this or that," or do you mean some formal complaint?

BY MR. HALEY:

**Q.** Some way where a complaint is made formally to the Hayward Police Department about your action.

**A.** I believe so.

**Q.** And did Internal Affairs investigate that?

**A.** Sort of. It's difficult for me to answer because I can't remember if I was listed as a witness or

**A.** At this point, yes. When I got the WRAP out, yes.

**Q.** And so when you got back, you can tell me he had handcuffs on. You can tell me that there were officers holding him down?

**A.** Uh-huh.

**Q.** But could you tell me whether or not he was on his back or stomach at that point?

**A.** When I have the WRAP now?

**Q.** You have the WRAP out of the duffle bag.

**A.** Yeah, he is on his stomach.

**Q.** Was he still yelling?

**A.** Yes.

**Q.** What was he saying?

**A.** "What are you doing? Let me go. Get off me." The same stuff. He kind of was just repeating himself.

**Q.** And then did you attempt to put the WRAP on him?

**A.** Yes.

**Q.** Did anybody help you?

**A.** Yes. I didn't do it alone.

**Q.** Who --

**A.** I don't remember who was there.

**Q.** Okay. And who helped you put the WRAP on?

**A.** I don't remember.

**Q.** And did Officer Spillner help you put the WRAP

on?

**A.** I don't recall.

**Q.** How many other officers helped you put the WRAP on?

**A.** I don't recall.

**Q.** And my understanding is that there's three parts to the WRAP?

**A.** Yes.

**Q.** And when you first started putting the WRAP on, what part did you put on first?

**A.** I don't recall what part I put on first, but the WRAP goes on in three steps -- the ankle restraint, the leg WRAP, and then the upper body portion.

**Q.** Okay. And did you put on the whole WRAP?

**A.** I helped with the lower half and started with the upper half.

**Q.** Okay. When you started putting the WRAP on, he was on his stomach?

**A.** Uh-huh.

**Q.** Is that right?

**A.** Yes.

**Q.** And did you fully put the lower part, the ankle part of the WRAP on before you went to the next part?

**A.** Yes.

**Q.** While you were putting the WRAP on, what was he

EMERICK AND FINCH
Certified Shorthand Reporters
18 Crow Canyon Court, Suite 125
San Ramon, California 94583
(925) 831-9029

Date: ____________

OFFICER JULIAN COSGRIFF
c/o JEFFREY M. VUCINICH, ESQ.
Clapp, Moroney, Vucinich, Beeman, Scheley, A.P.C.
1111 Bayhill Drive, Suite 300
San Bruno, CA 94066

Re: GREER v. CITY OF HAYWARD, ET AL.
USDC 3:15-CV-02307-WHO

Dear Officer Cosgriff:

Your deposition in the above matter is now available at this office. You may wish to discuss with your attorney whether he or she requires that it be read, corrected, if necessary, and signed before it is filed with the court, if so ordered. Your rights regarding signature of this deposition are contained in the Code of Civil Procedure.

Since the original deposition may not be released from our custody, if you wish to sign it, please appear at this office, 18 Crow Canyon Court, Suite 210, San Ramon, California, within the next 30 days on any weekday between the hours of 9:00 a.m. and 4:00 p.m. It is necessary that you bring this letter with you.

In the alternative, you may wish to read your attorney's copy of the deposition and notify this office by letter of any changes that you desire to be made.

Very truly yours,
EMERICK AND FINCH

____________________________
LORI A. YOCK, CSR NO. 5801

cc: All Counsel
Original

# EXHIBIT G

CONFIDENTIAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSEPH JAMES GREER,

Plaintiff,

vs. No. 3:15-CV-02307-WHO

CITY OF HAYWARD, BAY AREA RAPID TRANSIT DISTRICT, et al.,

Defendants.

______________________________/

CONFIDENTIAL

DEPOSITION OF LIEUTENANT ERIC KRIMM

Taken before LORI A. YOCK, CSR, RPR

Certified Shorthand Reporter No. 5801

Registered Professional Reporter No. 18667

State of California

Tuesday, September 27, 2016

Q. Just so I get a better picture of it, how many different parts to the WRAP are there?

MR. KADOTANI: Objection; vague.

THE WITNESS: There's three pieces.

BY MR. HALEY:

Q. Okay. And starting with the feet first, what do you call the part of the WRAP that is closest to the feet or used closest to the feet?

A. Ankle strap.

Q. And is that just a single strap?

A. Yes.

Q. And in just basic terms, how does that work? How do you apply that?

A. You would cross the -- ideally you would cross or get the ankles close together, and you would loop it around the legs and tighten it up to keep the legs from being able to be spread apart.

Q. I'm thinking of a belt. Is it like a belt with a clasp on it?

A. I guess you could say it's like a belt. It's a strap, and it has a metal loop that you feed the end of the strap through and it has Velcro that cinches it down.

Q. Okay. What color is it?

A. The one we use is yellow and black.

Q. All right. And then what's the next -- the second part of the WRAP?

A. Would be the leg restraint itself.

Q. Okay. And can you describe that for me?

A. It's mesh, has some -- I think three metal bars in it, and it has three straps. The most current versions have buckle straps that connect like a seat belt. They clip together and can be tightened. Older versions have a Velcro mechanism, much like the ankle version.

Q. Okay. And once applied, what portion of the body does that control?

A. The legs.

Q. All right. And it goes from the ankle up how high on the body?

A. It depends on how tall you are.

Q. Okay.

A. Ideally mid thigh to lower calf.

Q. Okay. All right. Then what's the third part of the WRAP?

A. The third part is the chest harness.

Q. All right. And describe that for me.

A. It's black mesh with straps. The -- basically have -- if you want to call it a bib -- a front bib and a rear bib that are connected with two straps. So the

straps would hang over the shoulder. It has buckles that connect underneath the armpit, but I say generally under the armpit. Depending on how big you are, might be closer or further from the armpit. It has a tether strap from the front bib that connects to the lower portion of the leg restraint. If the leg restraint is properly applied, the buckle would be nearest the feet, and you would connect the tether to the carabiner in order to get the person into a seated position -- or I should say more of a 90-degree position. They could be seated up or laying on their side.

**Q.** Okay. And in terms of the arms, how does the upper portion of the restraint bind the arms?

**A.** The person should be handcuffed first.

**Q.** Handcuffed behind?

**A.** Yes. So the restraint wouldn't actually bind the arms. The chest harness portion would -- it keeps the person in that, you know, seated position.

**Q.** Okay. Does the chest portion go over the arms? In other words, perhaps providing additional control to a handcuffed person?

**A.** No.

**Q.** So the WRAP -- the upper portion of the WRAP does not wrap around the shoulders or the upper arms?

**A.** Well, like I said, there is a bib in the front,

EMERICK AND FINCH
Certified Shorthand Reporters
18 Crow Canyon Court, Suite 125
San Ramon, California 94583
(925) 831-9029

Date: ____________

LIEUTENANT ERIC KRIMM
c/o JEFFREY M. VUCINICH, ESQ.
Clapp, Moroney, Vucinich, Beeman, Scheley, A.P.C.
1111 Bayhill Drive, Suite 300
San Bruno, CA 94066

Re: GREER v. CITY OF HAYWARD, ET AL.,
USDC 3:15-CV-02307-WHO

Dear Lieutenant Krimm:

Your deposition in the above matter is now available at this office. You may wish to discuss with your attorney whether he or she requires that it be read, corrected, if necessary, and signed before it is filed with the court, if so ordered. Your rights regarding signature of this deposition are contained in the Code of Civil Procedure.

Since the original deposition may not be released from our custody, if you wish to sign it, please appear at this office, 18 Crow Canyon Court, Suite 210, San Ramon, California, within the next 30 days on any weekday between the hours of 9:00 a.m. and 4:00 p.m. It is necessary that you bring this letter with you.

In the alternative, you may wish to read your attorney's copy of the deposition and notify this office by letter of any changes that you desire to be made.

Very truly yours,
EMERICK AND FINCH

______________________________
LORI A. YOCK, CSR NO. 5801

cc: All Counsel
Original

# EXHIBIT H

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

| | | |
|---|---|---|
| JOSEPH JAMES GREER,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF HAYWARD; BAY AREA RAPID TRANSIT DISTRICT; MICHAEL CLARK; JULIAN COSGRIFF; DANIEL COVARRUBIAS; GUILLERMO DELIRA; BRIAN LEWANDOWSKI; JEFF LUPZINGER; NORM MCADAMS; SEAN SPILLNER; BRANDON TONG JON TOUGAS; RICK TRAN; DAVE WATERS; BEN YARBROUGH; and Does 1-10,<br><br>Defendants. | ) | Case Number:<br>3:15-CV-02307-WHO |

DEPOSITION OF

TODD HENDRICKS

DATE: JUNE 15, 2016 (WEDNESDAY)

TIME: 2:06 P.M.

LOCATION: CLAPP, MORONEY, BELLAGAMBA, VUCINICH BEEMAN & SCHELEY
1111 Bayhill Drive, Suite 300
San Bruno, CA 94066

DEPOSITION REPORTER: MELLONY L. KNIGHT, CSR
Certified Shorthand Reporter, #8448

Q. Any plans to move in the near future?
A. No.
Q. Where do you presently work?
A. I work for New Beginnings Church in Livermore California, 151 Linberg Avenue, Suite A.
Q. What do you do there?
A. I'm a pastor.
Q. How long have you been a Pastor there?
A. Since 2009.
Q. What's your official title?
A. Pastor.
Q. Now, you plan to stay in the Livermore area for some period of time?
A. As far as I can see.
Q. If we need to get ahold of you somehow, what's the best way to get ahold of you?
A. My cell.
Q. Can you give us that number?
A. (925) 216-3113.
Q. Thank you. My understanding is you on the evening in question were on a ride-along?
A. That's right.
Q. Who were you on a ride-along with?
A. Mike Clark.
Q. Can you tell us briefly how that came about?

Q. Well, in terms of trying to put it on him what do you recall? Tell us what you recall in that regard.

A. I don't recall anything specific. I remember seeing the wrap. I remember them trying to wrap his legs and even then that was difficult for them to accomplish. At some point they eventually did get some level of his legs wrapped and eventually they did get some type of handcuffs on him.

Q. With respect to their attempts to put the wrap on his legs, was he kicking his legs and preventing them from putting the wrap on, if you recall one way or the other?

A. Yes.

Q. And when they're putting the wrap on his legs could you see how far up his legs they were putting the wrap?

A. No.

Q. Could you see whether he was face down or face up at the time they're putting the wrap on his legs?

A. I believe he was face down.

Q. And his handcuffs were not on at that point in time?

A. I don't think so.

Q. And the wrap just went up to the legs; is that correct?

A. I believe so, yes.
Q. Did you see somebody sit him up?
A. I don't recall. You mean like sitting up?
Q. Yes, like versus -- I'll describe it versus flat on the ground. Sit him up so that he's L-shaped.
A. I don't believe so.
Q. But you did see him rolled over so he's faced up?
A. That's right.
Q. And how long he was face down that would be a guess on your part?
A. Correct.
Q. At any time during all this up until the time where we are right now, did you see any officer strike him with their fists?
A. No.
Q. At any time up to the time we have now, did you see any officer strike him with their feet, like a kicking-type blow?
A. No.
Q. At any time up until where we are right now in the scene we're talking about, did you see any officer strike him with a baton with blows?
A. No.
Q. Was it what you observed more pulling and

pushing and things of that nature?

A. Correct.

Q. And he was resisting for most of the time?

A. That's right. I would say the entire time.

Q. Did you observe him Mr. Greer being transported from the scene by the ambulance?

A. I don't recall.

Q. Did you see anybody, whether it's ambulance or police personnel, conducting any type of CPR at the scene?

A. I don't recall. I believe that the ambulance was there on the spot so quickly that that wasn't even needed. I think, if I remember the way that I remember it, it was soon as they rolled him over they observed he was unconscious the ambulance was right there and they called the guys over.

Q. When you say they, the police officers called the ambulance guys over?

A. The police officers, that's right.

Q. So it's fairly instantaneous?

A. Yes.

Q. Could you see what, if anything, the ambulance people were doing at that point in time?

A. No.

Q. But you're aware they took him away?

A. Just one.
Q. When did you first that particular evening see a BART police officer?
A. I don't recall.
Q. For example, was he there when you and Officer Clark arrived or did he show up afterwards?
A. I don't remember if he was there before we were. He was there either right before or right after we got there.
Q. What, if anything, did you see the BART officers do with respect to Mr. Greer?
A. I do not recall. I think when you don't know the police officers it's harder to maintain who's doing what. Because I knew Officer Clark or Officer Cosgriff, it's easy to follow in your mind what they're doing. I don't recall what the BART officer was doing.
Q. If anything?
A. No, I don't recall.
Q. Would it be fair to say that you do not know if the BART police officer punched Mr. Greer?
A. No.
Q. No, he didn't or no, you don't know?
A. No, I couldn't say.
In my recollection none of the police officers, and I would include him in my mind as an officer, he was

in some type of uniform, he pulled up in a squad car, in my mind, him and all of them altogether nobody ever threw a punch.

Q. So let's speed this up. When you said earlier that you did not see any officers punch, kick or use a baton on Mr. Greer that would include the BART officers?

A. That's right.

Q. Did you see any officers sitting on Mr. Greer at any time?

A. No.

Q. Did you see any officers kneeling on him?

A. Not specifically. My guess is that between four men trying to subdue a man of Mr. Greer's size and strength, I'm sure they were on top of him, there's no doubt about that. I wouldn't describe it as them sitting on the person. Once it went to the ground these officers had to get around and on top of Mr. Greer. Where their knee was I couldn't say.

Q. Would it be fair to say that Mr. Greer was substantially larger than any of the police officers?

A. Yes.

Q. And based upon your observations, is it fair to say Mr. Greer was substantially stronger than any of the police officers?

A. Yes.

talk about what happened that night?

A. Yes.

Q. What did you two talk about in general?

A. I asked him how he was doing. I knew that the event affected him emotionally. As a pastor I just checked in on him to see how he was handling everything.

Q. Did you two talk about specifically what happened vis-a-vis Mr. Greer?

A. Not about the exact details.

Q. Okay. Did you talk in general about what happened with Mr. Greer?

A. No.

Q. I take it you also knew Officer Cosgriff?

A. That's right.

Q. From the church?

A. That's right.

Q. Have you ever spoken to him since that evening about what happened with Mr. Greer?

A. Not about the specific details.

Q. Based upon your observation, do you think any police officers did anything wrong that evening?

MR. HALEY: Same objections as before.

MR. ROONEY: Q. You can answer.

A. I'm sorry. No.

Q. Why do you say that?

A. I'm no expert on the law. But it seemed like they wanted to arrest him and he resisted arrest. They did everything they could within their power to arrest him without trying to physically hurt him. By my account they did the best job that they could. I know had I been a police officer with a man that size that was resisting arrest it would have been challenging.

Q. Going to Exhibit No. 2, the diagram, can you identify for us generally where you were standing when you saw the wrestling between Mr. Greer and the various officers.

A. I think he originally was talking to him on this side (indicating).

Q. You're pointing to the passenger side of the vehicle toward Mission Boulevard?

A. That's where he began talking to him, giving him some type of sobriety test.

Q. Can you put an "FST" for field sobriety test.

A. (Witness complies.)

Q. Where were you standing approximately on Exhibit No. 2?

A. I don't know these cars lay out the way I would have laid him out, but I would have been more than likely over here (indicating).

Q. You just put an "X" by your spot.

Q. In what other way did you visibly see him resisting arrest?
A. That was the main thing I recall is that he would not allow them to put handcuffs on him. He was resisting physically primarily with his arms and his legs and his body movements. He wasn't running and he wasn't fighting. He just was big enough and strong enough to say no and pull away.
Q. He wouldn't put his hand behind his back to be handcuffed?
A. That's correct.
Q. What I want to know is when he was face down on the ground, did he continue to refuse to put his hand behind his back?
A. That's correct.
Q. And you would see the officers physically try to get this fellow to put his hand behind his back?
A. That's right.
Q. He was exerting a lot of energy resisting the officer's attempt to get his hand behind his back?
A. Right.
Q. He had officers at that time around him, true?
A. Yes.
Q. And on top of him?
A. I believe so.

Q. Could you see one way or another whether or not they were trying to get handcuffs on his hands in front?

A. I don't recall.

MR. VUCINICH: Thank you.

MR. ROONEY: I have one or two follow-ups.

FURTHER EXAMINATION BY OWEN T. ROONEY

BY MR. ROONEY:

Q. You mentioned that the officers, plural, and Mr. Greer the motorist, fell to the ground. From your vantage point, were you able to tell what precipitated or caused that fall?

A. Him resisting arrest.

Q. And why do you say that?

A. It had to do with the fact that he was trying to move away from them and move his body and his arms and use his body to resist arrest. He was so large and as they were trying to, it took multiple people to get ahold of his arms and try to pull his arms together as he moved around away from him that they tumbled down.

Q. From your vantage point, could you see whether any officer used any type of technique to try to trip him up or try to lose his balance?

A. Not that I could see.

Q. From your position, could you see whether any

 officers physically tried to pull him towards the ground?

A. Not that I could see.

Q. Last question. Do you have a time estimate as to when Mr. Greer was rolled over how soon a paramedic was by his side? I know you don't know exactly. Do you have a ballpark estimate?

A. I mean, it was within -- I couldn't say with all honesty. It seemed to be a very short time period. It was within a minute or two to me. It was fast.

MR. ROONEY: Thank you.

MR. HALEY: I'm going to leave this guy alone.

MR. VUCINICH: I have no further questions. If you ask us a question we'll probably have another half an hour.

THE REPORTER: Mr. Haley, are you ordering a copy?

MR. HALEY: Yes.

THE REPORTER: And are you ordering a copy, sir?

MR. ROONEY: Yes, please.

THE REPORTER: Okay. I have forms for you guys to fill out.

(Whereupon, the proceedings were concluded at 3:21 p.m.)

STATE OF CALIFORNIA )
) ss.
COUNTY OF ALAMEDA )

The witness, TODD HENDRICKS, in the foregoing deposition appeared before me, Mellony L. Knight, a Certified Shorthand Reporter in and for the State of California.

Said witness was then and there at the time and place previously stated, by me placed under oath to tell the truth, the whole truth and nothing but the truth in the testimony given on the date of the within deposition.

The testimony of the witness and all questions and remarks requested by Counsel and reported thereafter, under my direction and control, caused to be transcribed into typewritten form by means of Computer-Aided Transcription.

I am a Certified Shorthand Reporter licensed by the State of California. I further certify that I am not of counsel or attorney for either or any of the parties to the case named in the within caption, and that I am not related to any party thereto.

IN WITNESS WHEREOF, I have hereunto affixed my signature this 21st day of June 2016.

__________________________________
Mellony L. Knight, CSR
Certified Shorthand Reporter #8448

# EXHIBIT I

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

| | | |
|---|---|---|
| JOSEPH JAMES GREER,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF HAYWARD; BAY AREA RAPID TRANSIT DISTRICT; MICHAEL CLARK; JULIAN COSGRIFF; DANIEL COVARRUBIAS; GUILLERMO DELIRA; BRIAN LEWANDOWSKI; JEFF LUPZINGER; NORM MCADAMS; SEAN SPILLNER; BRANDON TONG JON TOUGAS; RICK TRAN; DAVE WATERS; BEN YARBROUGH; and Does 1-10,<br><br>Defendants. | ) | Case Number: 3:15-CV-02307-WHO |

DEPOSITION OF

CUITLAHUAC FRIAS

DATE: JUNE 15, 2016 (WEDNESDAY)

TIME: 11:38 P.M.

LOCATION: CLAPP, MORONEY, BELLAGAMBA, VUCINICH BEEMAN & SCHELEY
1111 Bayhill Drive, Suite 300
San Bruno, CA 94066

DEPOSITION REPORTER: MELLONY L. KNIGHT, CSR
Certified Shorthand Reporter, #8448

 that?

A. Probably it was more most probably because the guy was screaming, "What are you doing? What are you doing? What are you doing?" All the time.

Q. When you were standing there and there's a group of people around him, could you hear him screaming?

A. Yeah.

Q. What was he screaming?

A. "What are you doing? What are you doing? What are you doing?"

Q. Could you tell whether or not he seemed to be fighting with the officers in terms of preventing him?

A. I saw him doing this all the time, (indicating).

Q. When you say doing this all the time, can you describe for us in words what you saw.

A. I saw the guy kind of like going like back and forth (indicating).

Q. I believe what you're showing us is going back and forth with his shoulders?

A. Yeah.

MR. HALEY: If I might, with his hands behind his back.

THE WITNESS: Yes.

MR. VUCINICH: Q. Let me ask you that because that's a good question. I appreciate that.

Did you see him doing that before or after he had his hands behind his back, or both times?

A. Both times, he was trying to go -- (indicating).

Q. So we're clear on this. Did you see his shoulders moving back and forth when he didn't have his hands behind his back?

A. Yes, I did.

Q. Did you see him moving his shoulders back and forth when he did have his hand behind his back?

A. Yes, I did see.

Q. When you saw that was he standing or on the ground? Where was he?

A. On the ground.

Q. And so, you could see him at some point in time on the ground, correct?

A. Yes, because I can saw him under the feet of the officers.

Q. You mean like through their legs?

A. Yeah, through their legs.

Q. And when you could see through their legs was he sitting up and moving his shoulders back and forth?

A. Yes.

Q. How long was it that you saw him, if you can give us a ballpark figure, moving his shoulders back and forth?

A. Probably like five minutes, about five minutes.

Q. That's your ballpark figure?

A. Yeah, that's my ballpark figure.

Q. He was yelling during that time frame. What was he yelling?

A. "What are you doing? What are you doing?" And "What are you doing?"

Q. Did you hear the officers yelling anything during that time period you just described?

A. I heard two officers "Stop resisting, Stop resisting." And that's all I hear.

Q. "Stop resisting"?

A. "Stop resisting."

Q. Did you hear more than one officer say that?

A. No.

Q. Could you hear that in a loud voice?

A. Yeah, in a loud voice.

Q. Did you hear that more than once?

A. I heard it three times.

Q. And that was while he was on the ground with the officers around him?

A. Yes.

MR. HALEY: Excellent question, Counsel.

MR. VUCINICH: Well, these other gentlemen may have some questions for you.

THE WITNESS: Sure, no problem.

EXAMINATION BY OWEN T. ROONEY

BY MR. ROONEY:

Q. Hi. My name is Owen Rooney. I represent BART.

A. Hi.

Q. How are you?

A. Good, and you?

Q. Did you see any BART police officers that night?

A. Just one I think.

Q. And what did you see the BART police officer do with the man in the truck?

A. Standing up. He was just standing. He was behind the cops -- the officers. I'm sorry.

Q. He was behind the other officers?

A. Yes.

Q. Did you ever see the BART officer interact in any way with the driver of the truck?

A. No.

Q. Did you see the BART officer punch the driver of the truck?

A. No, sir.
Q. Did you see the BART officer kick the --
Did you see the BART officer kick the driver of the truck?
A. No, sir.
Q. Did you see the BART officer use a billy club on the driver of the truck?
A. No, sir.
Q. Did you see the BART officer touch in any way the driver of the truck?
A. No.
Q. At any time when you saw the driver of the truck on the ground, did you see him punching at the officers?
A. No.
Q. Did you see the motorist when he was on the ground flailing his arms around at the officers?
A. No, I didn't saw that.
Q. Did you see him kick at the officers?
A. No.
Q. Which arrived first, the paramedics or the fire department?
A. The fire department.
Q. How much time passed until the paramedics arrived, after the fire department?

A. Two minutes, the most.

Q. So you said earlier, if I understood you correctly, that the motorist of the car was on the ground and he was twisting his shoulders back and forth.

A. Back and forth.

Q. And that went on for roughly five minutes?

A. Yes.

Q. Was the motorist still twisting his arm back and forth when the fire department arrived?

A. No.

Q. How about when the paramedics arrived?

A. No.

Q. So after he stopped twisting back and forth when did the fire department arrive, how much time?

A. Probably like two minutes.

Q. And then, after the fire department arrived how much time until the paramedics arrived?

A. Two minutes.

Q. Another two minutes?

A. Yes.

Q. Did you see any officers sitting on the motorist?

A. No.

Q. Did you see any officer put their foot on any part of his body?

A. No, sir.
Q. Did you see any officers kneeling on him?
A. No.
Q. Did you see the officer trying to apply anything to the motorist's legs?
A. No.
Q. Nothing at all?
A. I don't -- no. I don't recall that.
Q. Were you actually in the parking lot or on the sidewalk?
A. In the parking lot.
Q. Did you think the police did anything wrong?
MR. HALEY: Objection: Not reasonably calculated to lead to the discovery of admissible evidence.
MR. ROONEY: You can answer.
THE WITNESS: I didn't hear the question. Can you repeat.
MR. HALEY: Just ignore what I said.
MR. VUCINICH: Always ignore what he says.
THE WITNESS: Okay.
MR. VUCINICH: The guy on your right also ignore what he says.
MR. ROONEY: Those are words of wisdom, by the way.

STATE OF CALIFORNIA )
) ss.
COUNTY OF ALAMEDA )

The witness, CUITLAHUAC FRIAS, in the foregoing deposition appeared before me, Mellony L. Knight, a Certified Shorthand Reporter in and for the State of California.

Said witness was then and there at the time and place previously stated, by me placed under oath to tell the truth, the whole truth and nothing but the truth in the testimony given on the date of the within deposition.

The testimony of the witness and all questions and remarks requested by Counsel and reported thereafter, under my direction and control, caused to be transcribed into typewritten form by means of Computer-Aided Transcription.

I am a Certified Shorthand Reporter licensed by the State of California. I further certify that I am not of counsel or attorney for either or any of the parties to the case named in the within caption, and that I am not related to any party thereto.

IN WITNESS WHEREOF, I have hereunto affixed my signature this 21st day of June 2016.

__________________________________
Mellony L. Knight, CSR
Certified Shorthand Reporter #8448

**EXHIBIT J**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSEPH JAMES GREER,

Plaintiff,

vs. No. 3:15-CV-02307-WHO

CITY OF HAYWARD, BAY AREA RAPID TRANSIT DISTRICT, et al.,

Defendants.

_______________________________/

DEPOSITION OF ERIC BRASSFIELD

Taken before LORI A. YOCK, CSR, RPR

Certified Shorthand Reporter No. 5801

Registered Professional Reporter No. 18667

State of California

Thursday, September 29, 2016

---oOo---

ERIC BRASSFIELD,

having first been duly sworn to tell the truth, the whole truth, and nothing but the truth, was thereupon examined and testified as follows:

EXAMINATION

BY MR. HALEY:

**Q.** Could you please state your name.

**A.** Eric Brassfield.

**Q.** And what is your occupation?

**A.** Firefighter-paramedic for the City of Hayward Fire Department.

**Q.** Have you ever had your deposition taken before?

**A.** By phone when I worked for El Dorado County Fire.

**Q.** Okay. I'm going to give you some rules that we always start these things with. Okay?

**A.** Yes, sir.

**Q.** First I want to remind you that you are under oath and sworn to tell the truth. You understand that?

**A.** Yes, sir.

**Q.** I'm going to ask you questions about an event that happened some time ago, and we have your report here, but if you don't remember something or if you don't know

night?

**A.** Captain Dan Jones.

**Q.** Okay. And -- okay. So what brought you to the scene of this incident on that night?

**A.** Dispatched as staging required for -- I don't remember exactly what dispatch said. All I know is when the tones go off in the station, they tell you a general direction of where you are going, and they give you a brief narrative of the call that you are going on. But it said: Engine 2, staging required, agency assist or medical aid. So we staged.

(Plaintiff's Exhibit No. 1 marked for identification.)

BY MR. HALEY:

**Q.** Okay. Let me show you what we've marked as Exhibit 1 --

**A.** Okay.

**Q.** -- and ask you what that is.

MR. KADOTANI: What the document is?

MR. HALEY: What the document is, yeah.

THE WITNESS: This is my patient care report for this incident.

BY MR. HALEY:

**Q.** And did you prepare that report?

**A.** I did.

**Q.** And did you prepare that report at or near the time of this incident?

**A.** Yes, sir, that night.

**Q.** And in your efforts to prepare that report, you wanted to be accurate?

**A.** Yes, sir.

**Q.** Okay. Now, going back to the rig -- the engine you were on, how many people were on the engine?

**A.** Three, sir.

**Q.** And where were you on the engine when you arrived?

**A.** Facing backwards in the firefighter seat.

**Q.** And when you say staging, what do you mean by that?

**A.** Staging required for agency assist means that the scene isn't safe, that it hasn't been cleared for us to come in. So you leave your fire station to go towards the call, and you are staging at a safe distance until you are cleared by dispatch when they come over the radio and say: Engine 2 the scene is secure. You guys can roll in. You guys can respond in to the call.

**Q.** Okay. And on this night, did you go to the scene and stage at the scene?

MR. KADOTANI: It's vague as to distance.

THE WITNESS: We staged -- we staged on Harder

Road.

BY MR. HALEY:

**Q.** Okay.

**A.** Right outside of the Kmart Shopping Center.

**Q.** All right. Other than your engine, did any other engines respond?

**A.** No, sir.

**Q.** Did you arrive there before Paramedics Plus arrived?

MR. KADOTANI: Calls for speculation.

THE WITNESS: I don't recall.

BY MR. HALEY:

**Q.** That's fine. Do you recall there being a time period between the time you arrived and staged and the time you were cleared to go render aid?

**A.** Can you repeat the question?

**Q.** I'm sure I'm using the wrong nomenclature, but you went to the scene and your truck came to a stop?

**A.** Our engine.

**Q.** Your engine came to a stop; right?

**A.** Yes, sir.

**Q.** And when your engine came to a stop, was there a time between then and the time you were able to go render aid to the subject?

**A.** Yes, sir.

**Q.** All right. And was that for the reason you talked about, that the area had to be cleared to be safe for firefighters to respond to it?

**A.** Yes, sir.

**Q.** And who clears the area for the firefighters to come in?

MR. KADOTANI: Calls for speculation.

BY MR. HALEY:

**Q.** If you know.

**A.** I would assume the police officers that are on scene.

MR. KADOTANI: Don't assume. I mean, if you know, respond. If you don't --

THE WITNESS: I don't know, then.

BY MR. HALEY:

**Q.** On this night, I take it that at some point fire dispatch cleared you to go from the truck where you were staged to go render aid?

**A.** Yes, sir.

**Q.** And you don't remember the exact words that were used?

**A.** No, sir.

**Q.** But something like that happened; true?

**A.** Yes, sir.

**Q.** Do you recall how long it was between the time

you staged on Harder Road and the time you were dispatched to go render aid?

**A.** Approximately a minute or two.

**Q.** Okay. On your report, I see a lot of timestamps on there. Is there a time on your report when you arrived and staged on Harder Road?

**A.** May I refer to my report?

**Q.** Please.

**A.** Not that I see, sir.

**Q.** In my looking at the report, the first time appears to be the time when you began to render aid.

**A.** Yes, sir.

**Q.** Is that accurate?

**A.** Yes, sir.

**Q.** Okay. So I think I'm just going to go through each sentence of your narrative first. Okay?

**A.** Yes, sir.

**Q.** So the first sentence says, quote, "E2 dispatched for medical aid at Kmart Shopping Center. Staging required," close quote.

We've talked about that. That's staging on Harder Road?

**A.** Yes, sir.

**Q.** And in this report, E2 is obviously your engine?

**A.** Yes, sir.

yeah.

BY MR. HALEY:

Q. Yeah. Okay. And then under, "Cardiac Arrest," that's the next line down. Under, "Cardiac Arrest," you wrote, "Yes. After EMS arrival." What do you mean by that?

A. Um, "Yes. After EMS arrival." So emergency medical services, meaning Engine 2 -- so fire and Paramedics Plus. It was witnessed after we arrived, because he had agonal respirations, according to my report, when we walked up. And then we put him on the monitor, and it was PEA or asystole. So that's after we arrived.

Q. Does this note indicate that he went into cardiac arrest after you had arrived?

MR. KADOTANI: Asked and answered.

THE WITNESS: Yes.

BY MR. HALEY:

Q. Okay. I'm done with that.

(Mr. Goff is now present.)

BY MR. HALEY:

Q. Down that line a little bit further, it says, "Estimated Time of Arrest," zero to two minutes. Do you see that there?

A. Yes, sir.

**Q.** What do you mean by that?

**A.** Within the first two minutes of EMS -- us -- being on scene.

**Q.** All right. So that means that he -- he went into cardiac arrest within two minutes of your arrival there?

**A.** Yes, according to my report.

**Q.** And so I would be reading it wrong if I said that the cardiac arrest lasted from zero to two minutes?

**A.** You would be reading it wrong, yes.

**Q.** That's why we have to ask these questions.

MR. KADOTANI: We are all idiots.

BY MR. HALEY:

**Q.** Okay. On the second page, we've already talked about the note under patient complaint so I won't ask you about that again.

Below "Assessment," under "ETOH/Drug use," you wrote "Not Applicable." What did you mean by that?

**A.** Where are we at?

**Q.** Right under "Assessment."

**A.** Unknown.

**Q.** Okay.

MR. KADOTANI: Matt, can we take a quick second here? I just want to remind him he had to feed his meter possibly.

MR. HALEY: Yes. Let's take --

EMERICK AND FINCH
Certified Shorthand Reporters
18 Crow Canyon Court, Suite 125
San Ramon, California 94583
(925) 831-9029

Date: ____________

MR. ERIC BRASSFIELD
c/o JEFFREY M. VUCINICH, ESQ.
Clapp, Moroney, Vucinich, Beeman, Scheley, A.P.C.
1111 Bayhill Drive, Suite 300
San Bruno, CA 94066

Re: GREER v. CITY OF HAYWARD, ET AL.
USDC 3:15-CV-02307-WHO

Dear Mr. Brassfield:

Your deposition in the above matter is now available at this office. You may wish to discuss with your attorney whether he or she requires that it be read, corrected, if necessary, and signed before it is filed with the court, if so ordered. Your rights regarding signature of this deposition are contained in the Code of Civil Procedure.

Since the original deposition may not be released from our custody, if you wish to sign it, please appear at this office, 18 Crow Canyon Court, Suite 210, San Ramon, California, within the next 30 days on any weekday between the hours of 9:00 a.m. and 4:00 p.m. It is necessary that you bring this letter with you.

In the alternative, you may wish to read your attorney's copy of the deposition and notify this office by letter of any changes that you desire to be made.

Very truly yours,
EMERICK AND FINCH

______________________________
LORI A. YOCK, CSR NO. 5801

cc: All Counsel
Original

# EXHIBIT K

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

JOSEPH JAMES GREER,

Plaintiff,

vs.

CITY OF HAYWARD; BAY AREA RAPID TRANSIT DISTRICT; MICHAEL CLARK; JULIAN COSGRIFF; DANIEL COVARRUBIAS; GUILLERMO DELIRA; BRIAN LEWANDOWSKI; JEFF LUPZINGER; NORM MCADAMS; SEAN SPILLNER; BRANDON TONG JON TOUGAS; RICK TRAN; DAVE WATERS; BEN YARBROUGH; and Does 1-10,

Defendants.

Case Number: 3:15-CV-02307-WHO

DEPOSITION OF

THOMAS WAYNE ROGERS, M.D.

DATE: JUNE 23, 2016 (THURSDAY)

TIME: 1:07 P.M.

LOCATION: CLAPP, MORONEY, BELLAGAMBA, VUCINICH BEEMAN & SCHELEY
1111 Bayhill Drive, Suite 300
San Bruno, CA 94066

DEPOSITION REPORTER: MELLONY L. KNIGHT, CSR
Certified Shorthand Reporter, #8448

the body at that moment in time still has enough oxygen in it to survive and these cells will take 3 to 5 minutes to die. That's why I always say minutes.

Q. Typically am I correct if somebody's tased and they're having a reaction you're going to know something's going on then and there, their body's not going to be functioning at that point in time?

A. I don't know. I think exactly what happens to a person when they're tasered is going to just vary from case to case.

Q. You didn't come to the conclusion that the tasing was the cause of death in this instance?

A. I could not make this conclusion.

Q. You note the blood PCP, correct?

A. Yes.

Q. And you come up with cause of death. If you could read that into the record.

A. "Acute Phencyclidine intoxication associated with physical exertion."

Q. You read that very well.

Can you tell us how you came up with that conclusion.

A. My autopsy dissection, the Toxicology Report, and the Coroner's investigation report. And I could well have reviewed medical records and things on this

case. I don't remember now. And those are not in the computer at the Coroner's Office, so I did not really have access into those things today.

Q. Okay. How did your autopsy dissection contribute to your conclusion?

A. Just in the negative sense. Like, there was not, aside from some bruises on the outside of the skull, there was not any head trauma inside the skull or the brain that I could see. The individual's neck was clean. There were not hemorrhages in the strap muscles of the neck. The laryngeal structures were intact. Looking for other forms of trauma I didn't have any broken ribs. I took down his facial bones. Those were all intact, no breaks. Internal visceral organs looked normal to me. Not normal, of course some are abnormal. I didn't see any traumatic injuries to the internal visceral organs. So that's what I mean in the negative sense. The autopsy did contribute to certainly formulating this cause of death.

Q. Add to that the Toxicology Report, how did that contribute to your opinion?

A. That contributed to my opinion on the cause of death because he had a very high level of PCP in his.

Q. And the high level of PCP in terms of cause of death, how would that contribute to it?

A. Contribute to him dying?

Q. Yes.

A. Well, I think it had reached the level -- he had toxic amounts of this drug in his blood and that alone could have caused him to die. I'm not going to be able to tell you the exact mechanism by which PCP causes the heart to stop beating, but those high levels certainly can lead to the death of an individual. On top of the high levels there's also I think a history of physical exertion in this case. Physical exertion is going to, among other things, consume oxygen and it puts the individual in a situation where he dies. So that is ideal how PCP was one of the factors that caused this individual to die.

Q. Does the fact that he has an enlarged heart, does the use of PCP, physical exertion, does that put a large strain on the heart?

A. Yes, it will absolutely. Even a normal heart.

Q. He didn't have a normal heart, did he?

A. No, he didn't.

Q. So you're having use of PCP, which could put strain on the heart, you're having physical exertion, which could put strain on the heart, and you're having that put on somebody who has an abnormal heart, correct?

A. Yes.

STATE OF CALIFORNIA )
) ss.
COUNTY OF ALAMEDA )

The witness, THOMAS WAYNE ROGERS, M.D., in the foregoing deposition appeared before me, Mellony L. Knight, a Certified Shorthand Reporter in and for the State of California.

Said witness was then and there at the time and place previously stated, by me placed under oath to tell the truth, the whole truth and nothing but the truth in the testimony given on the date of the within deposition.

The testimony of the witness and all questions and remarks requested by Counsel and reported thereafter, under my direction and control, caused to be transcribed into typewritten form by means of Computer-Aided Transcription.

I am a Certified Shorthand Reporter licensed by the State of California. I further certify that I am not of counsel or attorney for either or any of the parties to the case named in the within caption, and that I am not related to any party thereto.

IN WITNESS WHEREOF, I have hereunto affixed my signature this 27th day of June 2016.

__________________________________
Mellony L. Knight, CSR
Certified Shorthand Reporter #8448

# EXHIBIT L

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

JOSEPH JAMES GREER,

Plaintiff,

vs.

CITY OF HAYWARD; BAY AREA RAPID TRANSIT DISTRICT; MICHAEL CLARK; JULIAN COSGRIFF; DANIEL COVARRUBIAS; GUILLERMO DELIRA; BRIAN LEWANDOWSKI; JEFF LUPZINGER; NORM MCADAMS; SEAN SPILLNER; BRANDON TONG JON TOUGAS; RICK TRAN; DAVE WATERS; BEN YARBROUGH; and Does 1-10,

Defendants.

Case Number: 3:15-CV-02307-WHO

DEPOSITION OF

BILL L. POSEY

DATE: JUNE 23, 2016 (THURSDAY)

TIME: 10:17 A.M.

LOCATION: CLAPP, MORONEY, BELLAGAMBA, VUCINICH BEEMAN & SCHELEY
1111 Bayhill Drive, Suite 300
San Bruno, CA 94066

DEPOSITION REPORTER: MELLONY L. KNIGHT, CSR
Certified Shorthand Reporter, #8448

usually that they will fight the fright rather than try to flee.

Q. Next to that potentially not toxic I see some handwriting. I can't make it out, and the number 50.

A. Yeah. The literature in individuals who are driving the average level you see is 50 nanograms per mil, which is .05.

Q. Let's go down again. I know we touched on this briefly. It's your handwriting. And the fatalities, .3-25 milligrams. And the mean is 4.8.

A. Correct.

Q. In this case the finding was .596 milligrams, correct?

A. Yes.

Q. What are the effects of somebody who has .596 milligrams of PCP? What are the general effects on them?

A. You're going to see an individual with a very severe response to the presence of this drug in their system. They can be anywhere, as I indicated, from a very slow lethargic individual to a total space case from the standpoint of uncontrollable.

Q. Can this level, at least in your experience, .596 cause death?

A. It can, especially if the individual has an

 existing problem with the heart. This drug will increase the heart rate and also increase the blood pressure. And those conditions on someone with a bad heart is going to push him over the hill faster. But if you look at the range it's a fairly wide range, so it's not a drug that necessarily causes a death in a lot of people.

Q. But it causes death in some people?

A. Yeah, it can. And then also it causes behavior that may lead to death.

Q. If you know, if you don't know the answer to this question please tell me, are some of the causes of death related to PCP cardiopulmonary arrest?

A. Yes. That's what I was leading to concerning the increased heart rate and someone with a preexisting high blood pressure or heart rate, that's going to add to it.

Q. Now, Mr. Greer just so you know, his height and weight is listed on the Coroner's report at 5-11, 380 pounds. Is weight a factor one way or another in terms of how this drug effects somebody?

A. No, not necessarily. The drug likes fat tissue. So the more it's used the more will be deposited into the fat cells and essentially what that will end up occurring is that when they stop using the

drug it takes longer to clear it out of their system because it has to leach that out of the fat cell.

Q. I ask you this question with respect to alcohol in terms of when the testing was done. With respect to PCP when the testing was done at a later point in time does the amount in the blood diminish?

A. No. This drug has a very long half-life. It can range anywhere from 7 to 46 hours to remove half of what's in the blood. So over a span of a few hours it's not going to change much at all. And once an individual is deceased the metabolism of it stops whatever it was at the time of death. That's what would be showing up in the results.

Q. I read some symptoms of causes of death related to it and I read -- whether this is accurate or not I do not know. Intercranial hemorrhage in hypertension, are you familiar with that at all?

A. I have some knowledge about it; however, that gets into pathology and a pathologist would be best to answer that.

Q. This level of PCP on someone 5-11, 380 pounds, what physiological effects does it have on them?

A. As I indicated, they're going to be rather lethargic and slow in their speech and in their thinking processes. It tends to make the muscles very rigid so

to see what the lung condition was.

MR. VUCINICH: Counsel, do you have any questions?

MR. ROONEY: Sure. I have a few follow-up questions.

EXAMINATION BY OWEN T. ROONEY

BY MR. ROONEY:

Q. For the record, I introduced myself before. My name is Owen Rooney. I represent the BART Police Department.

A. Uh-huh.

Q. Referring to the first page of your file, the document we were talking about results.

A. Correct.

Q. If I understand this correctly, Mr. Greer's level of PCP was 0.596 milligrams per liter, right?

A. Yes.

Q. And the fatal range, according to your handwritten note, is 0.3 to 25 milligrams per liter?

A. Correct.

Q. That would put him within the fatal range, correct?

A. Within, yes, but below what the average would be for people who have died.

 Q. Meaning the mean?
A. Yes.
Q. But he would be approximately, if I have my math right, twice the level of the lowest end of that range?
A. Yeah.
Q. And then on page 2 of your file, the document that has the screens in the upper right-hand corner --
A. Yes.
Q. -- next to PCP there's a plus sign, correct?
A. Yes.
Q. Which would mean positive?
A. Yes.
Q. What is the 0.200?
A. I kind of indicated what that is. The number on top is the number that the instrument generated for this sample. The number on the bottom is the number for the minimum positive level of control. So their level is more than twice positive than what the screening was. The level of the screen is .01 milligrams per liter or ten nanograms.
Q. And if I understand you correctly, you take the sample from the femoral vein?
A. That's where they indicated this sample was from.

STATE OF CALIFORNIA )
) ss.
COUNTY OF ALAMEDA )

The witness, BILL L. POSEY, in the foregoing deposition appeared before me, Mellony L. Knight, a Certified Shorthand Reporter in and for the State of California.

Said witness was then and there at the time and place previously stated, by me placed under oath to tell the truth, the whole truth and nothing but the truth in the testimony given on the date of the within deposition.

The testimony of the witness and all questions and remarks requested by Counsel and reported thereafter, under my direction and control, caused to be transcribed into typewritten form by means of Computer-Aided Transcription.

I am a Certified Shorthand Reporter licensed by the State of California. I further certify that I am not of counsel or attorney for either or any of the parties to the case named in the within caption, and that I am not related to any party thereto.

IN WITNESS WHEREOF, I have hereunto affixed my signature this 27th day of June 2016.

Mellony L. Knight, CSR
Certified Shorthand Reporter #8448