1  Matthew D. Haley (SBN 104493)
   THE HALEY LAW OFFICES
2  1633 San Pablo Avenue
   Oakland, CA 94612
3  Telephone: (510) 444-1881
   Facsimile: (510) 444-5108
4  Email: matt@haleylaw.com

5  Fulvio F. Cajina (SBN 289126)
   LAW OFFICE OF FULVIO F. CAJINA
6  311 Oak Street, Suite 108
   Oakland, CA 94607
7  Telephone: (415) 601-0779
   Facsimile: (510) 225-2636
8  Email: fulvio@cajinalaw.com

9  Stanley C. Goff (SBN 289564)
   LAW OFFICES OF STANLEY GOFF
10 15 Boardman Place Suite 2
   San Francisco, CA 94103
11 Telephone: (415) 571-9471
   Email: goffs@mail2world.com

Attorneys for Plaintiff JOSEPH GREER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH GREER, <br><br> Plaintiff, <br><br> vs. <br><br> CITY OF HAYWARD, BAY AREA RAPIC TRANSIT; and Does 1 to 50, inclusive, <br><br> Defendants. | Case No. 3:15-cv-02307-WHO <br><br> MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT BAY AREA RAPID TRANSIT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT <br><br> Date: January 4, 2017 <br> Time: 2:00 pm <br> Courtroom: 2 <br><br> Assigned to the Honorable William H. Orrick |

MPA IN OPPOSITION TO DEFENDANT BAY AREA RAPID TRANSIT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

## I. INTRODUCTION

On May 23, 2014, decedent James Greer was stopped by Hayward police for suspected drunk-driving. Hayward Police Department lieutenant, Jeff Lutzinger, stopped Greer and directed him to a K-Mart parking lot on Mission Boulevard. Greer complied and pulled into the parking lot.

Defendant Bay Area Rapid Transit ("BART") officer, JON TOUGAS, was driving on Mission Boulevard when he spotted Lt. Lutzinger and Greer. TOUGAS pulled into the K-Mart parking lot. He offered Lutzinger assistance and Lutzinger accepted it. TOUGAS then turned on his BART-issued police body camera, which he wore on his uniform, and proceeded to record the next sixteen (16) minutes in high resolution.

TOUGAS' footage shows how a routine traffic stop turned deadly when four to five officers – including TOUGAS – dogpiled Greer, pinning his torso against the pavement for several minutes to the point Greer could no longer breathe. All the while, as TOUGAS pinned Greer down, other officers Tasered him repeatedly, stepped on his head, and pressed a baton against his neck. Greer can be heard screaming in pain before falling silent.

The video shows the entire event from start to finish. It shows that Greer was not some incoherent colossal with superhuman strength, but rather a person who was cooperating with the officers before he got scared. The video shows, and it is undisputed, that Greer never once swung at an officer, never once threatened anyone, and never once engaged in "pre-assaultive" behavior as claimed by TOUGAS at his deposition.

Likewise, with respect to TOUGAS, both deposition testimony and the video establish that TOUGAS was the only officer that thought to take Greer to the ground. In the video, we see TOUGAS pulling Greer down by his shirt. The video also shows TOUGAS applying his body weight on a prone Greer's back for several minutes until Greer – who was struggling to breathe and uttering the phrase "Get off me!" – finally goes quiet and loses consciousness.

Then, after a pause as the officers decide how to roll Greer over, the video shows the

1
MPA IN OPPOSITION TO DEFENDANT BAY AREA RAPID TRANSIT'S MOTION
FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

Hayward officers and TOUGAS place Greer on his back. Once there, Greer's eyes are closed, his lips are blue, and TOUGAS can be heard exclaiming, "He's unconscious!" But for the next seven (7) minutes, none of the officers present – neither from BART nor Hayward – do anything to address Greer's serious and apparent medical distress. In a chilling display of indifference, TOUGAS, *who only the day before had received CPR training*, simply gets up and walks away to laugh and joke with his BART colleagues. In the video, we hear the BART officers discuss a ring they found on the ground, examine it to see if it's a mood ring, and wonder, while laughing, what mood the dying Greer is in.

In short, the video shows exactly how TOUGAS and BART violated Greer's civil rights. Knowing this, the public agencies involved in this case have done everything possible to distance themselves from the police camera footage. First, the Alameda County medical examiner testified at his deposition that he had not seen the video of Greer's death. The medical examiner then proceeded to misstate the facts of that evening, claiming, for instance, that Greer lingered on at the hospital even though Greer became asystolic at the scene and was pronounce dead upon his arrival to the hospital. Now, BART and TOUGAS bring forth their motion for summary judgment without sharing with the Court the single most important piece of evidence in this case – <u>the video footage of what transpired on May 23, 2014</u>.

The reason for that omission is simple: the video, together with all the other evidence in this case, is a indictment of the actions and inactions taken by TOUGAS and BART.

## II. STATEMENT OF FACTS

### A. The BART videos

On the evening of May 23, 2014, at approximately 10:00 p.m., Lt. Lutzinger of the Hayward Police Department ("HPD") stopped James Greer for suspicion of driving while intoxicated somewhere on Mission Boulevard. Lt. Lutzinger directed Greer to a K-Mart parking lot. There, he requested backup. (Declaration of Fulvio F. Cajina (hereafter, "Cajina Decl."), Exhibit 1, Lutzinger Deposition, 10:16-20; 38:8-49:1.)

2

While waiting for backup officers from HPD, Lt. Lutzinger instructed Greer to turn off his car engine and put his car keys up on the roof of his truck. Greer complied with the commands. Lt. Lutzinger then asked Greer for his driver's license, which Greer provided. (See *id*.)

Before HPD backup arrived, BART officer, TOUGAS, arrived on scene. TOUGAS offered Lt. Lutzinger assistance (i.e., "cover") and Lutzinger accepted. Lutzinger further testified that up to that point, Greer had not been physically combative. (Cajina Decl., Exhibit 1, Lutzinger Deposition, 51:3-53:6.)

Soon thereafter, two HPD backup officers, Officer Clark and Officer Lewandowski, arrived on-scene. The four officers, Lutzinger, TOUGAS, Clark and Lewandowski returned to Greer's car to perform the FSTs. (Cajina Decl., Exhibit 1, Lutzinger Deposition, 54:12-55:1; 58:11-59:7; Cajina Decl., Exhibit 4, Lewandowski Deposition, 32:23-33:6; 34:3-15.)

By this time, TOUGAS had already engaged his police body camera. (Cajina Decl., Exhibit 2, Tougas Deposition, 37:19-38:25.) According to TOUGAS, the video he took that night accurately depicts the events that were recorded on the video. (Cajina Decl., Exhibit 2, Tougas Deposition, 6:25-7:24.)

That video, together with other BART videos that were provided by HAYWARD in discovery, are included in a DVD titled Exhibit 3. (Cajina Decl., ¶ [5], Exhibit 3.) The TOUGAS video is titled, "**asstd_HPD_in_an_11-95.mp4**." TOUGAS took that video on his police body camera. (*Id*.; and also Cajina Decl., Exhibit 4, Declaration of Bryan Reuter, Exhibit.) The DVD contains several other pieces of media, including the other BART videos titled, "**J_Mateu_58035_Cover_Unit_1.mp4**" and "**cover.mp4**," as well as audio recordings of the dispatch tapes provided by BART in discovery under a folder titled "BART00001— Dispatch Audio." (Cajina, Decl. ¶ [6], Exhibit 3.) Exhibit 3 also contains a combined video of the three above-referenced videos titled, "**Greer_Combined_Timecoded.mp4**," (hereafter, the "Combined Video") which synchronizes the three videos referenced above and adds a timer to

3

the screen. As explained by plaintiff's expert in his declaration, aside from synchronizing the videos and adding a timer at the bottom, the BART videos are otherwise unaltered. (Cajina Decl., Exhibit 5, Initial Expert Report of Bryan Reuter.) Lastly, Exhibit 3 contains a .ssa files created by Mr. Reuter, which, when run together with the BART videos, adds close-captioning to the screen, so that the viewer can follow the parties' dialogue. (Cajina, Decl. ¶ [6], Exhibits 3 and 5.) The combined video is a total of 19 minutes and 19 seconds from start to finish. (Cajina, Decl., Exhibit 3, "**Greer_Combined_Timecoded.mp4**.") The Combined Video shows the events of May 23, 2014 from the time Greer is asked to step out of his vehicle to when he is being loaded onto the ambulance. (*Id*.)

## B. Mr. Greer was neither "fumbling" nor did he appear to be acutely intoxicated with PCP during the Field Sobriety Tests

Defendants argue that Mr. Greer "'was fumbling' to retrieve his driver['s] license, his face was flushed, his eyes were glassy and was incoherent" when interacting with Lt. Lutzinger. (Defendant's Motion for Summary Judgment, 3:8-9.) However, the Combined Video paints a quite different picture. Beginning at the 58-second mark on the video, we hear Lt. Lutzinger ask Mr. Greer several questions, including whether he has weapons, to which he replies that he doesn't; whether he's had anything to drink, to which he states that he hasn't. Then Mr. Greer is asked to place his hands on the vehicle, to turn around, and to take a Nystagmus test to check his horizontal gaze. Mr. Greer follows all of the Lieutenant's commands. (Cajina, Decl., Exhibit 3, **Combined Video**; 00:58:28- 02:30:00.) At no point during this interaction does Mr. Greer appear to be "incoherent." (*Id*.) In fact, Lewandowski recalls that Greer was cooperative up with Lt. Lutzinger, allowing himself to be patted down, for instance. (Cajina Decl., Exhibit 4, Lewandowski Deposition, 37:2-38:9.)

At about the 2:30-mark, Lt. Lutzinger asks Greer to walk to the other side of his vehicle to perform balance tests on a more even surface. Mr. Greer follows Lt. Lutzinger's commands and walks over to the other side. There, the Lieutenant asks Greer about his medical history,

4

and Greer provides him with answers, including information regarding abdomen problems and past problems with his legs. (Cajina, Decl., Exhibit 3, **Combined Video**; 02:30:00 – 03:45:00; Cajina Decl., Exhibit 4, Lewandowski Deposition, 42:6-22.) Thereafter, Greer begins to perform the FSTs, putting his legs together, closing his eyes, and putting his head back. Greer does not appear to have difficulties following commands. (Cajina, Decl., Exhibit 3, **Combined Video**; 02:30:00 – 03:45:00.)

C. **Officer TOUGAS decides to take Greer to the ground**

At around the 3:45-mark, Greer appears to notice that an officer to his right begins to walk toward him. Greer appears to get scared by that and asks, "Why are you guys messing with me for, though?" (Cajina, Decl., Exhibit 3, **Combined Video**; 03:45:00 – 03:55:00; Cajina, Decl., Exhibit 7, Reuter Initial Report, Transcript for Combined Video, 4:16-23). Greer takes a couple of steps away from Lt. Lutzinger. Immediately, the other officers descend on Greer. (Cajina, Decl., Exhibit 3, **Combined Video**; 03:55:00 – 04:40:00.) However, Greer does not swear at the officers; he does not throw a punch; he does not threaten any of them. (*Id*.)

Lewandowski recalls that the officers immediately grabbed Mr. Greer's arms. Lewandowski also recalls that he initially had his Taser out, but re-holstered because it didn't appear like it "would be necessary" because Greer wasn't "fighting or throwing any punches." (Cajina Decl., Exhibit 4, Lewandowski Deposition, 66:14-67:20.) Lewandowski's intent was not to takedown Greer, but to handcuff him while in standing position. (Cajina Decl., Exhibit 4, Lewandowski Deposition, 67:6-17.)

By contrast, BART officer TOUGAS was in a completely different and inappropriate state of mind. TOUGAS walked over to Greer, grabbed the back of Greer's T-shirt and, in TOUGAS' words "the struggle was on." (Cajina Decl., Exhibit 2, Tougas Deposition, 56:3-25.) TOUGAS further testified that his plan from the moment the struggle began was to take down Mr. Greer. (Cajina Decl., Exhibit 2, Tougas Deposition, 57:1-25; 60:3-13; and 63:4-21.) The Combined Video confirms TOUGAS's testimony. At the 4:41-mark, we see that TOUGAS is

5
MPA IN OPPOSITION TO DEFENDANT BAY AREA RAPID TRANSIT'S MOTION
FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

holding onto Greer; we see that TOUGAS pulling him down. (Cajina, Decl., Exhibit 3, **Combined Video**; 04:40:00 – 04:54:00; Cajina, Decl., Exhibit 8, Reuter Supplemental Report, p. 3.)

Yet, in their motion, BART argues that no one knows why or how Greer and the officers "wound up on the ground." (Defendant's Motion for Summary Judgment, 4:23-24.) Defendants fail to acknowledge that Greer was taken to the Ground because TOUGAS wanted him there.

**D.     Once on the ground, Greer is subjected to excessive force and is asphyxiated**

On the ground, Greer was placed on his stomach. Greer was a significantly obese man, with a protruding hernia that is clearly visible in the Combined Video. Moreover, early on, Greer had indicated to the officers – including TOUGAS – that he had medical problems with his abdomen region. (Cajina, Decl., Exhibit 3, **Combined Video**; 02:30:00 – 03:45:00.) Nonetheless, for the next seven (7) minutes of his life, the officers placed Greer in a prone position (i.e., facedown), (Cajina, Decl., Exhibit 3, **Combined Video**; 04:54:00 – 11:26:00), and proceed to Taser him multiple times, (see, e.g., Cajina, Decl., Exhibit 3, **Combined Video**; 06:51:37-06:56:00 and 07:07:52-07:13:00 (for the sounds of the Taser going off and Mr. Greer screaming)), step on his head, (Cajina, Decl., Exhibit 3, **Combined Video**; 09:02:00-09:18:00), and apply pressure to Greer's neck with their hands and a collapsible baton. (Cajina, Decl., Exhibit 3, **Combined Video**; 08:21:00-08:43:00.) Additionally, several officers, including TOUGAS, can be seen putting pressure on Greer's torso – his back – in an effort to keep him prone. (Cajina, Decl., Exhibit 3, **Combined Video**; 07:55:24-10:36:01.)

For instance, at 8:46 in the Combined Video, we can see the knee of one officer between Greer's shoulder blades and TOUGAS' arm and elbow putting pressure on Greer's back. (Cajina, Decl., Exhibit 3, **Combined Video**; 08:46:00.) In fact, TOUGAS continuously applied pressure to Greer's torso from 7:55-10:36 on the Combined Video. (Cajina, Decl., Exhibit 3, **Combined Video**; 07:55:24-10:36:01; Exhibit 8, Reuter Supplemental Report, p. 3.) This time-frame is critical, given that it is during this time-frame that Greer repeatedly begs the officers to

6
MPA IN OPPOSITION TO DEFENDANT BAY AREA RAPID TRANSIT'S MOTION
FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

"Get off [him]." As the seconds tick, Greer's breathe becomes rapid as he is struggling to get air into his lungs. Around the 9:30-mark, Greer is yelling in desperation and the officers respond by applying maximum pressure to his back as can be seen in the Combined Video. Greer stops saying words, and starts grunting. Ultimately, around 10:27 Greer utters his last sound. After 10:30, he appears to lose consciousness. Yet officers continue to hold him down in a prone position – continue putting pressure on him – for another minute. (Cajina, Decl., Exhibit 3, **Combined Video**; 07:55:24-11:30:01; Exhibit 8, Reuter Supplemental Report, p. 3; Exhibit 7, Initial Reuter Report, Transcript for Combined Video, 12:23.)

According to plaintiff's pathology expert, Dr. Joseph Cohen, Greer's death resulted from, among other things, the "minutes of sustained relative hypoxia consequent to restraint maneuvers and compression [of Greer's] torso with inability to adequately exchange air." (Cajina, Decl., Exhibit 12, Cohen Report, p. 4.) In plain English, Mr. Greer couldn't breathe because of the pressure being applied to his torso by the officers – including TOUGAS. Greer's life was snuffed.

Similarly, according to plaintiff's police expert, Barry Brodd, "BART PD" violated the "standards of practice for police officers in California in their detention of James Greer on May 23, 2014 by … [a]pplying prolonged and extreme pressure to Mr. Greer's torso while he lay in a prone position, which is a known and taught danger given that it can cause positional asphyxia." (Cajina, Decl., Exhibit 9, Initial Report of Barry Brodd, p. 3.) In other words, California officers should know that keeping a suspect prone for a long time while putting pressure on him can lead to death. According to Mr. Brodd, this is especially the case when dealing with someone of "Mr. Greer's body size, weight, level of exertion and apparent problems with his abdomen." (*Id*.)

In fact, even though TOUGAS argues that he did not engage in use of force on Greer, at the end of the night, he is heard of dispatch calling for a "use of force" supervisor. (Cajina, Decl., Exhibit 3, Audio file, 11.01.12.wav.)

Defendants counter that the Alameda County Medical Examiner found that Greer died from acute PCP intoxication with "physical exertion." (Defendant's Motion for Summary Judgment, 9:21-26 (citing the Deposition of Thomas Rogers, 41:16-43:20).) However, Dr. Rogers' analysis should be taken with a large grain of salt for two reasons: first, Dr. Rogers never saw any of the BART videos; his file on Greer made no mention of the videos, (See, generally, Cajina, Decl., Exhibit 13, Rogers Depostion, pages 8-15); and second, he misstated critical facts at his deposition. According to Rogers, for instance, Greer "linger[ed] on awhile at the hospital." (Cajina, Decl., Exhibit 13, Rogers Deposition, 50:14-51:14.) However, that's not what happened. Mr. Greer arrived without a pulse and was pronounced dead soon thereafter!

Additionally, Dr. Rogers' cause of death must further be discounted given that plaintiff's expert toxicologist disagrees that Mr. Greer was lethally intoxicated with PCP. According to Dr. Kent Olson, the head of Poison Control at San Francisco General Hospital, (i) Mr. Greer did not appear to be intoxicated based on his behavior, and the toxicology reading of his blood was likely elevated by up to a factor of 10 as a result of the asphyxia. (Cajina, Decl., Exhibit 11, Olson Report, 3:14-4:21.)

### E. All the officers – including TOUGAS – failed to render immediate medical aid to Greer

As the officers rolled Greer over onto his back, Greer was clearly unconscious. (Cajina, Decl., Exhibit 3, **Combined Video**; 11:29:00-11:32:00.) Officer TOUGAS testified that after Greer was rolled over, he saw that "[h]is eyes were closed. And I just told whoever was there, 'Hey, he's unconscious.'" (Cajina Decl., Exhibit 2, Tougas Deposition, 84:5-8.) In fact, looking at a still image of Mr. Greer at 11:30 on the Combined Video, it's apparent that his lips are blue. Officer McAdams from Hayward confirms that. (Cajina, Decl., Exhibit 3, **Combined Video**; 11:30:00; Exhibit 7, Bryan Reuter Initial Expert Report; Cajina, Decl., Exhibit 5, McAdams Deposition, 43:15-21.)

However, when pressed on what he did after recognizing that Greer was unconscious,

8

MPA IN OPPOSITION TO DEFENDANT BAY AREA RAPID TRANSIT'S MOTION
FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

TOUGAS replied, "I believe I got up and walked away." (Cajina, Decl., Exhibit 2, Tougas Deposition, 91:24-92:2.) Amazingly, TOUGAS left the unconscious Greer even though the *previous* day he had received CPR training! (Cajina, Decl., Exhibit 2, Tougas Deposition, 27:19-28:2.) When plaintiff deposed BART's PMK and asked her if BART had "ever trained an officer who has concluded that the subject is unconscious to turn and walk away," she ultimately answered – after several speaking objections and a break from the deposition – "No." (Cajina, Decl., Exhibit 6, Tougas Deposition, 30:24-32:5.) Further, BART's PMK testified that officers are trained to assess an unconscious person immediately, to provide CPR if medical responders aren't there, and that "seconds counts." (Cajina, Decl., Exhibit 6, Tougas Deposition, 26:22-28:3.)

Defendants argue that TOUGAS did nothing wrong here because medical was already on scene. (Cajina, Decl., Exhibit 6, Tougas Deposition, 32:5-7.) However, that argument is belied by the Combined Video. From 11:30 to 13:20 – for nearly two minutes – no paramedics or EMTs were near Greer. (Cajina, Decl., Exhibit 3, **Combined Video**; 11:30:00-13:20:16.) To the contrary, during that period, the officers continued to apply restraints to Greer, (*id*.) which ultimately delayed the treatment he received. (See, e.g., Cajina, Decl., Exhibit 14, Brassfield Deposition, 40:7-42:1.) As explained by Eric Brassfield, EMT, the physical restraints impeded the paramedics' ability to provide care. (*Id*.) Ultimately, the officers had to remove the WRAP device so that CPR could be initiated. (See, e.g., Cajina, Decl., Exhibit 14, Brassfield Deposition, 26:24-27:12.) By then, nearly seven (7) minutes had gone by from the time Mr. Greer was first flipped over at 11:30 to when he received the first chest compressions at 18:15 on the Combined Video. (Cajina, Decl., Exhibit 3, **Combined Video**; 11:30:00-18:15:31.)

As explained by plaintiff's experts, the officers' failure to render medical care, as well as their actions that delayed the rendering of such care, was yet another cause of Mr. Greer's death. (Cajina, Decl., Exhibits 10 and 12, the Initial Expert Reports of Dr. Carter Clements and Joseph Cohen.) Again, in terms of police training, plaintiff's police expert further explained that

9

police officers violate standards of practice when they fail to "recognize and properly react to signs of Mr. Greer's labored breathing as he lay prone on the ground." (Cajina, Decl., Exhibit 9, Initial Report of Barry Brodd, p. 3.)

It should be noted that while Mr. Greer was dying, officer TOUGAS for the most part casually talking with his colleagues. The officers can be heard joking – at Greer's expense – while Mr. Greer slowly fades away. (Cajina, Decl., Exhibit 3, **Combined Video**; 13:26:00-13:34:95.)

### III. STANDARD OF REVIEW ON SUMMARY JUDGMENT

Summary judgment shall be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The plain language of the rule mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish an essential element of his case in chief. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The burden of demonstrating the absence of a genuine issue of material fact lies with the moving party. See Zoslaw v. MCA Distr. Corp., 693 F.2d 870, 883 (9th Cir. 1982), cert. denied, 460 U.S. 1085 (1983). For this purpose, the material lodged by the moving party must be viewed in the light most favorable to the nonmoving party. See Adickes v. S.H. Kress and Co., 398 U.S. 144, 157 (1970); Baker v. Centennial Ins. Co., 970 F.2d 660, 662 (9th Cir. 1992). A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. See S.E.C. v. Seabord Corp., 677 F.2d 1301, 1306 (9th Cir. 1982).

Once the moving party presents evidence that would call for judgment as a matter of law at trial if left uncontroverted, the respondent must show by specific facts the existence of a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In meeting this burden, the non-moving party must go "beyond the pleadings and by its own evidence present specific facts showing that there is a genuine issue for trial." Far Out Prods., Inc. v. Oskar, 247 F.3d 986, 997 (9th Cir. 2001) (citing Keenan v. Allan, 91 F.3d 1275, 1279

(9th Cir. 1996)) (quotations omitted). [T]here is no genuine issue of fact for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Id. at 249-50 (citations omitted). "

### A. TOUGAS and the other officers' use of force was unreasonable given that it resulted in compression asphyxia

Plaintiff first claims Fourth Amendment violations arising out of the officers repeated and consistent use of excessive force. For over a decade, the Ninth Circuit has held that fact patterns such as the one presented here – where officers use excessive force against a suspect in a prone position, resulting in asphyxia – (i) support a claim for excessive force per the Fourth Amendment, and (ii) **do not shield officers from liability under qualified immunity**. See Drummond Ex Rel. Drummond v. City of Anaheim, 343 F. 3d 1052, 1061-62 (9th Cir. 2003) (holding that "the officers had 'fair warning' that the force they used was constitutionally excessive… [where t]he officers allegedly crushed Drummond against the ground by pressing their weight on his neck and torso, and continuing to do so despite his repeated cries for air, and despite the fact that his hands were cuffed behind his back and he was offering no resistance.")

Here, the facts are very similar to *Drummond*. Mr. Greer was taken to the ground to be handcuffed. Once there, officers placed cuffs on him and continued to hold him down as they applied a WRAP device, which, according to plaintiff's police expert was wholly unnecessary. (Cajina, Decl., Exhibit 9, Initial Report of Barry Brodd, p. 4.) Before becoming unconscious, Greer can be heard pleading with the officers to get off him. He had also explained to them early on that he had problems with his abdomen, which the video clearly shows was large and protruding. In other words, officers should have known that it was unsafe to have Greer in a prone position for prolonged period of time.

Here, TOUGAS and the other officers even continued to hold Greer in a prone position after he had gone silent – after it should have been apparent that he was in distress.

11

Since *Drummond*, the Ninth Circuit has held that officers have fair warning that pressing someone on the ground, despite repeated cries for help, and where he is not combative, can sustain a claim of excessive force. The BART video show that this is exactly what happened in this case.

### B. <u>Plaintiff has a viable medical needs case</u>

In addition, plaintiff contends the officers neglected Greer's serious medical serious medical needs at all times after he was handcuffed. The Ninth Circuit has long held that an officer is "liable for neglecting a [suspect's] serious medical needs on the basis of either his action or his inaction," and that such an officer is further liable "when they deny, delay, or intentionally interfere with medical treatment" for a serious medical need. *Lolli v. County of Orange*, 351 F. 3d 410, 419 (9th Cir. 2003).

Here, TOUGAS and the rest of the officers scattered as soon as they saw that Greer was unconscious. Amazingly, even though there are well over 10 officers present, not one tried to administer CPR on Greer before paramedics arrived. Not even TOUGAS, who the day before had received CPR training!

To the contrary, the officers can be seen talking and socializing all the while Mr. Greer slowly dies. And to makes matter worse, the officers placed on Greer the WRAP device, which ultimately delayed EMTs from beginning CPR. TOUGAS and the other officer's actions (and inactions) constitute a denial of care and neglect. To anyone with the most minimal CPR training, Greer was in serious medical distress. Greer's lips were blue and he was just slumped over.

### C. <u>There is a loss of familial relations</u>

Defendant next contends that there was no loss of a familial relationship citing *Porter v. Osborne* 546 F.3d 1131 (9th Cir.) The Porter case confirms that the loss of a father (or son) is a constitutionally protected relationship. "The Ninth Circuit recognizes that a parent has a constitutionally protected liberty interest under the Fourteenth Amendment in the

12

companionship and society of his or her child ."); see also Moreland v. Las Vegas Metro. Police Dep't, 159 F.3d 365, 371 (9th Cir.1998). Id at 1131. To the extent the defendant suggests here that son does not have a right to recover for the loss of a father it is misleading.

Porter confirmed the notion that where the officer's conduct "shocks the conscience" they are liable for constitutional violations under the 14th Amendment. Here, as argued, there is ample evidence the conduct of Tougas "shocks the conscience".

The Porter Court discusses whether or not to meet this standard in a fast passed circumstance, the proof must be deliberate indifference or purpose to harm. The court generally concludes that in a fast paced event where there is no time for deliberation, purpose to injure must be found and deliberate indifference is not sufficient. Plaintiff responds in this way.

First, Porter and the standards discussed therein do not apply to plaintiff's claim that Tougas failed to render medical aid. Those cases, cited inter alia, set the standard for refusal or denial of medical aid and Porter is inapposite to that standard.

Further, as to the claims of excessive force, the instant case is not fast paced like Porter or the cases it relies on. Those cases generally involve high speed chases, moving vehicles or prison riots. In Porter, the victim was non-complaint, refused to follow orders, attempted to strike officers with a vehicle, was impervious to pepper spray, and sought to injure the officers and flee all in a matter of moments.

In our case, we have an obese, unarmed man who was compliant, non-violent and out a vehicle. He was just standing there. The only "rush" move he made was to take two slow awkward steps to the side when he was surrounded by 4 officers. He was not going anywhere. There is substantial evidence all the Hayward Officers were confident they could handcuff Mr. Greer while standing.

Unbeknowst to the Hayward officers, the BART officer, having deliberated, decided the fight was on and he would have to take down Mr. Greer, and he did so. Because Tougas had the opportunity to deliberate this is not the fast moving event like Porter and "deliberate

13

indifference" is the standard. Certainly, there is evidence of deliberate indifference. Assuming, arguendo, the court feels this is "fast paced" and the intent to injure standard applies, there is certainly sufficient evidence from which a jury could similarly conclude that Tougas' purpose was "to cause harm unrelated to the legitimate object of arrest." Lewis, 523 U.S. at 836, 118 S.Ct. 1708. When no other office present felt the need to escalate, Tougas did it. He alone took down Mr. Greer. Tougas determined that a fight was going to occur when Mr. Greer lifted up he pants to show the Lieutenant his injuries. There as no legitimate law enforcement purpose in making that decision at that time. There was no legitimate law enforcement reason to "take down" Mr. Greer when no one thought it necessary, and there was no legitimate law enforcement reason for putting Mr. Greer is a position where he sustained positional asypyxia.

The Porter case is simply inapposite to ours.

**D.    Lastly, TOUGAS was an integral participant**

BART and TOUGAS seek to separate their actions from those of the Hayward Officers. First, plaintiff submits the TOUGAS alone violated Greer's constitutional rights by taking him down and walking away after Greer was unconscious. In addition, TOUGAS is responsible for the acts of the Hayward officers. The Ninth Circuit has held that officers can be held liable under the Fourth Amendment for the conduct of other officers, where they are an "integral participant" in the conduct that caused the constitutional violation. *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir.2004). For such purposes, an officer can be an active participant even if he did not directly cause the constitutional violation. *Id*.

Here, TOUGAS did directly violate Mr. Greer's rights by, among other things, compressing his torso to the point he could no longer breath, despite Greer's repeated cries, and by failing to render any medical aid to a person he knew, or should've known, was in acute medical distress. In fact, even BART's PMK could not say that TOUGAS had acted appropriately on the night in question.

14

## IV. **CONCLUSION**

For the foregoing reasons, plaintiff respectfully requests that defendant's motion for summary judgment or partial summary judgment be denied in its entirety.

Respectfully,

Dated: December 13, 2016

LAW OFFICE OF FULVIO F. CAJINA


By: __/s/_____
Fulvio F. Cajina, Esq.
Attorneys for Plaintiff

15

MPA IN OPPOSITION TO DEFENDANT BAY AREA RAPID TRANSIT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT