# EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


JOSEPH JAMES GREER,

        Plaintiff,

vs.                                    No. 3:15-CV-02307-WHO

CITY OF HAYWARD, BAY AREA RAPID
TRANSIT DISTRICT, et al.,

        Defendants.

_____/




VIDEOTAPED DEPOSITION OF LIEUTENANT JEFF LUTZINGER




Taken before LORI A. YOCK, CSR, RPR

Certified Shorthand Reporter No. 5801

Registered Professional Reporter No. 18667

State of California

Monday, September 19, 2016

1                    I N D E X

2                                          PAGE

3    EXAMINATION BY MR. HALEY                 5

4    EXAMINATION BY MR. ROONEY              118

5    EXAMINATION BY MR. GOFF               121

6
                       E X H I B I T S
7

8    PLAINTIFF'S EXHIBITS:                    PAGE

9    1     Hayward Police Department
           Policy 309                         17
10
     2     Hayward Police Department
11         Policy 300                         28

12   3     Photograph of Joseph Greer        103

13

14            DEPOSITION OF LIEUTENANT JEFF LUTZINGER

15           BE IT REMEMBERED that pursuant to Notice of

16   Taking Deposition, videotaped, and on Monday,

17   September 19, 2016, commencing at the hour of

18   10:00 a.m., at the Haley Law Offices, 1633 San Pablo

19   Avenue, Oakland, California 94612-1505, before me,

20   LORI A. YOCK, CSR No. 5801, a Certified Shorthand

21   Reporter in and for the State of California, appeared

22               LIEUTENANT JEFF LUTZINGER,

23           produced as a witness in the above-entitled

24   action, who being by me first duly sworn, was thereupon

25   examined as a witness in said action.
                  EMERICK & FINCH (925) 831-9029

1          MATTHEW D. HALEY, ATTORNEY AT LAW, Haley Law

2     Offices, 1633 San Pablo Avenue, Oakland, California

3     94612-1505, (510) 444-1881, appeared as counsel on

4     behalf of Plaintiff.

5

6          STANLEY GOFF, ATTORNEY AT LAW, 15 Boardman

7     Place, Suite 2, San Francisco, California 94103,

8     (415) 571-9570, appeared as counsel on behalf of

9     Plaintiff.

10

11         JEFFREY M. VUCINICH, ATTORNEY AT LAW, Clapp,

12    Moroney, Vucinich, Beeman, Scheley, A.P.C., 505

13    Montgomery Street, 11th Floor, San Francisco, California

14    94111, (415) 874-3562, appeared as counsel on behalf of

15    Defendant City of Hayward and the Witness.

16

17         OWEN T. ROONEY, ATTORNEY AT LAW, Gilbert,

18    Kelly, Crowley & Jennett, LLP, 44 Montgomery Street,

19    Suite 2080, San Francisco, California 94104,

20    (415) 352-6421, appeared as counsel on behalf of

21    Defendants Bay Area Rapid Transit District and Jon

22    Tougas.

23

24    Also present:  Jefree Anderson - Videographer

25
                  EMERICK & FINCH (925) 831-9029

| | | |
|---|---|---|
| 1 | that there were things on the video that you didn't | 10:07:37 |
| 2 | witness yourself. | 10:07:40 |
| 3 | **A.** Correct. | 10:07:40 |
| 4 | **Q.** This is just a little bit different. Was there | 10:07:43 |
| 5 | anything on the video that you saw on the video that you | 10:07:46 |
| 6 | said to yourself, "I saw that same thing and it didn't | 10:07:49 |
| 7 | happen that way"? | 10:07:54 |
| 8 | **A.** I do not believe so. | 10:07:55 |
| 9 | **Q.** Okay. Other than counsel, have you spoken to | 10:07:56 |
| 10 | anyone about your deposition here today? | 10:08:04 |
| 11 | **A.** No. | 10:08:06 |
| 12 | **Q.** Is there any reason you would be unable to | 10:08:06 |
| 13 | testify truthfully and accurately today about the events | 10:08:09 |
| 14 | that happened back when they happened? | 10:08:12 |
| 15 | **A.** No. | 10:08:14 |
| 16 | **Q.** As you know, I am here to ask you a series of | 10:08:16 |
| 17 | questions about an event that happened on May 23rd, 2014, | 10:08:20 |
| 18 | involving a gentleman by the name of Mr. Greer. Generally | 10:08:25 |
| 19 | do you know what incident we are talking about? | 10:08:29 |
| 20 | **A.** I do. | 10:08:31 |
| 21 | **Q.** I want to ask you some questions about your | 10:08:33 |
| 22 | background. | 10:08:35 |
| 23 | **A.** Okay. | 10:08:36 |
| 24 | **Q.** When did you graduate high school? | 10:08:37 |
| 25 | **A.** 1985. | 10:08:39 |

| | | |
|---|---|---|
| 1 | to have another officer requested for -- you know, to | 10:50:43 |
| 2 | come assist. | 10:50:48 |
| 3 | Q. All right. In that timeframe, is it fair to say | 10:50:49 |
| 4 | that any DUI arrest, generally you don't have an officer | 10:50:55 |
| 5 | do it by himself? He always has someone come and assist | 10:51:00 |
| 6 | him? | 10:51:04 |
| 7 | A. That is the desired procedure, yes. | 10:51:05 |
| 8 | Q. All right. Do you remember how long you were out | 10:51:10 |
| 9 | on patrol before you noticed what came to be Mr. Greer's | 10:51:15 |
| 10 | truck? | 10:51:21 |
| 11 | A. Again, no, I do not. | 10:51:21 |
| 12 | Q. Do you remember what time it was that you first | 10:51:23 |
| 13 | had your attention drawn to Mr. Greer's truck? | 10:51:26 |
| 14 | A. Not exactly. I know it was in the | 10:51:28 |
| 15 | 10:00 o'clock hour. | 10:51:32 |
| 16 | Q. And what drew your attention to Mr. Greer's | 10:51:33 |
| 17 | truck? | 10:51:36 |
| 18 | A. I was traveling southbound on Mission Boulevard | 10:51:37 |
| 19 | and approaching the intersection of Mission and Berry | 10:51:40 |
| 20 | Avenue. | 10:51:45 |
| 21 | MR. ROONEY: Did you say Berry? | 10:51:46 |
| 22 | THE WITNESS: Berry. | 10:51:49 |
| 23 | MR. ROONEY: Thank you. | 10:51:52 |
| 24 | THE WITNESS: Berry, B-E-R-R-Y, Avenue. As I | 10:51:53 |
| 25 | approached that intersection, the signals for southbound | 10:51:56 |

| | | |
|---|---|---|
| 1 | traffic was red.  I saw the green arrow for southbound | 10:52:00 |
| 2 | traffic to turn left to go eastbound on Berry Avenue | 10:52:05 |
| 3 | turned green.  There was a truck, which turned out to be | 10:52:10 |
| 4 | Mr. Greer's truck, in the left turn pocket.  When the | 10:52:13 |
| 5 | light turned green -- a green arrow, he proceeded | 10:52:16 |
| 6 | straight and then had to make a right-hand lane change | 10:52:21 |
| 7 | to the right to continue southbound on Mission | 10:52:27 |
| 8 | Boulevard.  There was a vehicle traveling northbound | 10:52:31 |
| 9 | Mission Boulevard in the left turn pocket to go east -- | 10:52:35 |
| 10 | I'm sorry -- westbound on Berry Avenue.  So when the two | 10:52:40 |
| 11 | vehicles should have turned left, it wouldn't have been | 10:52:46 |
| 12 | any problem.  However, since Mr. Greer's truck continued | 10:52:48 |
| 13 | straight, that car had to, you know, stomp on his brakes | 10:52:51 |
| 14 | real quick.  I could tell that by the headlights dipping | 10:52:57 |
| 15 | and coming to a fairly abrupt stop.  And then | 10:53:01 |
| 16 | Mr. Greer's truck continued southbound in the No. 1 | 10:53:05 |
| 17 | lane. | 10:53:08 |
| 18 | BY MR. HALEY: | 10:53:08 |
| 19 | Q.  Okay.  And did you decide to follow the truck? | 10:53:08 |
| 20 | A.  Yes. | 10:53:11 |
| 21 | Q.  Did you activate your lights at that point? | 10:53:11 |
| 22 | A.  At that point, no. | 10:53:13 |
| 23 | Q.  Tell me what happened next. | 10:53:14 |
| 24 | A.  Then the truck continued southbound to the | 10:53:16 |
| 25 | intersection of Torrano Avenue -- that's T-O-R-R-A-N-O | 10:53:22 |

EMERICK & FINCH (925) 831-9029

| | | |
|---|---|---|
| 1 | -- again, he got into the left turn pocket to go | 10:53:31 |
| 2 | westbound on Torrano, but then -- and, again, this is an | 10:53:33 |
| 3 | uncontrolled intersection, but when he got up to the | 10:53:37 |
| 4 | intersection, instead of turning left, he again veered | 10:53:41 |
| 5 | to the right back into the No. 1 lane of southbound | 10:53:44 |
| 6 | Mission and continued straight. | 10:53:47 |
| 7 | I was just about catching up to him at this | 10:53:48 |
| 8 | time, because back at Berry where we had the light I was | 10:53:52 |
| 9 | a little distance behind. | 10:53:56 |
| 10 | The next intersection south of Torrano on | 10:53:59 |
| 11 | Mission is Devon, D-E-V-O-N. Traffic going southbound | 10:54:03 |
| 12 | on Mission cannot turn on Devon because of the center | 10:54:09 |
| 13 | median. So I'm using the intersection of Devon just as | 10:54:13 |
| 14 | a geographical point of reference. Right there he came | 10:54:17 |
| 15 | to a stop in the No. 1 lane and just stopped. | 10:54:20 |
| 16 | At this point, I pulled up behind him. I | 10:54:25 |
| 17 | radioed in my location, and, you know, I believe I even | 10:54:28 |
| 18 | said at that point I suspected that it might be an | 10:54:33 |
| 19 | intoxicated driver. | 10:54:36 |
| 20 | I sat there for a second just to see what was | 10:54:38 |
| 21 | going on. No movement. So at that point I did activate | 10:54:42 |
| 22 | my lights, opened the door, started to get out. I | 10:54:49 |
| 23 | paused a second at the door. Again, from experience, I | 10:54:52 |
| 24 | know frequently people will drive away at that point, as | 10:54:57 |
| 25 | this truck did. So as I'm standing at my door, the | 10:55:00 |

| | | |
|---|---|---|
| 1 | truck drives away.  I get back in and continue following | 10:55:04 |
| 2 | it southbound on Mission Boulevard. | 10:55:09 |
| 3 | **Q.**  All right.  How fast was he going southbound on | 10:55:10 |
| 4 | Mission Boulevard after he had driven away? | 10:55:14 |
| 5 | **A.**  Not fast.  It did not appear that he was | 10:55:17 |
| 6 | attempting to flee, if that's kind of what your thought | 10:55:21 |
| 7 | was.  He was just casually driving away, which furthered | 10:55:26 |
| 8 | in my mind that he may be intoxicated.  It's not an | 10:55:32 |
| 9 | uncommon thing. | 10:55:36 |
| 10 | **Q.**  All right.  And then what happened? | 10:55:38 |
| 11 | **A.**  Then we got to the intersection of Mission | 10:55:40 |
| 12 | Boulevard and Harder Road, continued straight through | 10:55:43 |
| 13 | that intersection.  At the southwest corner of Mission | 10:55:47 |
| 14 | and Harder is a retail parking lot, which is the Kmart | 10:55:56 |
| 15 | store. | 10:56:01 |
| 16 | So as we went southbound, the first driveway | 10:56:02 |
| 17 | goes into a small little retail section.  I think it has | 10:56:06 |
| 18 | a car stereo.  He bypassed that driveway, pulled into | 10:56:09 |
| 19 | the second driveway which goes into the Kmart parking | 10:56:13 |
| 20 | lot, which is quite large.  He pulled in there, turned | 10:56:17 |
| 21 | in the very first lane where parking stalls are.  The | 10:56:23 |
| 22 | parking lot was empty, but he just stopped in the lane. | 10:56:28 |
| 23 | He didn't park in a parking stall or anything.  He just | 10:56:32 |
| 24 | stopped. | 10:56:39 |
| 25 | **Q.**  From the time you activated your lights, I assume | 10:56:39 |

1   you kept them on the whole time until he stopped?          10:56:42

2       A.   I did.                                            10:56:45

3       Q.   Did you use any other device to get his attention  10:56:46

4   other than just the lights?                               10:56:51

5       A.   I would have used my siren also.                 10:56:52

6       Q.   Do you remember when in the series of events you  10:56:55

7   used your siren?  And what I have in mind is can you tell  10:56:59

8   me, did you use it as soon as he turned into the parking  10:57:03

9   lot?  Did you use it as soon as he left?  Do you remember?  10:57:07

10      A.   As soon as I got back into the car and drove     10:57:10

11  after him, I would have turned it on.  I turned it on.    10:57:13

12      Q.   And he did pull over and stop in this parking lot  10:57:24

13  lane; is that true?                                       10:57:29

14      A.   Yes.                                             10:57:30

15      Q.   In the parking lot there?                        10:57:31

16      A.   Yes.                                             10:57:33

17      Q.   And at that point, you were suspicious that he   10:57:40

18  might be driving under the influence?                     10:57:43

19      A.   I was.                                           10:57:44

20      Q.   Were you suspicious that he committed any other  10:57:45

21  kind of a crime at that point?                            10:57:48

22      A.   No.  I was thinking more of an intoxicated       10:57:50

23  subject.                                                  10:57:53

24      Q.   Okay.  All right.  And then did you -- where did  10:57:54

25  you park your patrol vehicle in relation to the truck?    10:58:00
                EMERICK & FINCH (925) 831-9029

| | | |
|---|---|---|
| 1 | **A.** I was back probably 30 feet or so and offset | 10:58:04 |
| 2 | slightly to the left. | 10:58:12 |
| 3 | **Q.** Okay. And then did you leave your patrol car? | 10:58:15 |
| 4 | **A.** Yes. I got out of it. Initially I did not | 10:58:18 |
| 5 | leave it. | 10:58:24 |
| 6 | **Q.** In going back to the time when you first noticed | 10:58:25 |
| 7 | the truck until the time he came to a stop, you indicated | 10:58:29 |
| 8 | that you had radioed one time? | 10:58:34 |
| 9 | **A.** I indicated one time. I did not follow up. | 10:58:38 |
| 10 | You know, as he drove away, I updated that he was | 10:58:44 |
| 11 | driving away. As we got to Harder Road, I updated | 10:58:47 |
| 12 | location. As he pulled into Kmart, I updated that we | 10:58:52 |
| 13 | pulled over in the Kmart. | 10:58:56 |
| 14 | **Q.** In any of those radio transmissions, did you ask | 10:58:58 |
| 15 | for any kind of assistance? We have them. I just don't | 10:59:01 |
| 16 | want to pull them out, but if you remember -- | 10:59:07 |
| 17 | **A.** I expect that I did. I don't specifically | 10:59:10 |
| 18 | remember, but having done this job for so many years, I | 10:59:15 |
| 19 | would be completely shocked if I didn't. | 10:59:19 |
| 20 | **Q.** Because that's typically what you do -- | 10:59:21 |
| 21 | **A.** Yes. | 10:59:23 |
| 22 | **Q.** -- with a DUI arrest? | 10:59:23 |
| 23 | **A.** Or any vehicle that is driving away from you. | 10:59:25 |
| 24 | **Q.** And how do you do that? What words do you use | 10:59:29 |
| 25 | with the dispatcher to say, "I want some help"? | 10:59:34 |

| | | |
|---|---|---|
| 1 | **A.** You can use plain English. "Give me -- give me | 10:59:39 |
| 2 | another unit. We have a Code 8" is the code we use. | 10:59:46 |
| 3 | You can use either, like I said, plain English or | 10:59:53 |
| 4 | Code 8. | 10:59:58 |
| 5 | **Q.** And it's fair to say that while you don't | 11:00:01 |
| 6 | specifically remember doing it, you would be shocked if | 11:00:04 |
| 7 | you didn't seek a Code 8 or assistance from another unit? | 11:00:08 |
| 8 | **A.** Yes. | 11:00:11 |
| 9 | **Q.** All right. After your patrol car came to a stop, | 11:00:11 |
| 10 | what did you do? | 11:00:17 |
| 11 | **A.** Excuse me. Turned on the spotlights. I opened | 11:00:20 |
| 12 | my door, and I stood outside my door, and I called out | 11:00:24 |
| 13 | to the driver and told him to turn off the car, because | 11:00:30 |
| 14 | I didn't want him driving away again. So I told him, | 11:00:35 |
| 15 | "Turn off the car." | 11:00:39 |
| 16 | **Q.** Okay. Did he turn off the car? | 11:00:41 |
| 17 | **A.** Not immediately. He was, you know, verbally | 11:00:43 |
| 18 | challenging -- not in an aggressive way, but in a | 11:00:47 |
| 19 | questioning why. "Why are you stopping me? What are | 11:00:52 |
| 20 | you picking on me for? What do you need? What do you | 11:00:55 |
| 21 | want?" | 11:00:58 |
| 22 | **Q.** Okay. And so you are about 30 feet behind his | 11:00:58 |
| 23 | car with your patrol door open? | 11:01:04 |
| 24 | **A.** Uh-huh. | 11:01:06 |
| 25 | MR. ROONEY: Objection; misstates testimony. | 11:01:06 |

EMERICK & FINCH (925) 831-9029

1    BY MR. HALEY:                                          11:01:09

2        Q.  If I do that, you yell at me -- misstate your    11:01:09

3    testimony.  You can tell me, "I didn't say that."       11:01:13

4            MR. VUCINICH:  Well, 30 feet back and offset.    11:01:15

5            MR. ROONEY:  He said "behind."                   11:01:19

6            MR. HALEY:  He is right.                         11:01:27

7            You are 30 feet back but offset to the truck;    11:01:28

8    right?                                                   11:01:31

9        A.  Yes -- approximately 30 feet.                    11:01:31

10       Q.  Approximately.  You have got the spotlights on?  11:01:33

11       A.  Yes.                                             11:01:36

12       Q.  And can you see inside through the cab of the    11:01:36

13   truck?                                                   11:01:40

14       A.  Partially.                                       11:01:41

15       Q.  And did -- you can see him in the truck?         11:01:41

16       A.  I can see, you know, the silhouette of a         11:01:47

17   person.  I could not tell if there was a passenger or    11:01:53

18   not.                                                     11:01:55

19       Q.  Could you see a passenger?                       11:01:56

20       A.  I could not -- I could not tell if he was the    11:01:57

21   sole occupant or if anybody else was with him.          11:02:01

22       Q.  And you opened your door.                        11:02:06

23       A.  Yes.                                             11:02:09

24       Q.  And then you stood up behind the door --         11:02:09

25       A.  Yes.                                             11:02:12

1      Q.  -- for the reasons you indicated.  And then was        11:02:13

2   his window up or down?                                        11:02:16

3      A.  He opened the window -- or the window was open.        11:02:19

4   I don't know when he opened it or if he had been driving      11:02:25

5   with it open, but I was able to yell to him, and he was       11:02:28

6   able to yell right back to me.                                11:02:32

7      Q.  And do you remember whether or not you asked him       11:02:34

8   to open the window?                                           11:02:37

9      A.  I didn't.                                              11:02:38

10     Q.  Do you know whether or not he voluntarily opened       11:02:39

11  the window, recognizing there was a Hayward police officer    11:02:42

12  that had pulled him over?                                     11:02:45

13     A.  Again, I do not know when the window was               11:02:47

14  opened.                                                       11:02:49

15     Q.  Did he try to roll the window up at any point so       11:02:49

16  you couldn't talk with him?                                   11:02:53

17     A.  No.                                                    11:02:55

18     Q.  And then I want to know the words that you             11:02:55

19  remember saying to him from your position behind the door     11:02:57

20  and what he said back.                                        11:03:01

21     A.  I can't tell you verbatim what was said, but I         11:03:02

22  know I told him to turn off the truck.  He -- like I          11:03:06

23  said, he was questioning, "Why are you stopping me?           11:03:10

24  What do you want" -- things like that.  And I continued       11:03:12

25  to tell him, "Turn off the truck."  I believe one time        11:03:15

| | | |
|---|---|---|
| 1 | when he said, "why," I said, "I don't want you to drive | 11:03:18 |
| 2 | away again." And eventually he did turn off the truck. | 11:03:22 |
| 3 | **Q.** All right. Would it be fair to characterize that | 11:03:25 |
| 4 | as you asked him to turn off the truck, he several times | 11:03:28 |
| 5 | asked you, "why am I" -- "why are you asking me to do | 11:03:34 |
| 6 | this" kind of thing, and finally he turned the truck off? | 11:03:39 |
| 7 | **A.** Yes. | 11:03:42 |
| 8 | **Q.** Was he combative at all during that? | 11:03:43 |
| 9 | **A.** Combative, no. | 11:03:46 |
| 10 | **Q.** Okay. Then what did you do? | 11:03:47 |
| 11 | **A.** Then I had him -- I instructed him to drop the | 11:03:49 |
| 12 | keys outside. I wanted to make sure the keys weren't in | 11:03:54 |
| 13 | the ignition so he couldn't crank up and drive away as I | 11:03:57 |
| 14 | walked up. I told him to drop the keys outside. He was | 11:04:02 |
| 15 | again questioning, challenging verbally why. "Why are | 11:04:06 |
| 16 | you stopping me? Why are you bothering me? Why do I | 11:04:10 |
| 17 | need to do that? I don't want to throw my keys out." | 11:04:12 |
| 18 | So I told him put the keys on the roof, which | 11:04:16 |
| 19 | after a little back and forth he complied and put the | 11:04:19 |
| 20 | keys on the roof. | 11:04:23 |
| 21 | **Q.** And, again, this discussion happened with you | 11:04:24 |
| 22 | standing next to your patrol car? | 11:04:27 |
| 23 | **A.** Yes. | 11:04:27 |
| 24 | **Q.** Okay. How long was it from the time you | 11:04:30 |
| 25 | initially asked him to turn his truck off until he turned | 11:04:32 |

1    his truck off?                                          11:04:36

2        **A.**   Not excessively.  I would say maybe 10 seconds,   11:04:37

3    15 seconds, somewhere.                                  11:04:43

4        **Q.**   And then how long was it from the time you      11:04:44

5    initially said "drop your keys" until the time he put them   11:04:47

6    up on the roof of the truck?                            11:04:52

7        **A.**   Again, not real excessive.  Ten, 15 seconds.    11:04:53

8    It was just a couple of banters back and forth.  He     11:04:58

9    asked questions.  I told him why.                       11:05:00

10       **Q.**   But other than asking, "Why did you stop me; what   11:05:01

11   are you doing," did he say anything else?               11:05:04

12       **A.**   No.  You know, "why are you bothering me" type   11:05:06

13   things.                                                 11:05:09

14       **Q.**   Right.  Okay.                               11:05:09

15       **A.**   Did he say anything?  Not that I recall.    11:05:14

16       **Q.**   Okay.  What happened next?                  11:05:17

17       **A.**   Then I walked up to the driver door.  I made   11:05:18

18   contact with Mr. Greer.  I asked him for his driver's   11:05:24

19   license, which, you know, he eventually gave me.  You   11:05:28

20   know, he asked repeatedly, "Why are you stopping me?    11:05:32

21   Why are you bothering me?"  I explained that he had made   11:05:36

22   some driving maneuvers, that I had a concern about his   11:05:41

23   intoxication.  He was argumentative.  You know, "I'm not   11:05:45

24   drunk" type, you know, statements.  Again, I don't      11:05:51

25   remember verbatim what he said.  Asked him for his      11:05:55
              EMERICK & FINCH (925) 831-9029

1    driver's license.                                          11:05:59

2         At the time, I could see being up close to him,       11:06:01

3    you know, his face was flushed.  His eyes were, you        11:06:04

4    know, glassy.  He was just incoherent -- not incoherent    11:06:08

5    -- but having difficulty, you know, following train of     11:06:15

6    thought.  When he was looking for his driver's license     11:06:19

7    in his wallet, he was fumbling trying to get the           11:06:22

8    driver's license out of his wallet, all which furthered    11:06:26

9    my, you know, belief that he was under the influence of    11:06:30

10   something.  I'm not sure what yet.                         11:06:33

11        Q.  All right.  Did you -- I want to slow you down.   11:06:35

12        A.  All right.                                        11:06:40

13        Q.  You asked him to give you his driver's license?  11:06:41

14        A.  Yes.                                              11:06:44

15        Q.  Did he do that?                                   11:06:44

16        A.  Eventually, yes.                                  11:06:45

17        Q.  And after you asked him to give you his driver's  11:06:46

18   license, did he reach someplace and get his wallet?        11:06:52

19        A.  Yes.  I don't remember where, if it was in his    11:07:00

20   pocket or the center console.  I don't recall where it     11:07:03

21   came from.                                                 11:07:06

22        Q.  Was he able to grab the wallet from wherever it   11:07:06

23   was without any difficulty?                                11:07:11

24        A.  I don't recall.                                   11:07:13

25        Q.  And then his driver's license was in the wallet?  11:07:13
                 EMERICK & FINCH (925) 831-9029

```
 1   brief break?                                          11:08:14
 2          MR. HALEY:  Yes.  Okay.  Good.                 11:08:15
 3          All right.  And after he gave you the driver's 11:08:18
 4   license, what did you do?                             11:08:20
 5      A.  Based on his driving -- his driving away from  11:08:23
 6   me, his verbally challenging me when I told him to stop 11:08:28
 7   the car or turn off the car, and then with the keys,  11:08:32
 8   making contact with him up at the door, saw he was quite 11:08:35
 9   large, I knew I wanted to do further examination, but I 11:08:40
10   wanted to wait until another officer was there.  So I 11:08:43
11   told him -- you know, I had his driver's license.  I  11:08:47
12   instructed him to wait there and I would be back, and I 11:08:51
13   went back to my car and waited for another officer to 11:08:54
14   arrive.                                               11:08:58
15      Q.  All right.  And did he stay in his car while you 11:08:58
16   went back to your car?                                11:09:02
17      A.  He did.                                        11:09:03
18      Q.  What did you do when you got back to your car? 11:09:11
19      A.  Very soon after I got back to my car is when   11:09:16
20   the BART officer, Tougas, arrived.                    11:09:25
21      Q.  Had you known Officer Tougas from before?      11:09:29
22      A.  No.                                            11:09:34
23      Q.  Was he the first officer to arrive on the scene? 11:09:34
24      A.  Yes.                                           11:09:38
25      Q.  And if you know, how does that happen that a BART 11:09:39
```

```
 1   police officer responds to a Hayward Police Department's    11:09:43
 2   call?                                                        11:09:45
 3           MR. ROONEY:  Objection; calls for speculation       11:09:45
 4   and assumes facts not in evidence.                           11:09:48
 5   BY MR. HALEY:                                                 11:09:52
 6       Q.  If you know.                                         11:09:52
 7       A.  It would be my expectation he was not                11:09:53
 8   responding to my request for another unit.                   11:09:56
 9       Q.  He was perhaps just driving by and saw you?          11:09:59
10       A.  Correct.                                             11:10:02
11       Q.  All right.  So did he come up and talk -- were       11:10:03
12   you seated in your patrol car when he arrived?               11:10:06
13       A.  No.                                                  11:10:09
14       Q.  Standing outside?                                    11:10:09
15       A.  Yes.                                                 11:10:11
16       Q.  All right.  And did he come up to you?               11:10:11
17       A.  Yes.                                                 11:10:13
18       Q.  And what did he say?                                 11:10:14
19       A.  He asked if everything was okay, if I wanted         11:10:15
20   him to stand by.                                             11:10:18
21       Q.  And what did you say?                                11:10:20
22       A.  I said yes, the guy was a little, you know,          11:10:21
23   argumentative and a very large guy.  So, yes, if he          11:10:24
24   didn't mind standing by.                                     11:10:31
25       Q.  Had Mr. Greer been combative at any point before     11:10:34
```

| | | |
|---|---|---|
| 1 | the BART police officer arrived? | 11:10:38 |
| 2 | MR. VUCINICH: I'll object to the form of the | 11:10:40 |
| 3 | word "combative." It's vague, ambiguous. | 11:10:42 |
| 4 | THE WITNESS: Physically combative, no. | 11:10:47 |
| 5 | Argumentative, attitude-wise, um, uncooperative, you | 11:10:51 |
| 6 | know, partially. | 11:10:58 |
| 7 | BY MR. HALEY: | 11:10:58 |
| 8 | Q. Well, had he been uncooperative or not? | 11:11:03 |
| 9 | A. Well, very challenging. | 11:11:06 |
| 10 | Q. Did you consider him asking you why you were | 11:11:08 |
| 11 | pulling him over to be challenging? | 11:11:12 |
| 12 | A. The question of why I pulled him over, no, | 11:11:16 |
| 13 | that's a fair question. But the repeated questions of, | 11:11:19 |
| 14 | "What are you doing? Why are you bothering me? Why are | 11:11:23 |
| 15 | you bothering me" -- that goes towards the, okay, this | 11:11:26 |
| 16 | is a potential issue, you know, because if he is in the | 11:11:29 |
| 17 | mindset of I'm bothering him. If a normal driver who is | 11:11:32 |
| 18 | not intoxicated knew they just made a left -- went | 11:11:37 |
| 19 | straight on a left-turn lane on a left arrow, continued | 11:11:42 |
| 20 | down, went straight from a left-turn lane into the | 11:11:45 |
| 21 | straight lane, stopped in the middle of the traffic, a | 11:11:49 |
| 22 | police car got behind him, turned on the lights, and you | 11:11:52 |
| 23 | drove away -- a reasonable, non-intoxicated subject | 11:11:57 |
| 24 | would know exactly why they are being stopped and | 11:12:00 |
| 25 | wouldn't have the notion of the police are bothering me. | 11:12:03 |

| | | |
|---|---|---|
| 1 | A reasonable person would not. | 11:12:06 |
| 2 | Q. I'll just close this at this point. Was the fact | 11:12:09 |
| 3 | that he said to you why are you bothering -- why are you | 11:12:12 |
| 4 | bothering him -- something that made you think he may | 11:12:17 |
| 5 | become violent or combative? | 11:12:20 |
| 6 | A. The totality of everything is what made me | 11:12:23 |
| 7 | believe that. | 11:12:28 |
| 8 | Q. Including the fact that he asked you why were you | 11:12:28 |
| 9 | bothering him? | 11:12:33 |
| 10 | A. Including that. That was part of the totality, | 11:12:33 |
| 11 | yes. | 11:12:38 |
| 12 | Q. Okay. So you asked the BART police officer to | 11:12:44 |
| 13 | stay there with you; true? | 11:12:47 |
| 14 | A. Yes. | 11:12:49 |
| 15 | Q. All right. And what happened next? | 11:12:49 |
| 16 | A. I told Officer Tougas that I was waiting for a | 11:12:52 |
| 17 | Hayward officer to arrive also, and then very shortly | 11:12:57 |
| 18 | thereafter, Officers Clark and Lewandowski arrived. | 11:13:04 |
| 19 | Q. At any point before Officer Clark and Lewandowski | 11:13:15 |
| 20 | arrived, had you made any radio calls saying anything | 11:13:17 |
| 21 | like, "I'm concerned about this guy. He's big. He is" -- | 11:13:21 |
| 22 | I've forgotten what word we used -- "he is not being | 11:13:26 |
| 23 | cooperative." Had you said that to anybody to get Hayward | 11:13:30 |
| 24 | police officers there faster? | 11:13:37 |
| 25 | A. No, I don't believe so, because I knew they | 11:13:39 |

1  were coming.                                          11:13:40

2      Q.  Did you do anything that may have -- this is   11:13:41

3  probably an inappropriate question, but let me ask it  11:13:44

4  anyway.  Did you do anything that may have made Officer 11:13:48

5  Lewandowski think, "Oh, he needs help over there.  The  11:13:53

6  hair is up on the back of my neck.  I have got to get over 11:13:56

7  there"?                                                 11:14:01

8          MR. VUCINICH:  Objection; inappropriate       11:14:01

9  question.                                              11:14:03

10         THE WITNESS:  I can't state about Officer      11:14:03

11 Lewandowski's hairs.  I don't know what causes them to  11:14:07

12 raise.                                                 11:14:10

13 BY MR. HALEY:                                          11:14:18

14     Q.  All right.  I don't want to belabor the point, 11:14:19

15 but you certainly never made any radio calls that would 11:14:21

16 have made any of the Hayward police officers arriving   11:14:25

17 think you are in trouble or that this suspect might hurt 11:14:28

18 you?                                                   11:14:33

19         MR. ROONEY:  Objection; vague as to time.      11:14:33

20 BY MR. HALEY:                                          11:14:35

21     Q.  At any point before Officer Lewandowski and Clark 11:14:36

22 arrived.                                               11:14:39

23     A.  Yes.  I think the -- my stating on the radio   11:14:40

24 that I was stopping a suspected -- a driver I suspected 11:14:43

25 of driving under the influence, and then when I got back 11:14:48

Page 58

1    Is that what you used that night -- that term?          11:30:11

2        A.   I don't remember.  I conveyed that sentiment,   11:30:13

3    but I don't remember exactly what words I used.          11:30:15

4        Q.   You used those words or something like those    11:30:17

5    words?                                                   11:30:20

6        A.   Something like, yes.                            11:30:20

7        Q.   All right.  And did they say anything to you that  11:30:22

8    you remember?                                            11:30:28

9        A.   They would have acknowledged, but I don't       11:30:30

10   remember any specific questions or statements.           11:30:33

11       Q.   All right.  And then did you go back to the     11:30:35

12   truck?                                                   11:30:38

13       A.   Yes.                                            11:30:39

14       Q.   All right.  And when you went back to the truck,  11:30:39

15   it would be you, Officer Clark, Officer Lewandowski, and  11:30:41

16   Officer Tougas?                                          11:30:47

17       A.   Yes.                                            11:30:48

18       Q.   All right.  And what happened when you went back  11:30:49

19   to the truck?                                            11:30:52

20       A.   I went to the driver's door.  I know Officer    11:30:53

21   Clark was within a few feet of me.  At that time, I do   11:30:59

22   not recall where Officer Lewandowski was or Officer      11:31:03

23   Tougas, but I do remember Officer Clark being right in   11:31:09

24   my immediate presence.                                   11:31:13

25       Q.   Okay.                                           11:31:15
                 EMERICK & FINCH (925) 831-9029

1     **A.**   And then so I got to the car and I asked          11:31:17

2   Mr. Greer to step out of the car.                            11:31:21

3     **Q.**   Okay.  And what did he do?                        11:31:26

4     **A.**   He stepped out.  You know, during the whole       11:31:29

5   contact, he was asking me why -- you know, repeatedly        11:31:33

6   asking, "Why?  What's going on?  What are you doing?"        11:31:37

7   But he did -- he complied.  He got out of the car.           11:31:39

8     **Q.**   Do you recall if you opened the car door for him  11:31:42

9   or did he open it himself?                                   11:31:45

10    **A.**   I do not.                                         11:31:47

11    **Q.**   All right.  Did he say anything different from    11:31:50

12  what he had been saying to you during all the earlier        11:31:56

13  contacts -- "why are you bothering me; why are you           11:32:00

14  stopping me" -- anything different in that?                  11:32:02

15    **A.**   Not that I recall.  I don't remember the          11:32:04

16  verbatim conversation.                                       11:32:07

17    **Q.**   All right.  And then so he got out of the truck?  11:32:09

18    **A.**   Yes.                                              11:32:12

19    **Q.**   And then where did he go?                         11:32:13

20    **A.**   I had him stand right next to the truck, right    11:32:14

21  at the end of the cab, beginning of the bed.                 11:32:17

22    **Q.**   Okay.                                             11:32:20

23    **A.**   And I explained to him, you know, that I wanted   11:32:20

24  to evaluate his intoxication.  I asked him if he had any     11:32:23

25  weapons, told him I wanted to pat search him.  I told        11:32:30
                  EMERICK & FINCH (925) 831-9029

1                    CERTIFICATE OF REPORTER

2

3          I, LORI A. YOCK, CSR No. 5801, a Certified

4     Shorthand Reporter in and for the State of California,

5     do hereby certify:

6               That prior to being examined, the witness named

7     in the foregoing deposition was by me duly sworn to

8     testify to the truth, the whole truth, and nothing but

9     the truth.

10              That said deposition was taken before me at the

11    time and place set forth and was taken down by me in

12    shorthand and thereafter reduced to computerized

13    transcription under my direction and supervision, and I

14    hereby certify the foregoing deposition is a full, true

15    and correct transcript of my shorthand notes so taken.

16              And I further certify that I am neither counsel

17    for nor related to any party to said action nor in any

18    way interested in the outcome thereof.

19              IN WITNESS WHEREOF, I have hereunto subscribed

20    my name this 2nd day of October, 2016.

21

22

23                    _____
                              LORI A. YOCK
24                            CSR No. 5801

25
                      EMERICK & FINCH (925) 831-9029

Emerick and Finch, Certified Shorthand Reporters
                Lieutenant Jeff Lutzinger