1

2

3

4                             UNITED STATES DISTRICT COURT

5                           NORTHERN DISTRICT OF CALIFORNIA

6

7    JOSEPH JAMES GREER,                          Case No.  3:15-cv-02307-WHO

                    Plaintiff,
8
                                                  **ORDER GRANTING DEFENDANTS'**
9          v.                                     **MOTION FOR SUMMARY JUDGMENT**

10   CITY OF HAYWARD,                             Re: Dkt. No. 59

                    Defendant.
11

12

13                                   **INTRODUCTION**

14          This is a tragic case.  James Greer was pulled over by a Hayward police officer on the

15   evening of May 23, 2014 for suspicion of driving under the influence.  He was dead an hour later,

16   after a scuffle with several Hayward Police Department ("HPD") officers, and one officer,

17   Sergeant Jon Tougas, from the Bay Area Rapid Transit District ("BART").  Tougas recorded the

18   encounter on his BART-issued body camera ("bodycam").  Greer's son, the plaintiff, brought this

19   action against the City of Hayward, BART, Tougas, and each of the involved HPD officers

20   alleging 42 U.S.C § 1983 claims for violation of the Fourth and Fourteenth amendments to the

21   Constitution of the United States and for wrongful death under state law.[1]

22          Before the court is BART and Tougas's motion for summary judgment.[2]  Tougas's video

23   raises genuine disputes of material fact regarding his conduct and whether he violated clearly

24   established law.  He is not entitled to qualified immunity or summary judgment on the excessive

25   force-related claims.  But he was not deliberately indifferent under the law to Greer's medical

26

27   [1] Given the similarities of their names, the decedent (James Greer) is referred to as "Greer" in this
     Order and his son (Joseph James Greer) as "plaintiff."

28   [2] The claims against the City of Hayward and its officers are now resolved.

needs and the defendants are entitled to summary judgment on that claim.  Since plaintiff offers no evidence of a pattern or practice by BART, the *Monell* claim fails as well.

## BACKGROUND

### I.  FACTUAL BACKGROUND

The BART bodycam video lasts approximately 16 minutes.  Cajina Decl. Ex. 3[3] and Ex. 2 (Tougas Dep.) at 6:25–7:24.  Given that the bodycam footage documented the entire interaction, many of the facts are undisputed.

### A.  The Traffic Stop

On May 23, 2014 at approximately 10:43 p.m., HPD officer Lieutenant Lutzinger attempted to initiate a traffic stop after twice observing Greer proceed straight from a left turn lane.  Rooney Decl. Ex. A, Lutzinger Dep. 38:14–40:6 (Dkt. No. 59-2).  Greer initially came to a stop in the lane furthest to the left, but when Lutzinger began to exit his patrol car, Greer drove away.  *Id*. at 40:15–41:1.  He was not driving fast but "casually driving away."  *Id*. at 41:5–7.  Lutzinger followed Greer who eventually came to a stop in a K-Mart parking lot.  *Id*. at 41:16–24.  Lutzinger radioed for backup, exited his vehicle and directed Greer to turn the engine off and drop the keys from the window or place them on the roof of the vehicle.  *Id*. at 44:1–15, 47:11–17.  Greer did not immediately comply, but rather began questioning, "Why are you stopping me?  What are you picking on me for?  What do you need?  What do you want?"  *Id*. at 44:17–21, 47:11–17.  After about 10–15 seconds, Greer complied and put the keys on the roof.  *Id*. at 47:18–20, 48:4–9.

Based on Greer's driving maneuvers and repeated questioning, Lutzinger suspected Greer

---

[3] The DVD containing the Tougas bodycam footage also contains footage from two other BART officers who arrived to the scene after the encounter concluded, as well as audio recordings of the dispatch tapes.  Opp'n at 3.  BART and Tougas argue that plaintiff's exhibit 3 submitting the body camera video as evidence contains inadmissible hearsay and unauthenticated videos.  Reply at 4.  Defendants object to plaintiff's submission of the following: (1) video entitled "J_Mateu_58035_Cover_Unit_1.mp4;" (2) the "Cover.MP4" video; and (3) the "combined video" synchronizing the three videos.  *Id*.  Because the compiled videos are not authenticated, defendants' objections are SUSTAINED.  I will only consider the video footage from Tougas's body camera, but because plaintiff cites to the combined video footage throughout his opposition, those citations will be included.

of driving under the influence.  Lutzinger Dep. 48:17–24.  He observed Greer "fumbling"[4] to retrieve his driver's license, his face was flushed, his eyes were glassy, and he was "not incoherent – but having difficulty ... following train of thought."  *Id.* at 49:2–49:10.  Lutzinger planned to conduct a field sobriety test, but wanted to wait for another officer to arrive.  *Id.* at 51:5–14.  He instructed Greer to "wait there and [he] would be back," and he waited in his patrol car for another officer to arrive.  *Id.*

BART officer Sergeant Jon Tougas was traveling back to his police office in Hayward when he passed the K-Mart parking lot and saw the lone HPD officer and Greer's truck stopped. Rooney Decl. Ex. B, Tougas Dep. 32:9–14 (Dkt. No. 59-2).  Tougas pulled into the parking lot and asked Lutzinger if he needed assistance, to which Lutzinger responded affirmatively. Lutzinger Dep. 51:25–52:24; Tougas Dep. 32:9–14, 37:19–38:15.  Tougas told Lutzinger that if he remained on scene, he would have to turn his camera on.  Tougas Dep. 38:5.  Lutzinger responded, "Go ahead," Tougas Dep. 38:6, and informed Tougas that Greer was "argumentative and a very large guy," Lutzinger Dep. 52:22–23, but noted that he had not been physically combative.  *Id.* at 51:3–53:6.  Soon after, two HPD officers, Clark and Lewandowski, arrived on the scene.  *Id.* at 54:16–18; Lewandowski Dep. 26:13–27:22.

**B.  The Field Sobriety Tests**

Lutzinger led the officers back to Greer's truck and asked Greer to step out of the car. Lutzinger Dep. at 58:14–59:2.  Greer complied but repeatedly questioned "Why?  What's going on?  What are you doing?"  *Id.* at 59:4–7.  Lutzinger explained that he wanted to evaluate Greer's intoxication and asked if he had any weapons on him.  *Id.* at 59:23–25.  Officers Lutzinger and Clark conducted a pat down and recovered a pocket knife.  *Id.* at 62:2–15.  Lutzinger then administered a horizontal gaze Nystagmus test, found that Greer had trouble following the instructions, and concluded that additional field sobriety tests were necessary.  *Id.* at 64:18–65:22, 66:2–67:8.  He directed Greer to move to more level ground on the passenger's side of the vehicle so that he could conduct balance tests.  *Id.* at 71:17–20.  Greer obeyed Lutzinger's orders,

---

[4] Plaintiff disputes whether Greer fumbled for his license.  Opp'n at 4.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Lewandowski Dep. 42:6–22, and answered affirmatively when Lutzinger asked if he had any

2    problems with his legs.  Cajina Decl. Ex. 7 (Transcript of bodycam footage)(Dkt. No. 62-1) at

3    3:4–26.

4         Once on the passenger's side of the truck, Lutzinger began to administer the balancing test.

5    Lewandowski Dep. 49:15–25.  Greer continually asked questions such as "What's going on? Why

6    are you bothering me?" and "Why messing with me?"  Lutzinger Dep. 68:9–13; Tougas Dep. 42:

7    21–25; *see, e.g.*, Ex. 7 at 4:14, 22, 27–28.  Perceiving that Greer was in an "agitated state,"

8    Lewandowski withdrew his Taser.  Lewandowski Dep. 49:21–50:1.  Tougas testified that at some

9    point Greer "pulled up his shorts and started to look around," and determined that "those [were]

10   preassaultive behaviors."  Tougas Dep. 53:3–6.  Plaintiff contends that his father was merely

11   identifying a shin injury for the officers.  Opp'n at 5 (citing Combined Video and Lewandowski

12   Dep. 42:6–22).  Greer also informed the officers that he had medical problems with his abdomen

13   region.  *Id*. at 6 (citing Combined Video).

14        During the balance test, Greer was unable to follow basic commands and his agitation

15   increased.  Lutzinger Dep. 71:23–73:8, 75:23–76:19.  He eventually stopped the test and "started

16   to walk away." *Id*. at 77:2–3; Tougas Dep. 50:20–53:6.  Plaintiff contends that his father "simply

17   took several steps to his side," Compl. ¶ 12, because an officer began to walk towards him.  Opp'n

18   at 5. The officers told Greer to stop and put his hands behind his back.  Tougas Dep. 58:2–3.

19   Lutzinger grabbed his right arm and attempted to use a "twist lock control hold" for compliance.

20   *Id*. at 80:11–18.   As the officers struggled to control Greer's hands, Lewandowski holstered his

21   Taser because "[h]e wasn't active – he wasn't fighting or throwing any punches," Lewandowski

22   Dep. 67:24–25, and he "went in to assist the officers in trying to control [Greer's] hands."  *Id*. at

23   68:3–7.  Lutzinger did not intend to take Greer to the ground.  Lutzinger Dep. 82:18–25.  The

24   other officers grabbed ahold of Greer as they continued to move towards the rear of the truck.  *Id*.

25   at 80:20–81:8.

26        **C.  The Struggle**

27        Tougas grabbed the back of Greer's t-shirt and "[t]he struggle was on."  Tougas Dep.

28   56:23–25.  Tougas tried to use a takedown procedure because he wanted Greer on the ground.  *Id*.

4

at 57:14–61:8, 16.  Eventually, they all ended up on the ground, *id.* at 66:21, although none of the officers reported using a takedown maneuver.  Lutzinger Dep. 83:14–22; Lewandowski Dep. 68:20–21, 69:18–23, 71:7–9; Tougas Dep. 57:14–58:3, 60:11–61:16, 63:16–21.  Greer initially fell on his back or right side, but the officers were eventually able to roll him onto his stomach. Lutzinger Dep. 85:18–86:2; Tougas Dep. 68:9–16; Lewandowski Dep. 73:19–25.  Greer was "a significantly obese man, with a protruding hernia that [was] clearly visible... ."  Opp'n at 6.

Greer refused to allow the officers to handcuff him.  The officers repeatedly told Greer to calm down, stop resisting and put his hands behind his back, as they struggled to gain control of Greer's hands which were underneath his body.  Lutzinger Dep. 85:18–20; Tougas Dep. 58:23–59:4.  Over the next seven minutes, approximately four or five officers attempted to control Greer by various means, including  tasing him, applying pressure with their hands and a baton, and stepping on his head.  Opp'n at 6 (citing Combined Video).  The officers claim that Greer exhibited "super human strength."  Lutzinger Dep. 89:12; Tougas Dep. 72:22–73:1; Lewandowski Dep. 78:15–19; Tong Dep. 61:13–14.  At some point during the struggleTougas struck his head on the back of Greer's truck.  Tougas Dep. 73:18–74:8.  Somehow Tougas was able to pull Greer's right arm from underneath him.  *Id.* at 73:16–17.

After several minutes, Lutzinger warned Greer that he would be tased if he did not stop resisting.  Lutzinger Dep. 89:22–90:3.  He then twice discharged his Taser in dart mode, to no effect.  *Id.*  During the struggle, HPD Officer McAdams and Reserve Officer Covarrubias arrived on-scene and attempted to control Greer's legs.  Ex. D, McAdams Dep. 22:2–8, 25:8–19, 37:17–22.  At some point, Lewandowski placed his knee on Greer's back near his left shoulder blade to try to prevent him from getting up or rolling over.  Lewandowski Dep. 75:8–76:10.  Greer was able to continue lifting up with Lewandowski's knee on him.  *Id.* at 78:15–23.  While in this position, Lewandowski discharged his Taser in drive mode.  *Id.* at 100:19–101:14.  This did not have any effect either.  *Id.*  He also used his baton to try to pry Greer's arm from under his torso. *Id.* at 83:5–8.  HPD officer Tong also applied two different types of nerve stimulation pain techniques to Greer's jawline.  Rooney Decl. Ex. E, Tong Dep. 12:6–8, 38: 14–39:7, 40:5–41:1. One of the techniques involved using a collapsible baton in the closed position.  *Id.* at 43:4–44:11,

46:15–47:1.

Lutzinger was eventually able to secure a handcuff onto Greer's left wrist. Lutzinger Dep. 89:5–6. Another officer secured a handcuff around Greer's right wrist, and after a struggle lasting approximately five to seven minutes; the officers were eventually able to link the handcuffs together. Tougas was involved in the struggle, but it is unclear whether he assisted in handcuffing Greer. Lutzinger Dep. 119:12 – 21; Tougas Dep. 75:16–25. The video shows the struggle from Tougas's perspective. According to plaintiff, "Tougas continuously applied pressure to Greer's torso from 7:55-10:36 on the Combined Video." Opp'n at 6. During this time, "Greer repeatedly begs the officers to 'Get off [him].'" *Id*. at 7. His "breathing becomes rapid as he is struggling to get air into his lungs." *Id.* Plaintiff contends that Greer "appears to lose consciousness" around the 10:30 mark, and "[y]et officers continue to hold him down in a prone position – continue putting pressure on him – for another minute." *Id*. (citing Combined Video).

After Greer was handcuffed, several HPD officers placed Greer into a WRAP, a three-part device designed to control combative and resistive subjects. Mot. at 8; Lutzinger Depo. 98:4– 102:8; Ex. F, Cosgriff Depo. 22:17–23:24; Ex. G, Krimm Depo. 78. The device consists of an ankle strap, a leg restraint, and a chest harness, with a tether connecting the chest harness to the leg restraint. *Id*.

Plaintiff does not dispute that Tougas did not use a baton or Taser, or punch or kick Greer during the struggle. Lutzinger Dep. 118:20–119:11, 120:3–121; Lewandowski Dep. 108:9–109:6; Tong Dep. 80:16–81:7; Zwickey Decl. 19; Tougas Decl. ¶¶ 5–7 (Dkt. No. 59-3).

**D. Medical Response**

When the officers rolled Greer over, his eyes were closed. Tougas Dep. 84:7; Lutzinger Dep. 113:2–3. Tougas stated aloud, "He's unconscious." *Id.* at 84:8. One of the officers checked for a pulse, but it is unclear whether he found one. Lewandowski Dep. 96:18–97:5; Tougas Dep. 87:3–22. Plaintiff contends that Greer's lips were blue when he was rolled over, as evidenced in the Combined Video. Opp'n at 8 (citing Combined Video, Reuter Expert Report, MacAdams Dep. 43:15–21). It is unclear if Greer was unconscious when the officers first began applying the WRAP device. Tougas Dep. 84:7–24. According to Lewandowski, "[h]is head was lulled to the

United States District Court
Northern District of California

1   side." Lewandowski Dep. 96:10.   The Hayward Fire Department and paramedics ("emergency

2   medical services" or "EMS") were already on scene, but staging a safe distance away until the

3   scene was cleared.  Lutzinger Dep. 113:6–8; Tougas Dep. 91:25; Lewandowski Dep. 97:5; Ex. J,

4   Brassfield Dep. 15:13–16:4.  Approximately a minute or two passed between the time EMS staged

5   and the time the paramedics were dispatched to render aid.  Brassfield Dep. 17:25–18:3.

6   According to the paramedic's patient care report, Greer suffered cardiac arrest after EMS arrival.

7   *Id*. at 40:3–13.  Within 30 – 60 seconds of EMS's arrival, the WRAP was removed.  Cajina Decl.

8   Ex. 14, Brassfield Dep. 26:21–27:4.  The paramedics began administering CPR at approximately

9   11:04 p.m.  Brassfield Dep. 48:6–16.  They transported Greer from the scene at 11:16 p.m. and

10  arrived at the hospital at 11:27 p.m.  Greer was pronounced dead at 11:49 p.m.

### E.  Third Party Witnesses

On the night of the incident, Pastor Todd Hendricks was on a ride-along with Officer

Clark. Ex. H, Hendricks Dep. 9:3–11.  He observed the encounter from approximately 30 yards

and witnessed Greer resisting the officers' attempts to control him.  *Id*. at  31:13–32:2, 37:19–25,

36:19–37:18, 26:9–13, 53:1–8, 32:3–4.  He did not see the officers punch, kick, or use a baton on

Greer.  *Id*. at 37:4–7.  A second eyewitness, Cuitahus Frias, also observed Greer resisting and

denied seeing the officers kicking, punching, or standing on Greer.  Ex. I, Frias Dep. 29:24–30:11,

31:21–32:3.

### F.  BART Training and Policies

BART Police Department requires a minimum of 40 hours of training every year,

compared to the 24 hours every two years required by the Peace Officers Standard and Training

(POST).  Mot. at 9; *see also* Haight Decl. ¶ 9 (Dkt. No. 59-5).

### G.  Forensic Investigations

The Alameda County medical examiner considered his autopsy dissection, the Toxicology

Report, and the coroner's investigation report and determined Greer's cause of death to be acute

phencyclidine (PCP) intoxication associated with physical exertion.  Ex. K, Rogers Depo. 41:16–

43:20.  The manner of death is listed as "accident."  Greer's PCP level was 0.596 milligrams per

liter (mgL).  Ex. L, Posey Depo. 26:12–14.  The fatal range for PCP is 0.3 to 25 mgL.  *Id*. at

7

30:16–21.  He was 46 years old, 5'11" tall and weighed 380 pounds.

### H.  Plaintiff's Experts[5]

In opposition to summary judgment, plaintiff submitted numerous expert reports.  The experts include Bryan Reuter, a digital forensic examiner who synchronized and analyzed the video footage, and created still images from the video, Cajina Decl. Exs. 7 and 8 (Dkt. Nos. 61-9 and 61-10; Barry Brodd, "Use of Force" police expert, Cajina Decl. Ex. 9 (Dkt. No. 61-11), Dr. Carter Clements, emergency medical expert, Cajina Decl. Ex. 10 (Dkt. No. 61-12), Dr. Kent Olson, medical toxicology expert, Cajina Decl. Ex. 11 (Dkt. No. 61-12), and Dr. Joseph Cohen, forensic pathologist, Cajina Decl. Ex. 12 (Dkt. No. 61-14).

#### 1.  Reuter Report

Reuter concludes, "the body mounted video recording depicts Sergeant Tougas pulling Mr. Greer to the ground, maintaining contact with Mr. Greer as a taser was being deployed, and continuously leaning on Mr. Greer from above while applying the pressure of his bodyweight onto Mr. Greer's torso from 00:07:53 until 00:11:21, a total of approximately 3 minutes, 28 seconds. After Mr. Greer was rolled onto his back, Sergeant Tougas declared him unconscious.  Sergeant Tougas then walked away from Mr. Greer."  Cajina Decl. Ex. 8 (Dkt. No. 61-10).

#### 2.  Brodd Report

Brodd reviewed police reports, the videos, depositions and other discovery, the policies and procedures of the police departments, the personnel records for the officers, the WRAP training manual, the POST use of force, and the relevant law.  Brodd Report at 2.  He concluded, in part:

> d.  Failure of Lt. Lutzinger and the officers engaged with Mr. Greer to realize that due to the amount of pressure applied to Mr. Greer's upper torso and Mr. Greer's physical statute it would have been extremely difficult for Mr. Greer to have placed his hands behind his back;
> e.  Attempting to control Mr. Greer by intentionally and forcefully stepping on Mr. Greer's head while Mr. Greer was in a prone position on the pavement and being held down by a minimum of five officers;

---

[5] Defendants agreed that expert reports would be admissible in connection with the motion for summary judgment.  Rooney Decl. ¶ 14.

United States District Court
Northern District of California

...

    g.  Applying prolonged and extreme pressure to Mr. Greer's torso while he lay in a prone position, which is a known and taught danger given that it can cause positional asphyxia – especially given Mr. Greer's body size, weight, level of exertion and apparent problems with his abdomen;

    h.  Failing to recognize and properly react to signs of Mr. Greer's labored breathing as he lay prone on the ground;

Brodd Report at 3–4.

### 3. Clements Report

Dr. Clements reviewed the videos, paramedic reports, fire department records, police reports, hospital records, autopsy report, deposition testimony, and American Heart Association Guidelines for CPR prior to forming his opinion. Clements Report at 2–3. Dr. Clements concluded, in part: Mr. Greer's conduct was inconsistent with the level of PCP found in his system; the cause of Mr. Greer's death was asphyxia; a major factor in his death was the amount of time he spent in the prone position with officers compressing his chest cavity and abdomen cavity; he was unconscious when he was rolled over; and, had he been given immediate medical attention he would have survived. *Id.* at 3–4. He further opines that the "efforts by Mr. Greer to move from the prone position he was being held in ... were at least in part due to his effort to breath because, in that position, Mr. Greer was unable to get air in and out of his lungs." *Id.* at 4.

### 4. Olson Report

Dr. Olson reviewed the same records as Dr. Clements, plus medical literature related to phencyclidine intoxication. Clements Report (Dkt. No. 61-13 at 4). He concluded that "[Greer] exhibited no signs of serious or life-threatening phencyclidine (PCP) intoxication during his initial interaction with police," and he "did not die as a direct result of phencyclidine intoxication, but as a consequence of his physical interaction with the police." *Id.* He states that "[d]eath from phencyclidine alone is very uncommon" and would be associated with other symptoms not observed in Mr. Greer. *Id.* He explains that the acidity of Mr. Greer's blood would have been elevated by increased carbon dioxide caused by his inability to breath. *Id.* at 4–5. He cites to medical literature to posit that the measured level of PCP is inconclusive because "[w]hen the blood is more acidic, PCP shifts from tissues into the blood." *Id.* at 5.

### 5. Cohen Report

Dr. Cohen reviewed all of the police reports, hospital records, photographs, Coroner's report, autopsy protocol, histological examination, toxicology report, video and audio files, deposition testimony, discovery documents, and the certificate of death. Cohen Report at 1 (Dkt. No. 61-14). He criticized the autopsy report, noting ""[m]arked suffusion of the head, neck and upper torso is readily apparent in photographs of Mr. Greer, though this is not mentioned in the autopsy report." *Id*. at 4. According to Dr. Cohen, "[t]his is indicative of antemortem compression of the torso with the development of relative hypoxia." *Id*. He states that "[p]hencyclidine intoxication provided a physiologic contribution to his death, in the face of the physical confrontation, through death would not have occurred at that particular time in the absence of a confrontation." *Id*. He concluded that the cause of death was "Cardiorespiratory arrest (minutes) due to Sustained Hypoxia (minutes) due to Prolonged Physical Confrontation and Restraint by Law Enforcement (minutes)." *Id*. And "[o]ther significant contributing factors" as "Hypertensive Cardiovascular Disease; Obesity; Phencyclidine Intoxication." *Id*. And finally, "[t]he manner of death is most appropriately classified as 'homicide (death in the hands of other(s)).'" *Id*.

## II. PROCEDURAL BACKGROUND

On March 23, 2015, plaintiff, heir of the decedent, commenced this action in the Superior Court of the State of California, Alameda County. Compl. ¶ 1. Defendant City of Hayward was served on April 22, 2015, and, with consent from defendant BART, removed the action to federal court on May 22, 2015. Notice of Removal (Dkt. No. 1). Plaintiff filed a first amended complaint on March 9, 2016 (Dkt. No. 35), and a second amended complaint ("SAC") on April 7, 2016 (Dkt. No. 38). Plaintiff brought causes of action against the City of Hayward, BART, and the individual officers for: (1) wrongful death, SAC ¶¶ 20–25; (2) a violation of his father's Fourth Amendment rights, *id*. at ¶¶ 26–31; and (3) a violation of his father's Fourteenth Amendment rights, *id*. at 32–37.

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial."  *Id.*  The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor.  *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the non-movant.  *Id.* at 255.  In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Id.*  However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

BART and Sergeant Tougas move for summary judgment on the grounds that there is no genuine issue of material fact as to the following issues: (1) Tougas's use of force was reasonable; (2) Tougas is entitled to qualified immunity; (3) there was no loss of familial relationship; (4) Tougas was not deliberately indifferent to Greer's medical condition; (5) Tougas was not an integral participant; (6) there is no proximate cause between Greer's death and Tougas's actions; (7) BART is immune under Government Code § 845.6; (8) there is no viable Monell claim against BART; and (9) Tougas had no reasonable opportunity to intercede.  BART's Mot. for Summ. J. (Dkt. No. 59).  Plaintiff relies heavily on Tougas's body camera footage to argue that Tougas took Greer to the ground, applied his body weight to Greer's back for several minutes, recognized that Greer was unconscious when the officers rolled him over, and failed to render medical aid.  Opp'n at 1–2 (Dkt. No. 62).

United States District Court
Northern District of California

## I.   PRELIMINARY ISSUES

### A.   Proximate Cause

Plaintiff warns that the Alameda County Medical Examiner's conclusion regarding Greer's cause of death "should be taken with a large grain of salt" because Dr. Rogers never watched the police body camera video and he misstated critical facts at his deposition.  Opp'n at 8.  According to plaintiff's pathology expert, Greer's death resulted from the "minutes of sustained relative hypoxia consequent to restraint maneuvers and compression [of Greer's] torso with inability to adequately exchange air."  Cohen Report at 4 (Dkt. No. 61-14).  Plaintiff also points to the nearly seven minutes that passed between when Greer was turned over and when the paramedics began administering CPR.  Opp'n at 9 (citing Clements Report and Cohen Report).  Additionally, plaintiff provides an expert toxicologist who reports that "it is likely that the measured postmortem blood level of 0.596 mg/L was artificially high (perhaps as much as 10-fold) compared to what it was when he was initially stopped by police, due to the effects of acute respiratory and metabolic acidosis on the measured blood level."  Olson Report (Dkt. No. 61-13).  Given plaintiff's evidence, a disputed issue exists as to the actual cause of Greer's death.

### B.   Integral Participant

BART argues that Tougas was not an integral participant in an alleged constitutional violation because there was no coordination between Tougas and the HPD officers, and therefore, Tougas "was not fundamentally involved in restraining Mr. Greer."  Mot. at 18–19.  Plaintiff counters that Tougas "directly violate[d] Mr. Greer's rights by, among other things, compressing his torso to the point he could no longer breath, despite Greer's repeated cries, and by failing to render any medical aid to a person he knew, or should've known, was in acute medical distress."  Opp'n at 14.

"An officer's liability under section 1983 is predicated on his 'integral participation' in the alleged violation."  *Brown v. City & Cty. of San Francisco*, No. C 11-02162 LB, 2014 WL 1364931, at *10 (N.D. Cal. Apr. 7, 2014)(quoting *Blankenhorn v. City of Orange,* 485 F.3d 463, 481 n.12 (9th Cir. 2007)).  "Integral participation does not require each officer's actions themselves rise to the level of a constitutional violation.  But it does require some fundamental involvement in

United States District Court
Northern District of California

1    the conduct that allegedly caused the violation." *Id.* (internal quotation marks and citations

2    omitted).

3          BART misunderstands the requirements of an integral participant.  In *Blankenhorn*, the

4    court concluded that the officers who tackled the plaintiff were integral participants.  485 F.3d at

5    481 n.12.  Here, Tougas may have been responsible for bringing Greer to the ground.  Opp'n at 6

6    (citing Combined Video); *see also* Cajina Decl. Ex. 8 (Reuter Supplemental Report) at 3.  Further,

7    he assisted the other officers in attempting to handcuff Greer by applying pressure to his body.

8    *See id.*  Unlike the officer in *Brown*, Tougas was involved in the duration of the struggle.  2014

9    WL 1364931, at *11.  There is at least a dispute of material fact whether Tougas was an integral

10   participant.

## II. SECTION 1983 CLAIMS

12         A cause of action for violation of the Constitution by a person acting under color of state

13   law is brought under 42 U.S.C. § 1983.  *Gomez v. Toledo*, 446 U.S. 635, 639 (1980).  To

14   successfully assert a section 1983 claim, plaintiff must demonstrate that the action (1) occurred

15   "under color of state law," and (2) resulted in the deprivation of a constitutional or federal

16   statutory right.  *Leer v. Murphy*, 844 F.2d 628, 632–33 (9th Cir. 1988) (citations omitted).  The

17   parties do not dispute that the defendants acted under color of state law, but argue whether Tougas

18   used excessive force or is otherwise entitled to qualified immunity.

### A.  Fourth Amendment – Excessive Force

20         Under the Fourth Amendment, the amount of force used by law enforcement officers must

21   be objectively reasonable when viewed in light of the totality of the circumstances.  *Tennessee v.*

22   *Garner*, 471 U.S. 1, 7–8 (1985).  Determining the objective reasonableness of a particular use of

23   force involves a three-step inquiry.  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  After first

24   assessing the type and amount of force inflicted, the court should determine the government's

25   interests at stake by looking to "(1) the severity of the crime at issue, (2) whether the suspect

26   posed an immediate threat to the safety of the officers or others, and (3) whether the suspect

27   actively resisted arrest or attempted to escape."  *Maxwell v. Cty. of San Diego*, 697 F.3d 941, 951

28   (9th Cir. 2012).  These factors are non-exhaustive.  *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The final step is to balance the degree of force used against the government interest at

2    stake to determine if the force used was "greater than is reasonable under the circumstance."

3    *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002).  "The reasonableness of a particular use of

4    force must be judged from the perspective of a reasonable officer on the scene, rather than with the

5    20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.  And this determination is "ordinarily a

6    question of fact for the jury."  *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997).

7    Accordingly, "summary judgment should be granted sparingly."  *Maxwell*, 697 F.3d at 951.

8    BART argues that Tougas's use of force was reasonable under the totality of the

9    circumstances because he was confronted by "an extremely large and combative individual …

10   with 'Hulk-like strength.'"  Mot. at 11.  Greer claims that the officers "were negligent and careless

11   in their actions ... by[] deliberately and intentionally Tasering decedent at least three times in rapid

12   succession; placing decedent in a WRAP and applying pressure to decedent's back even though he

13   was unconscious, resulting in asphyxia... ."  SAC at 5:26–6:3.  He argues that Tougas is the one

14   officer that decided to escalate the situation and deliberately brought Greer down to the ground.

15   Opp'n at 13–14.  He points to the video footage and Tougas's own deposition testimony to

16   highlight Tougas's "inappropriate state of mind."  *Id*. at 5.

17       **1.  *Graham* Analysis**

18           a.   Nature and Quality of Intrusion

19   The incident involved the actions of numerous officers, all of whom participated in some

20   way to the use of force against Greer.  It is undisputed that Tougas did not use his Taser, nor did

21   he kick, punch, or deploy his baton in an effort to control Greer.  But plaintiff claims—and the

22   video tends to corroborate his claims—that Tougas continuously applied pressure to Greer's torso

23   in an attempt to control him.  Because the present motion pertains only to Tougas, the analysis will

24   focus on his application of prolonged body-weight on Greer's torso while Greer was in a prone

25   position.  While it is true that "not every push or shove, even if it may seem unnecessary in the

26   peace of a judge's chambers is a violation of the Fourth Amendment, it is equally true that even

27   where some force is justified, the amount actually used may be excessive."  *Santos v. Gates*, 287

28   F.3d 846, 853 (9th Cir. 2002)(internal quotation marks and citation omitted).

14

United States District Court
Northern District of California

1    The video depicts Greer on the ground in a prone position for approximately seven minutes

2    while several officers, including Tougas, applied pressure to various parts of Greer's body in an

3    attempt to make him comply.  According to plaintiff, Tougas "continuously applied pressure to

4    Greer's torso from 7:55–10:36:01."  Opp'n at 6 (citing Combined Video); *see also* Reuter

5    Supplemental Report at 3.  BART highlights  that Greer never claimed he was unable to breathe.

6    Reply at 8.  But as plaintiff points out, Greer "repeatedly beg[ged] the officers to 'Get off [him]'."

7    *Id*. at 6–7.  He then yelled in desperation as his breathing became labored, and he eventually

8    "stop[ped] saying words, and start[ed] grunting."  *Id*.  This evidence at least creates a genuine

9    issue whether the officers knew that Greer was having trouble breathing.

10   Although no evidence regarding the officers' knowledge of the risks of compression

11   asphyxia was presented, the officers may have been on notice that Greer had issues with his

12   abdomen that would have been exacerbated by his position on the ground.  Opp'n at 6 (citing

13   Combined Video).[6]  As discussed above, there exists a genuine issue as to the cause of Greer's

14   death.  Even though the officers may not have intended to use deadly force, their actions may have

15   resulted in Greer's death and could be found substantially likely to cause serious harm or death.

16   *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010)(finding lethal force is that which

17   "creates a substantial risk of death or serious bodily injury.").  Viewing the evidence in the light

18   most favorable to Greer, "a reasonable jury could find that the officers' use of force was

19   excessive."  *Lolli v. Cty. of Orange*, 351 F.3d 410, 416 (9th Cir. 2003).

20   A recent case from the Eastern District of California (which the parties inexplicably failed

21   to cite) analyzed a similar factual scenario in which the detainee, who was clearly under the

22   influence, "was restrained and prone on the ground for approximately eight to ten minutes with

23   four officers applying body-weight pressure to his back."  *Garlick v. Cty. of Kern*, 167 F. Supp. 3d

24   1117, 1155 (2016).  The court noted that "[p]revailing precedent in the Ninth Circuit is that law

25   enforcement officers' use of body weight to restrain a 'prone and handcuffed individual [] in an

26

27   ───────────────────

     [6] It is unclear from the bodycam footage and transcript whether Greer actually indicated a problem
28   with his abdomen, but at one point he appears to gesture towards his abdomen region.  *See*
     Combined Video at 0:03:00.70.

agitated state' can cause suffocation 'under the weight of restraining officers,' therefore, such conduct may be considered deadly force." *Id.* (citing *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056–67 (9th Cir. 2003)). "Known as 'compression asphyxia,' prone and handcuffed individuals in an agitated state have suffocated under the weight of restraining officers." *Id.* (citation omitted).

In *Drummond*, two officers brought to the ground an unarmed man whom they knew suffered from mental illness. *Id.* at 1054. Although Drummond "offered no resistance," the officers continuously applied their weight to his neck and upper torso. *Id.* Drummond repeatedly told the officers he could not breathe; he soon fell into respiratory distress, and eventually lost consciousness. *Id.* at 1054–55. In analyzing the *Graham* factors, the court found that the officers applied severe force that resulted in compression asphyxia, *id.* at 1056, despite the minimal need for force because Drummond was not resisting and "*no* underlying crime was at issue." *Id.* at 1057 (emphasis in original)(internal quotation marks omitted).

While there are factual differences between *Garlick* and this case, on the one hand, and *Drummond* on the other, the *Garlick* court found that "*Drummond*[] makes plain that multiple officers' use of prolonged body-weight pressure to a suspect's back is known to be capable of causing serious injury or death." *Garlick*, 167 F. Supp. 3d at 1155 (citing *Drummond*, 343 F.3d at 1056). I agree with its analysis. Under *Drummond*, and viewing the facts in a light most favorable to plaintiff, the nature and quality of the force used here could constitute lethal force. *Id.*; *see also Bryan*, 630 F.3d at 825 (finding lethal force is that which "creates a substantial risk of death or serious bodily injury.")

      b.  Government Interest

         i.  Severity of crime

Greer was suspected only of a non-violent crime, driving under the influence. Viewing the evidence in the light most favorable to Greer suggests that he was pulled over for minor traffic violations and that Lutzinger was unable to conclusively determine whether he was driving under the influence. There is no evidence that Greer escalated the incident to a violent encounter.

         ii.  Immediate threat to officers

United States District Court
Northern District of California

"The most important factor under *Graham* is whether the suspect posed an immediate threat to the safety of the officers or others." *Bryan,* 630 F.3d at 826 . In finding this factor weighed against the reasonableness of the police officers' conduct in *Drummond*, the court noted the detainee's relatively slight weight at 160 pounds compared to one of the officer's 225 pounds. 343 F.3d at 1057. Here, Greer weighed 380 pounds and a number of the officers testified as to his size and strength. But the officers also testified that Greer was not combative, merely uncooperative. None of them explicitly testified that they feared for their own safety. And the video raises doubts as to whether the officers were confronted with an "imminent threat of violence." *Ryburn v. Huff*, 132 S. Ct. 987, 990 (2012).

Of course, "judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." *Id*. at 991–92. But none of the officers testified that Greer presented a threat to their safety—he was not armed and did not verbally threaten the officers. *Cf. George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)("If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat."); *Gregory v. Cty. of Maui*, 523 F.3d 1103, 1108–09 (9th Cir. 2008)("Moreover, the officers had reason to believe that Gregory posed a threat to them, because he refused their requests, acted in an aggressive manner, and had already assaulted Finazzo.") The *Garlick* court found that "[d]efendants' allegations about the officers' concerns about [detainee's] size, apparent intoxication (alcohol or illicit substances), and general actions or noncompliance, are insufficient factual bases for the Court to conclude that [detainee] was an actual immediate threat, post-handcuffing, where a reasonable jury could also conclude that such conduct poses no such threat." *Garlick*, 167 F. Supp. 3d at 1156. The same holds true here. Defendants have not presented sufficient evidence establishing the immediacy of the threat to the safety of the officers or others.

### iii. Resisting Arrest

The parties dispute whether Greer resisted arrest. While the officers insist Greer's resistance caused the struggle, plaintiff's expert contends that Greer could merely have been struggling for air while he was face down in a prone position with five officers on top of him. *See*

United States District Court
Northern District of California

1  Clements Report at 4.  The defendants point to the officers' testimony, corroborated by third-party

2  witnesses, and to the officers repeated commands for Greer to relax and put his hands behind his

3  back.

4        Once again, the similarities to *Garlick* are instructive.  *Garlick*, 167 F. Supp. 3d at 1156–

5  57 ("Plaintiffs further allege that the officers' weight on Silva's back restricted his breathing and

6  that Silva's movements trying to lift his chest and kicking his legs were not resistance but a sign of

7  his struggle to breathe.")  In finding a genuine issue of material fact  whether the detainee was

8  actively or passively resisting, the court noted that "[s]imilar cases turn on the fact-finder's

9  determination of where on the spectrum of resistance a misdemeanor suspect falls."  *Id*. at 1157

10  (collecting cases); *see also Tucker v. Las Vegas Metro. Police Dep't*, 470 F. App'x 627, 629 (9th

11  Cir. 2012)("Keith, unlike Drummond, continued to resist the officers after handcuffs were applied,

12  but this distinction does not, by itself, suffice to bring this case out of Drummond's orbit.")  I agree

13  with the reasoning in *Garlick*; this issue should be left to the jury.

14        c.  Balancing Level of Intrusion Against Government Interests

15        To support its argument that Tougas's actions were reasonable under the circumstances,

16  BART submitted a declaration from Jared Zwickey, an Associate Professor at the San Joaquin

17  Delta College District in the Administration of Justice Discipline with over 38 years of law

18  enforcement experience.  Zwickey Decl. ¶ 1, 8 (Dkt. No. 59-4).  He works closely with the

19  California Commission on Basic Police Officer Standards and Training (POST), and currently

20  serves as the use of force subject matter expert.  *Id*. ¶ 4.  After reviewing numerous materials,

21  including police reports, the BART police video, the autopsy and coroner's reports, and the

22  deposition testimonies, he concluded that Tougas used reasonable force in detaining Greer.  *Id*. ¶

23  13.  Plaintiff countered with the report of Barry Brodd, a retired officer and adjunct faculty

24  member with 29 years of law enforcement experience and 34 years of teaching experience, who

25  concluded that HPD and BART PD "violated their training and standards of practice for police

26  officers in California in their detention of James Greer… ."  Cajina Decl. Ex. 9, Initial Report of

27  Barry Brodd at 3 (Dkt. No. 61-11).

28        Although there was an actual crime at issue, since Lutzinger observed Greer commit traffic

violations and suspected him of driving under the influence, the severity of the crime was relatively minor and there is no evidence that the officers feared for their safety. Further, the purported "resistance" may have been passive, and not active. These factors suggest that the government interest was low. The requisite balancing to determine whether the officers' use of force was reasonable, when considering their attempts to secure a 380 pound man who was passively or actively resisting arrest, "requires a jury to sift through disputed factual contentions, and to draw inferences therefrom… ." *Id.* When balanced against the lethal level of force employed, a factfinder could find the level of force used objectively unreasonable under the circumstances. Tougas's actions, in conjunction with the conduct of the other officers, may rise to the level of an constitutional violation.

## B. Tougas is Not Entitled to Qualified Immunity

BART and Tougas argue that Tougas is entitled to the protection of qualified immunity because his actions were objectively reasonable under the circumstances. Mot. at 13. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)(internal quotation marks omitted). The Supreme Court has repeatedly—and recently—"reiterate[d] the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 580 U.S. __, No. 16-67, slip op. at 6 (Jan. 9, 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Rather, "clearly established law must be particularized to the facts of the case." *Id.* (internal quotation marks and citation omitted).

"Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted). In addition, the Supreme Court has "repeatedly [] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson*, 555 U.S. at 232. However, "[i]f a genuine issue of material

19

1    fact exists that prevents a determination of qualified immunity at summary judgment, the case

2    must proceed to trial." *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003).  Defendants bear

3    the burden to prove they are entitled to qualified immunity.  *Moreno v. Baca*, 431 F.3d 633, 638

4    (9th Cir. 2005).

5        The appropriate inquiry is "whether it was clearly established that the Fourth Amendment

6    prohibited the officer's conduct in the situation [he] confronted." *Mullenix v. Luna*, 136 S. Ct.

7    305, 309 (2015).  Greer cites to *Drummond* to support his position that "fact patterns such as the

8    one presented here – where officers use excessive force against a suspect in a prone position,

9    resulting in asphyxia ... do not shield officers from liability under qualified immunity." Opp'n at

10   11 (citing *Drummond*, 343 F.3d at 1061–62).  The *Garlick* court agreed. 167 F. Supp. 3d at 1158

11   ("*Drummond* is sufficiently similar to the specific context of this case that it clearly warned

12   officers that when a suspect is handcuffed and prone on the ground, further restraint measures, if

13   applied as alleged here, would be unconstitutional.").  Several unpublished Ninth Circuit decisions

14   also support plaintiff's position. *See, e.g.*, *Tucker v. Las Vegas Metro. Police Dep't*, 470 F. App'x

15   627, 629 (9th Cir. 2012)("Turning to the clearly established law inquiry, we conclude that existing

16   law recognized a Fourth Amendment violation where two officers use their body pressure to

17   restrain a delirious, prone, and handcuffed individual who poses no serious safety threat.");

18   *Abston v. City of Merced*, 506 F. App'x 650, 652-53 (9th Cir. 2013)(" A reasonable fact-finder

19   could conclude that defendants' use of body compression as a means of restraint was unreasonable

20   and unjustified by any threat of harm or escape when Abston was handcuffed and shackled, in a

21   prone position, and surrounded by numerous officers.").  Accordingly, *Drummond* created clearly

22   established law on a particularized level sufficient to give fair and clear warning to officers. *See*

23   *White*, *supra*.

24       BART and Tougas contend that officers are entitled to "breathing room regarding use of

25   force," that they "need not retreat or desist," and have a "right to self-defense." Mot. at 14.  That

26   may be, but clearly established law indicates that the officers' use of prolonged pressure while

27   Greer lay on the ground in a prone position was substantially likely to cause death or serious

28   injury, and such force may not have been reasonable under the circumstances.  A jury may agree

United States District Court
Northern District of California

20

United States District Court
Northern District of California

1  with Tougas's view of the evidence, but given the disputed facts and the clearly established law, I

2  cannot find that Tougas is entitled to qualified immunity as a matter of law.

3  **C. Fourth Amendment – Denial of Medical Care[7]**

4          Under the Fourth Amendment, officers must provide objectively reasonable post-arrest

5  medical care to a detainee. *Tatum v. City and Cty. of San Francisco*, 441 F.3d at 1090, 1099 (9th

6  Cir. 2006). "[A] police officer who promptly summons ... necessary medical assistance has acted

7  reasonably for purposes of the Fourth Amendment, even if the officer did not administer CPR."

8  *Id*. Here, the evidence indicates that EMS arrived on the scene as the officers continued to

9  struggle with Greer. Plaintiff claims that Tougas and the other officers knew that Greer was

10 unconscious and yet walked away and neglected to administer CPR. Opp'n at 8–9. BART points

11 to testimony from the officers and third-party witness Pastor Todd Hendricks to support its

12 position that paramedics administered CPR without delay and therefore, Tougas was not

13 deliberately indifferent to Greer's medical needs. Mot. at 15–18; Reply at 10–11.

14         The parties disagree over the relevance of *Lolli v County of Orange*, *supra*, to this case.

15 *See* Mot. at 16–17; Opp'n at 12. Lolli was a diabetic who allegedly told the officers of his medical

16 condition and need for medical assistance. 351 F.3d at 419. Some officers, despite having actual

17 knowledge of Lolli's deteriorating medical condition, failed to provide medical aid. *Id*. at 420

18 The Ninth Circuit found that issues of fact precluded summary judgment. *Id*.

19         BART argues that this case is not like *Lolli* because "Tougas did not have such direct

20 actual knowledge." Mot. at 17. Defendants further contend that the presence of paramedics "who

21 [were] more experienced in rendering medical care," *id*. at 18, precludes a finding of deliberate

22 indifference. Plaintiff responds that the defendants' "argument is belied by the Combined

23 Video[,]" where "for nearly two minutes – no paramedics or EMTs were near Greer." Opp'n at 9.

24 Further, "the physical restraints impeded the paramedics' ability to provide care," and "nearly

25 seven minutes had gone by from the time Mr. Greer was first flipped over ... to when he received

26

27  ————————————

    [7] BART's immunity under Government Code 845.6 pertains to claims by *prisoners*. Greer was
28  not a prisoner, and BART offers no authority that this immunity extends to others in police
    custody.

1   the first chest compressions... ." *Id.* (citing Brassfield Depo.).

2      This case is not like *Lolli*. The officers "promptly summoned medical care," and "acted

3   reasonably for purposes of the Fourth Amendment." *Acevedo v. City of Anaheim*, No. 8:14-CV-

4   01147-ODW(E), 2016 WL 79786, at *5 (C.D. Cal. Jan. 6, 2016).  Even accepting plaintiff's

5   allegations as true, Tougas is entitled to summary judgment on Greer's failure to render medical

6   aid claim.

7   ### D.  Fourteenth Amendment – Substantive Due Process Claim

8      Plaintiff brings a cause of action for loss of familial relationship.[8]  Compl. § 31–37.  The

9   Fourteenth Amendment's substantive due process clause protects against "government power

10  arbitrarily and oppressively exercised." *Cty. of Sacramento v. Lewis*, 523 U.S. 833 (1998).  "The

11  Supreme Court has made it clear ... that only official conduct that 'shocks the conscience' is

12  cognizable as a due process violation." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)

13  (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).  "The relevant question ... is

14  whether the shocks the conscience standard is met by showing ... *deliberate indifference* or

15  requires a more demanding showing [of] a *purpose to harm* [decedent] for reasons unrelated to

16  legitimate law enforcement objectives." *Id.*  Plaintiffs urge me to apply the deliberate indifference

17  standard, while defendants contend the proper standard is a purpose to harm.  Mot. at 14.

18     The *Porter* court reviewed precedent and found that the more deferential "purpose to

19  harm" standard should apply when officers are "reacting to the urgent public safety threat of

20  fleeing motorists in a situation where inaction could be the most dangerous." *Id.*  The court

21  concluded that the higher standard should apply even where the officers faced a "much less

22  obvious public safety threat" than in police chase cases "because the critical consideration is

23  whether the circumstances are such that actual deliberation is practical." *Id.* (internal quotation

24  marks and citation omitted).  Here, the confrontation between Greer and the officers was not

25  "rapidly escalating" in the same way as in *Porter*.  But when Tougas pulled Greer's shirt, he was

26  making a "snap judgment" in which actual deliberation may have been impractical. *See Lewis*,

27

28  [8] Defendants' argument that no familial relationship exists between plaintiff and his father is, charitably, unconvincing.

523 U.S. at 851.

Subsequent cases have characterized *Lewis*'s "purpose to harm" as "the standard of culpability as applicable to substantive due process claims arising from the unintentional killing of an individual by law enforcement officers." *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998). Accordingly, "intentionality is relevant" but not central. *Porter*, 546 F.3d at 1138. Here, the officers had time to deliberate while they lay on Greer's back as he struggled to breathe. This is a close question, but again, the *Garlick* reasoning is helpful: "a reasonable trier of fact could conclude from [defendants'] alleged conduct pressing body-weight on Silva's back for a prolonged period that these officers were deliberately indifferent to the risk posed by their conduct to Silva's unjustified deprivation of liberty." *Garlick*, 167 F. Supp. 3d at 1171. The court relied on *Drummond* to find that the officers' "inaction [of not removing the pressure from Silva's back] supports the inference that the officers were deliberately indifferent to the risk of serious injury or death posed by their conduct." *Id.* Here, there is evidence to support both standards, and the determination should be left to the jury. *C.E.W. v. City of Hayward*, No. 13-cv-04516-LB, 2015 WL 1926289, at *13 (N.D. Cal. Apr. 27, 2015).

## III. CLAIMS AGAINST BART

Local governments "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where … the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978). "There are three ways to show a policy or custom of a municipality: (1) by showing a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity; (2) by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (3) by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate." *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005)(internal quotation marks omitted). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices

of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

BART contends that "there is no evidence of a long-standing practice or custom which constitutes the standard operating procedure of the BART Police Department or any other decision-making official regarding use of excessive force or lack of medical care." Mot. at 22 (citing Haight Decl.). Plaintiff does not address his *Monell* claim in his opposition, and includes no allegations of a custom or practice in his complaint. Accordingly, BART is entitled to summary judgment.

## CONCLUSION

BART's motion for summary judgment is GRANTED. Tougas's motion is granted with respect to the denial of medical care and denied in all other respects.

**IT IS SO ORDERED**.

Dated: January 17, 2017



WILLIAM H. ORRICK
United States District Judge